UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>QR Properties, LLC<br><br>           Debtor | Chapter 11<br>Case No.   10-45514-MSH |

Submitted herewith for approval by this Court is the Disclosure Statement With Respect To The Plan Of Reorganization Of QR Properties, LLC.

Respectfully submitted this 3rd day of March, 2011.

QR PROPERTIES, LLC

By its attorneys,

/s/  Joseph G. Butler

Joseph G. Butler. (BBO# 544284)
BARRON & STADFELD, PC
Counsel to QR Properties, LLC
100 Cambridge Street
Suite 1310
Boston, MA  02114
(617) 723-9800
jgb@barronstad.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

---

In re:

QR Properties, LLC

                    Debtor

Chapter 11
Case No.   10-45514-MSH

---

**[PROPOSED]**
**DISCLOSURE STATEMENT WITH RESPECT TO**
**PLAN OF REORGANIZATION OF QR PROPERTIES, LLC**

**DATED MARCH 3, 2011**

## TABLE OF CONTENTS

**I.      INTRODUCTION** ……………………………………………………..1

   **A.**   Background of the Debtor and the Plan ………………………………...1
   **B.**   Brief Explanation of the Chapter 11 Plan Process………………………1
   **C.**   Purpose of the Disclosure Statement………………………………….2
   **D.**   Disclaimers………………………………………………………..3

**II.     THE CONFIRMATION HEARING**………………………………….4

**III.    SUMMARY OF THE PLAN** ………………………………………….4

**IV.    THE DEBTOR AND ITS CHAPTER 11 CASE** …………………………6

   **A.**   History of QR Properties, LLC………………………………………6
   **B.**   The Assets of the Debtor …………………………………………..8

**V.     POST-PETION EVENTS**………………………………………..8

**VI.    FUNDING OF THE PLAN**…………………………………..…..8

**VII.   CLAIMS AGAINST THE ESTATE**………………………………9

**VIII.  TREATMENT OF CLAIMS AND INTERESTS** ………………………10

   **A.**   Unclassified Claims………………………………………………11
   **B.**   Classified Claims…………………………………………………12

**IX.    TREATMENT OF EXECUTORY CONTRACTS**…………………..14

**X.     IMPLEMENTATION OF THE PLAN** …………………………………15

   **A.**   Sale of Real Property………………………………………………15
   **B.**   Disbursing Agent …………………………………………………..15
   **C.**   Unclaimed Property …………………………………………...17
   **D.**   Disputed Claims …………………………………………………18

**XI.    ALTERNATIVES TO THE PLAN**………………………………19

**XII.   BEST INTERESTS OF THE CREDITORS**………………………………20

**XIII.  FEASIBILITY OF THE PLAN**………………………………………..21

**XIV.   TAX CONSEQUENCES OF THE PLAN**………………………22

**XV.    STANDARDS FOR CONFIRMATION OF THE PLAN**………………………22

**XVI.   RETAINED JURISDICTION**………………………………22

**XVII.   EFFECT OF CONFIRMATION OF THE PLAN…………………………………22**

**XVIII. NON-SUBSTANTIVE MODIFICATIONS OF THE PLAN………………....…23**

**XIX.    CONCLUSION……………………………………………………………………..23**

## I.  INTRODUCTION

### A.        Brief Background of the Debtor and the Plan

This Disclosure Statement (the "Disclosure Statement") is submitted by QR Properties, LLC ("Debtor") with respect to the Plan dated February 28, 2011 (the "Plan").  This Disclosure Statement has been prepared for the purpose of providing general background about the Debtor and the Estate and information concerning the Plan.  All capitalized terms used in this Disclosure Statement shall have the same meanings as set forth in the Plan.  The Plan should be consulted for the details and precise terms of the Plan provisions described in this Disclosure Statement.

The Debtor has proposed the Plan in order to reorganize its financial affairs.  The Debtor is presenting the Plan to the Bankruptcy Court and to the creditors for their consideration and approval.

The Debtor believes that, through the Plan, the Reorganized Debtor can emerge from the Chapter 11 process for the benefit of all parties in interest and that the Plan offers the Debtor's creditors substantially more than its' creditors would receive if the Debtor's assets were liquidated in a chapter 7.  The Plan provides for payment in full of all Allowed Administrative Claims, Allowed Priority Claims, including Allowed Priority Tax Claims, payment of the Town of Acton Secured Claim, payment of the secured portion of the claim of Webster Bank and for a pro rata distribution to holders Allowed Unsecured Claims against the Debtor.

### B.        Brief Explanation of the Chapter 11 Plan Process

Chapter 11 of the Bankruptcy Code provides the rules and procedures under which financially-distressed entities may be reorganized pursuant to a plan of reorganization.  Any such plan must be presented to the Bankruptcy Court, and to the creditors and shareholders of the debtor company, for consideration and approval.  Creditors and shareholders may, in some instances, vote to accept or to reject a proposed plan.  Even after the creditors have considered the plan, the Bankruptcy Court must confirm the plan before it becomes operative.  Confirmation of the plan is the culmination of the reorganization process.

Section 1129 of the Bankruptcy Code sets forth certain specific requirements all of which must be met for a plan to be confirmed.  Among those requirements is a requirement, set forth in section 1129(a)(7) that, with respect to each impaired Class of Claims or Interests, each holder of a Claim or Interest either accept the plan or the plan must provide that the holder of any such impaired Claim or Interest will receive or retain property of a value, as of the effective date of the plan, that is not less than the amount that the holder of such impaired Claim or Interest would

receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  Section 1129(a)(10) provides that if a class of Claims is impaired under a plan, in order to confirm a plan at least one class of claims that is impaired under the plan has accepted the plan, with the acceptance of such a class determined without including any acceptance by an insider.  In order for a plan to be accepted by any Impaired Class of Claims, the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Allowed Claims in each Class who vote on the Plan must vote for acceptance.

A plan which has not been accepted by all impaired classes of creditors (but which has been accepted by at least one impaired class, disregarding acceptances by insiders) may still be confirmed under the Bankruptcy Code under certain conditions.  Specifically, a debtor has the option to seek confirmation of a Plan under Section 1129(b) of the Bankruptcy Code. Confirmation of the Plan under Section 1129(b) could occur notwithstanding rejection of the plan by one or more Impaired Classes of Claims or Interests if the Bankruptcy Court determines that the plan does not discriminate unfairly and is fair and equitable with respect to each non-accepting Class of Claims or Interests.

Section 1129(a)(8) provides that, in order to confirm a plan, the Bankruptcy Court must find that with respect to each class of claim or interests, the class has accepted the plan or the class is not impaired by the plan.  The Plan proposed by the Debtor includes impaired classes of Claims.

The holders of Allowed Interests in the Debtor will receive no distributions based upon the value of their equity interests in the Debtor and are therefore deemed to have rejected the Plan.

Terms and conditions of the Plan, the Bankruptcy Code and the Bankruptcy Rules will govern the rights of the Debtor, and all of the Debtor's creditors and interest holders, who will be bound by the Plan upon confirmation.

### C.   Purpose of the Disclosure Statement

The purpose of a Disclosure Statement is to provide the creditors and equity holders with sufficient information about the Debtor and the proposed Plan so as to permit them to make an informed judgment when voting on the Plan.  This Disclosure Statement, therefore, includes background information about the Debtor and identifies the Classes into which creditors have been placed by the Plan.  The Disclosure Statement describes the proposed treatment of each of those Classes if the Plan is confirmed.  In addition, the Disclosure Statement contains information concerning the future prospects for the Debtor in the event of Confirmation or, in the alternative,

the prospects if Confirmation is denied or the proposed Plan does not become effective.

This Disclosure Statement and the Exhibits described herein have been approved by Order of the Bankruptcy Court as containing, in accordance with the provisions of the Bankruptcy Code, adequate information of a kind and in sufficient detail that would enable a reasonable, hypothetical investor typical of a holder of Impaired Claims or Interests to make an informed judgment about the Plan. The Bankruptcy Court's approval of this Disclosure Statement, however, does not constitute a recommendation by the Bankruptcy Court to vote either for or against the Plan.

D.    **Disclaimers**

A DISCLOSURE STATEMENT IS INTENDED TO PROVIDE ADEQUATE INFORMATION TO ENABLE CREDITORS TO MAKE A REASONABLY INFORMED DECISION IN EXERCISING THEIR RIGHT, IF ANY, TO VOTE TO ACCEPT OR REJECT THE PLAN. THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION FOR THAT PURPOSE. NO REPRESENTATIONS CONCERNING THE DEBTOR, ITS PROPERTY, LIENS ON ITS PROPERTY, OR ITS ASSETS OR LIABILITIES, OR ANY ASPECT OF THE PLAN, HAVE BEEN AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT OF THE PLAN. PLEASE READ BOTH THIS DISCLOSURE STATEMENT AND THE PLAN WITH CARE. IF THERE ARE ANY INCONSISTENCIES BETWEEN THE STATEMENTS IN THIS DISCLOSURE STATEMENT AND THE PROVISIONS OF THE PLAN, THE PROVISIONS OF THE PLAN SHALL BE CONTROLLING.

FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS IS UNAUDITED. FURTHER, DUE TO THE DEBTOR'S FINANCIAL DIFFICULTIES, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT COULD BE INCOMPLETE OR INACCURATE. ACCORDINGLY, THE DEBTOR, ITS ATTORNEYS AND AGENTS, ARE NOT ABLE TO WARRANT THAT THE INFORMATION IN THIS DISCLOSURE STATEMENT IS FREE OF ALL INACCURACY. HOWEVER, GREAT EFFORT HAS BEEN MADE TO PRESENT FAIRLY AND ACCURATELY THE INFORMATION CONTAINED IN THIS

DISCLOSURE STATEMENT.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE
CONSTRUED AS LEGAL, BUSINESS, OR TAX ADVICE.  YOU SHOULD CONSULT
YOUR OWN LEGAL COUNSEL AND ACCOUNTANT AS TO THE LEGAL, TAX, AND
RELATED MATTERS CONCERNING YOUR CLAIM OR INTEREST.

II.        THE CONFIRMATION HEARING

The Bankruptcy Court has scheduled a hearing on _____, 2011 at ____:___ .m.
to consider Confirmation of the Plan.  You are welcome to attend the hearing on Confirmation of
the Plan, but you are not required to do so, unless you have timely filed an objection to the
confirmation of the Plan.  The confirmation hearing may be rescheduled or continued to a later
date by an announcement made at the hearing.  Anyone not present or represented at the hearing
may not receive notice of the rescheduled hearing date.  If the Plan is confirmed, you will be so
advised after the confirmation hearing.

III.       SUMMARY OF THE PLAN

The assets of the Debtor consist, primarily, of certain real property shown on a Plan of
Land entitled "The Residences at Quail Ridge" located at 354 B Great Road and Skyline Drive,
Acton, Massachusetts and the buildings and improvements thereon (the "Premises").  The
Premises contains approximately 156 acres and currently includes an eighteen hole golf course.

The Debtor and Pulte Homes of New England, LLC have entered into an agreement dated
February 28, 2011, (the "Agreement") (copy annexed hereto as Exhibit A).   The Agreement provides
that Pulte Homes of New England, LLC will purchase the Premises from the Debtor for the Base
Purchase Price, as defined in the Agreement, $7,350,000.00 and the Additional Purchase Price, as
defined in the Agreement.  The Agreement contemplates the conversion of the golf course from an
eighteen hole course to a nine hole course and the construction and ultimate sale by Pulte Homes of
New England, LLC of 174 housing units on the Premises.  The Additional Purchase Price is to be
generated by the sale of the housing units in accordance with a formula set forth in the Agreement.

The sale of the Premises to Pulte Homes of New England, LLC is to be free and clear of
all liens, claims, encumbrances and interests with said claims arising from any lien, claim,
encumbrance or interest in the Premises attaching to the proceeds of the sale to the same extent,

priority and validity that existed on the Petition Date.  The Base Purchase Price and the
Additional Purchase Price will be used to fund the Plan.

Pulte Homes of New England, LLC is a limited liability company organized in the State of
Michigan and  is part of the PulteGroup, Inc. (NYSE: PHM), which is based in Bloomfield Hills,
Michigan.  PulteGroup, Inc. is a premier home building company with operations in 67 markets,
29 states and the District of Columbia.  For the year ended December 31, 2010, the combined
total revenue of the PulteGroup, Inc. and its subsidiaries was approximately, $4,569,290,000.  As
of December 31, 2010 the consolidated assets of the PulteGroup, Inc. and its subsidiaries had a
value of approximately $7,699,376,000.

The Agreement and the Plan contemplate that the Debtor will open and operate the golf
course in 2011 and further that the Debtor will complete the process of obtaining and finalizing
certain permits required for the construction of the housing units.

The Town of Acton, Massachusetts has a statutory lien claim for unpaid real estate taxes.
The claim is a first priority lien on the Premises.  The Debtor scheduled the claims of the Town of
Acton as being in the amount of $114,344.45 as of the Petition Date of November 3, 2011, and
additional amounts have accrued since the Petition Date.

Webster Bank, as of the Petition Date, had a mortgage on the Premises, subject only to
the Secured Claim of the Town of Acton, which secured a claim based upon loans made by
Webster Bank to Quail Ridge Country Club, LLC on or about January 6, 2005, in the original
principal amount of Ten Million Five Hundred Thousand and 00/100 Dollars ($10,500,000.00).
The Debtor scheduled Webster Bank as having a claim in the amount of $7,550,000.  Webster
Bank, in a motion seeking relief from the automatic stay filed on November 22, 2010, stated that
the obligations owed to it secured by its mortgage on the Premises totaled $7,815,527.16 as of
November 4, 2010, including principal in the amount of $7,452,952.44.  No payments have been
made to Webster Bank on its secured claim since prior to the Petition Date.

The Plan provides for payment of the secured claim of Webster Bank by payment of the
balance of the Base Purchase Price, after payment of the Secured Claim of the Town of Acton, to
Webster Bank on account of its secured claim.  The Plan further provides that, the balance of any
amount of Webster Bank's claim, after payment of the balance of the Base Purchase Price, shall
be deemed under secured and to be a general unsecured claim and shall receive the same
treatment as all other Allowed general unsecured Claims.

The Debtor has scheduled the following claims as claims secured by mortgages on the
Premises junior to that of Webster Bank: Brie Consulting Corp. ($1,408,302.00), Craig Palmer

($64,036.00), Gloria W. Palmer, Trustee of the Palmer Family Trust ($3,900,000.00), John L. Spencer ($64,036.00), Lia Grasso ($812,754.00), Mario F. Rolla ($3,127,876.00), Peabody Family Investments, LLC ($1,114,000.00), Philip M. Miller, Jr. ($625,526.00) and William B. McPherson, III ($635,000.00) (collectively, the "Junior Lien Holders"). The Plan provides that the Claims of the Junior Lien Holders will all be deemed to be unsecured and that the Claims will be general unsecured Claims and shall receive the same treatment as all other Allowed general unsecured Claims.

The Plan provides the Reorganized Debtor will, among other things, receive the Base Purchase Price pursuant to the Agreement, pay the Allowed Secured Claims of the Town of Acton and Webster Bank from the Base Purchase Price and ultimately receive the Additional Purchase Price, and distribute the balance of the proceeds to the holders of Allowed general unsecured claims.

## IV.    THE DEBTOR AND ITS CHAPTER 11 CASE

### A.    History of QR Properties, LLC

Quail Ridge Country Club, LLC is a Massachusetts limited liability company formed on October 12, 2000. Quail Ridge Country Club, LLC borrowed funds from, among others, Webster Bank, to acquire the Premises and develop it into an eighteen hole golf course. The golf course was officially opened on April 15, 2006. Due, at least in part, to slow membership sales, it became apparent over time that Quail Ridge Country Club, LLC could not generate sufficient revenue from the operation of the golf course to service its debt and maintain its operations.

QR Properties, LLC is a Massachusetts limited liability company which was formed on October 16, 2008. By a deed dated February 23, 2009, Quail Ridge Country Club, LLC conveyed the Premises to the Debtor. The conveyance was subject to the secured claims of Webster Bank and the Junior Lien Holders.

The Debtor leased the golf course and related facilities to QR Members, LLC, an organization comprised of certain of the members of the Quail Ridge Country Club. QR Members, LLC operated the golf course during 2009 and 2010.

The Debtor, using infusions of cash from its members, paid debt service to Webster Bank and the real estate taxes during 2009 and part of 2010 and, in addition, took the necessary steps to seek and obtain a permit from the Town of Acton to build 174 housing units on the Premises, conditioned upon some additional engineering specifications to be made to existing plans prior to the Town signing

and recording the plans.  The Debtor estimates that the cost of making the changes to the plans,
including some required onsite survey work, will be approximately $55,000.  The Debtor also sought,
and continues to pursue a permit to build a sewage treatment plan, which is necessary to construct the
174 units on the property.  The work to obtain the permit is approximately 90% complete, the
application for a permit has been reviewed and final comments have been made by the United States
Department of Environmental Protection and the final revisions, based upon those comments, are
being made to the plan and will be submitted.  The Debtor estimates that the cost of completing that
work will be approximately $25,000.   The Debtor has the ability to raise the funds necessary from its
existing investors and has the expertise and the historical knowledge necessary to complete the
permitting process.   The Debtor will also need to raise additional funds to fund the opening and, in
part, the operation of the golf course in 2011.

Starting prior to the Petition Date and continuing thereafter, the Debtor's efforts have also
been concentrated on finding either a buyer for the Premises or additional investors to assist the
Debtor in developing the Premises.  The Debtor has, through its manager and others, contacted
numerous parties who have expressed interest in acquiring the Premises or investing additional sums to
develop the Premises.   The Debtor had received at least two other offers to acquire the Premises,
including one offer from a national building company, but neither offer was as favorable to the Debtor
and the estate as the offer ultimately received from Pulte Homes of New England, LLC.

Webster Bank commenced proceedings to foreclose its mortgage on the Premises and
scheduled a public auction sale for November 4, 2010.  On November 3, 2010, the Debtor filed a
voluntary petition seeking relief under chapter 11.

**B.**     **The Assets of the Debtor**

The schedules filed by the Debtor on November 19, 2010, state that the Debtor is the fee
owner of the Premises and state that the value of the Premises, as of the Petition Date, was
estimated by the Debtor to be $6,000,000.00.  The estimated value was not based upon an
appraisal but constituted the Debtor's best estimate, based on information available to it
concerning recent sales of golf courses, of the value of the Premises in its condition as of the
Petition Date, i.e. as an 18 hole golf course.  In addition to the Premises, the other assets of the
Debtor, as set forth in the schedules, included contingent permits to construct housing, with an
unknown value, a permit to operate the golf course, also with an unknown value, and furniture
fixtures and equipment with an estimated value of $35,000.00.

Based upon its efforts to sell the Premises and the Agreement, the Debtor believes that the

current value of the Premises is not more than the $7,350,000 Base Purchase Price in the Agreement.

## V.      POST-PETITION EVENTS

Following the filing of its petition on November 3, 2010, the Debtor sought and obtained the Bankruptcy Court's authorization to hire counsel and, on November 19, 2010, filed its schedules and statement of financial affairs.  On November 22, 2010, Webster Bank filed a motion seeking relief from the automatic stay of 11 U.S.C. §362.  The Debtor opposed the motion and, following a hearing on December 16, 2010, the motion for relief was denied.

The majority of the Debtor's efforts following the entry of the order for relief have been focused on finding a buyer for the Premises.  The Debtor has spoken to numerous potential purchasers.  The Debtor's efforts resulted in the Agreement with Pulte Homes of New England, LLC.

## VI.      FUNDING OF THE PLAN

Funding for the Plan is to come primarily from the Base Purchase Price for the sale of the Premises pursuant to the Agreement, the Additional Purchase Price, any cash held by the estate, including any contributions to be made by current members of the Debtor, as well as the proceeds of any Rights of Action.  On the Effective Date of the Plan, Debtor shall be authorized to sell the Premises to Pulte Homes of New England, LLC in consideration of the Base Purchase Price and the Additional Purchase Price pursuant to the terms of the Agreement.   The sale will be approved pursuant to 11 U.S.C. §§ 363(b) and (f) and the Premises will be sold to Pulte Homes of New England, LLC free and clear of any and all liens, claims, encumbrances and interests of any kind or nature, with all such liens, claims, encumbrances and interests, to the extent that they are valid, attaching to the proceeds of the sale in the same order and to the same extent as such liens, claims, encumbrances and interests attached to the Premises being sold prior to the filing of the petition which commenced this case.  The Base Purchase Price shall be used to pay the Town of Acton Secured Claim and, thereafter, the balance shall be used to pay the Webster Bank Secured Claim.  The Additional Purchase Price shall be used to make subsequent pro rata distributions to the holders of Allowed Claims in Class 4 (General Unsecured Claims).  It is not contemplated that the holders of Interests in the Debtor will receive any distribution on account of those Interests.

## VII.    CLAIMS AGAINST THE ESTATE

The treatment of the various Classes of Allowed Claims is described below.  Only the holders of Allowed Claims are entitled to receive distributions under the Plan.  Until a Claim becomes an Allowed Claim, distributions will not be made to the holder of such Claim.  Only those creditors who have filed a proof of claim or are listed in the Debtors' schedules as liquidated, non-contingent and undisputed will be considered for distribution.  If you have not filed a proof of claim or interest by the deadline established by the Court and you are not listed in the Debtors' schedules as holding an undisputed, non-contingent and liquidated claim or interest, you will not receive any distribution under the Plan.  Further, if you have not filed a proof of claim by that deadline, the amount listed in the Debtors' schedules will be the amount of your Claim regardless of whether it is the full amount you believe you are owed.

Once a Claim has been asserted, it will be an Allowed Claim unless an objection to the Claim is timely filed by an interested party.  Pursuant to the Plan, the thirtieth (30th) day after the Effective Date of the Plan, or such other date as may be fixed or extended by the Bankruptcy Court or by agreement between the Debtor and the Holder of a Claim, is the last date for the filing of objections to Claims.  If an objection to your Claim is filed, you will receive a copy of the objection and will be provided with an opportunity to respond and be heard by the Bankruptcy Court.

Under the Plan, the Debtor has requested that the Bankruptcy Court establish a bar date for the filing of postpetition Administrative Claims of thirty (30) days after the Effective Date.  All requests for payment of postpetition Administrative Claims must be filed with the Bankruptcy Court and served on all interested parties no later than thirty (30) days following the Effective Date. Bankruptcy Courts strictly enforce deadlines for the assertion of claims.  **THEREFORE, IF YOU BELIEVE YOU HOLD AN ADMINISTRATIVE CLAIM, YOU ARE REQUIRED TO FILE THE REQUEST AND APPROPRIATE DOCUMENTATION WITHIN THE PRESCRIBED TIME, OR YOUR ADMINISTRATIVE CLAIM WILL BE DISALLOWED AND YOU WILL NOT BE PAID, EVEN IF YOU WOULD OTHERWISE BE ENTITLED TO PAYMENT.**

## VIII.    TREATMENT OF CLAIMS AND INTERESTS

The following is a summary of the significant provisions of the Plan and is qualified in its entirety by the provisions of the Plan, a copy of which accompanies this Disclosure Statement.  In the event and to the extent that the description of the Plan contained in this Disclosure Statement

is inconsistent with any provision of the Plan, the provisions of the Plan shall control and take precedence. All creditors are urged to read carefully the Plan in full.

The Bankruptcy Code and related case law establish the order in which claims are paid. Essentially, creditors with secured claims are paid first, up to the value of the collateral that they have for their claims. After that, the Bankruptcy Code establishes certain categories of "priority" claims, such as claims incurred by a debtor or estate during the administration of the bankruptcy case, claims of employees for wages (with certain limitations), claims for certain employee benefits and certain claims for taxes. After the priority claims are paid, general unsecured creditors are paid. Finally, if the general unsecured claims are paid in full, equity holders receive distributions.

The various Classes of Claims and Interests in the Plan are as follows:

| Class | Composition |
|-------|-------------|
| 1. | Other Priority Claims |
| 2. | Town of Acton Secured Claim |
| 3. | Webster Bank Secured Claim |
| 4. | General Unsecured Claims |
| 5. | Interests |

A.   **Unclassified Claims**

The Bankruptcy Code prohibits the classification of certain claims for the purposes of voting or receiving distributions under a plan of reorganization. Such claims include claims for the costs of administering the Chapter 11 case, including court fees, U.S. Trustee's fees, and attorneys' fees and expenses, and claims for certain taxes entitled to priority under the Bankruptcy Code. None of the holders of these unclassified claims is entitled to vote on the plan of reorganization.

The unclassified claims will receive the following treatment under the Plan:

**Allowed Administrative Claims:** Administrative Claims include such bankruptcy administrative expenses as the fees and expenses of the professionals retained by the Debtor, including legal counsel and accountants. The Plan provides for a deadline of thirty (30) days after the Effective Date of the Plan for the filing of Administrative Claims. Based upon estimates from the professionals, the Debtor projects that the unpaid fees and expenses of professionals employed in this Chapter 11 Case through Confirmation will be as follows:

| Barron & Stadfeld, PC Counsel to the Debtor | $ 35,000.00[1] |
| TOTAL | $ 35,000.00 |

The Bankruptcy Court will review all applications for fees and expenses by Barron & Stadfeld, PC and other professionals and will make the ultimate determination as to the amount of fees and expenses awarded.

The Debtor believes that all other Administrative Claims have been or will be paid prior to confirmation of the Plan.

Each Holder of an Allowed Administrative Claim shall be paid 100% of the unpaid allowed amount of such Administrative Claim in Cash on or as soon as reasonably practicable after the Effective Date.

**Priority Tax Claims:** Priority Tax Claims consist of certain tax Claims asserted against the Debtor which are entitled to priority of payment under the Bankruptcy Code.  The Debtor did not schedule any priority tax claims in its schedules.  The Internal Revenue Service has filed a claim in the amount of $1500.00, but the claim does not assert any priority.

Each Holder of an Allowed Priority Tax Claim shall be paid 100% of the unpaid amount of such Allowed Claim in Cash on or as soon as reasonably practicable after the Effective Date.

**U.S. Trustee Fees:** The Bankruptcy Code provides that every Chapter 11 debtor shall pay certain quarterly fees to the U.S. Trustee to be devoted to the administration of the U.S. Trustee System.  Any U.S. Trustee fees owing and unpaid on the Effective Date shall be treated as Administrative Claims.  After the Effective Date, the Reorganized Debtor shall be responsible for calculating, reporting and paying all fees and expenses assessed by the U.S. Trustee  and any other statutory court fees to the extent legally required.  The Debtor estimates that, for the quarter in which the closing under the agreement occurs, the quarterly fees to the Office of the United States Trustee will be $13,000.00.

None of the holders of the unclassified claims described above is entitled to vote on the Plan.

**B.     Classified Claims**

The Claims described below are classified for the purposes of receiving distributions under the Plan .  The classification and treatment of each Class of Claims is described as follows:

**CLASS ONE** consists of all Allowed Priority Non-Tax Claims.  Each Holder of an

---

[1]  Barron & Stadfeld, PC has received a retainer in the amount of $17,500.

Allowed Other Priority Claim shall be paid 100% of the unpaid amount of such Allowed Claim in Cash on or as soon as reasonably practicable after the Effective Date.  Class One is not Impaired and, therefore, Class One is deemed to have voted to <u>accept</u> the Plan.

**CLASS TWO** consists of the secured claim of the Town of Acton.  The Debtor scheduled the claims of the Town of Acton as being in the amount of $114,344.45 as of the Petition Date of November 3, 2011, and additional amounts have accrued since the Petition Date.

The Town Of Acton Secured Claim shall be paid 100% of the unpaid amount of such Allowed Claim in Cash from the Base Purchase Price on the Sale of the Premises.

Class Two is not impaired and is therefore not entitled to vote on the Plan.

**CLASS THREE** will consist of the Webster Bank Secured Claim.

Webster Bank, as of the Petition Date, had a mortgage on the Premises, subject only to the Secured Claim of the Town of Acton, which secured a claim based upon loans made by Webster Bank to Quail Ridge Country Club, LLC on or about January 6, 2005, in the original principal amount of Ten Million Five Hundred Thousand and 00/100 Dollars ($10,500,000.00). The Debtor scheduled Webster Bank as having a claim in the amount of $7,550,000.  Webster Bank, in a motion seeking relief from the automatic stay filed on November 22, 2010, that the obligations owed to it secured by its mortgage on the Premises totaled $7,815,527.16 as of November 4, 2010, including principal in the amount of $7,452,952.44.  No payments have been made to Webster Bank on its secured claim since prior to the Petition Date.

The Plan provides for payment of the secured portion of Webster Bank's claim by payment of the balance of the Base Purchase Price, after payment of the Secured Claim of the Town of Acton, to Webster Bank on account of its secured claim.  The Plan further provides that, the balance of any amount of Webster Bank's claim shall be deemed under secured and to be a general unsecured claim and shall receive the same treatment as all other Allowed general unsecured Claims.

Class Three is impaired and is therefore entitled to vote on the Plan.

**CLASS FOUR** will consist of the holders of Allowed General Unsecured Claims against the Estate.

The Debtor did not schedule any unsecured Claims.  Class 4 shall include the unsecured portion of any Allowed Claim of Webster Bank.  Class 4 shall also include the Claims of Brie Consulting Corp., Craig Palmer, Gloria W. Palmer, Trustee of the Palmer Family Trust, John L. Spencer, Lia Grasso, Mario F. Rolla, Peabody Family Investments, LLC, Philip M. Miller,

Jr. and William B. McPherson, III, notwithstanding any mortgages or other security instruments affecting the Premises and held by those claimants.  The Claims of those claimants shall be deemed to be unsecured and will be treated as general unsecured Claims.  The Debtor estimates that the total amount of the Allowed General Unsecured Claims will be approximately $12,000,000.00.

All Available Cash will be distributed by the Reorganized Debtor to the Holders of Allowed Class 4 Claims on, or as soon as reasonably practicable after (i) the Distribution Date if such Class 4 Claim is an Allowed Class 4 Claim as of the Effective Date or (ii) the Subsequent Distribution Date after the date a Class 4 Claim becomes an Allowed Class 4 Claim.  On each Subsequent Distribution Date and the Final Distribution Date, each Holder of an Allowed Class 4 Claim shall receive from the Reorganized Debtor its share of then Available Cash. Notwithstanding the foregoing, the Holder of an Allowed General Unsecured Claim may receive such other less favorable  treatment as may be agreed to by such Holder and the Chapter 11 Debtor or the Reorganized Debtor.

**CLASS FIVE** will consist of the holders of Interests in the Debtor.

It is not anticipated that the Holders of Interests in Class 5 will receive any distributions on account of those Interests.  Holders of Interests in Class 5 shall be deemed to have rejected the Plan.

The Holders of Interests in Class 5 shall retain their interest in the Reorganized Debtor in return for contributions to be made by the Holders of the Interests in Class 5 to the Debtor to fund the payment of administrative claims and other priority claims at confirmation.


IX.        <u>TREATMENT OF EXECUTORY CONTRACTS</u>

Executory contracts are those agreements and leases which still require performance by both the Debtor (or, in this case, the Estate) and the non-Debtor party to the contract. Effective upon the Effective Date, the Reorganized Debtor will assume those executory contracts and unexpired leases that are listed in <u>Schedule A</u> to the Plan. The Reorganized Debtor does not anticipate assuming any executory contracts but reserves the right to amend the list of contracts and leases to be assumed  through the conclusion of the Confirmation Hearing.

Effective upon the Effective Date, the Debtor will be deemed to have rejected all executory contracts and unexpired leases that exist between the Debtor and any other entity that

have not- been expressly assumed by the Reorganized Company pursuant to the Plan.  All Allowed General Unsecured Claims arising from the rejection of executory contracts or unexpired leases shall be treated as Claims in Class 4 under the Plan.  All Claims arising from the rejection of executory contracts or unexpired leases under the Plan must be filed with the Bankruptcy Court within thirty (30) days after notice of the entry of the Confirmation Order.  The Reorganized Debtor shall have sixty (60) days to object to any proof of claim filed pursuant to a rejection of an executory contract or unexpired lease.  Any such Claims that are not filed within such time will be forever barred from assertion against the Debtor and its Estate, and shall not share in any distributions under this Plan.

## X.      **IMPLEMENTATION OF THE PLAN**

The Plan will be implemented as follows.

### A.         **The Agreement**

The Base Purchase Price of the Agreement with Pulte Homes of New England, LLC, in the amount of $7,350,000, together with the Additional Purchase Price, along with other Cash in the estate and the proceeds, if any, of any Rights of Action, shall be used to fund the Plan. On and after the Effective Date, the operation of the Reorganized Debtor shall be the responsibility of the Reorganized Debtor.  Michael F. Rolla shall continue to serve as the manager of the Reorganized Debtor.  The Reorganized Debtor will, in accordance with the Agreement, operate the golf course and will collect the Additional Purchase Price and act as the disbursing agent under the Plan.

Cash payments to be made pursuant to the Plan shall be made by the Reorganized Debtor.

### B.   **Rights, Power and Duties of the Reorganized Debtor**.

The Reorganized Debtor shall succeed to all of the same rights, powers and duties of the Debtor.  Except as otherwise provided in the Plan, as of the Effective Date the Reorganized Debtor shall be re-vested with all of the assets and property of the Estate, including, without limitation, the Avoidance Actions.  The Reorganized Debtor shall have the following rights, powers and duties:

(i)      Investing Estate's Cash, including, but not limited to, the Cash held in the Reserves in (A) direct obligations of the United States of America or obligations of any agency or instrumentality thereof which are guaranteed by the full faith and credit of the United States of America; (B) money market deposit accounts, checking accounts, savings accounts or certificates of deposit, or other time deposit accounts or overnight

investments that are issued or administered by a commercial bank or savings institution organized under the laws of the United States of America or any state thereof; or (C) any other investments that may be permissible under (I) Section 345 of the Bankruptcy Code or (II) any order of the Bankruptcy Court entered in the Chapter 11 Case;

(ii)    Calculating and paying all distributions to be made under the Plan and other orders of the Bankruptcy Court to Holders of Allowed Claims and Interests including, without limitation, calculating, reporting and paying all fees and charges assessed against the Debtor Estate pursuant to Section 1930 of Title 28 of the United States Code , whether arising before or after the Effective Date;

(iii)    Employing, supervising and compensating professionals retained to represent the interests of and serve on behalf of the Reorganized Debtor without further Bankruptcy Court approval;

(iv)    Making and filing tax returns for the Reorganized Debtor;

(v)    Objecting to Claims or Interests filed against the Debtor's Estate on any basis;

(vi)    Seeking estimation of contingent or unliquidated Claims under Section 502(c) of the Bankruptcy Code;

(vii)    Seeking determination of tax liability under Section 505 of the Bankruptcy Code;

(viii)    Commencing, prosecuting, settling, dismissing or otherwise disposing of Rights of Action;

(ix)    Commencing, prosecuting, settling, dismissing or otherwise disposing of any action to subordinate any Claims or Interests;

(x)    Investigating Rights of Action against any Person other than a Released Party;

(xi)    Requesting entry of a final decree closing the Chapter 11 Case; and

(xii)    Taking any and all other actions necessary or appropriate to implement or consummate the Plan.

**Compensation of Professionals.**  Any professionals retained by the Reorganized Debtor shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Operating Reserve.  The payment of the fees and expenses of the Reorganized Debtor and its retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.  The Reorganized Debtor may employ any Person previously employed as a professional.

### C.   Unclaimed Property

Holding and Investment of Undeliverable and Unclaimed Distributions.  If the distribution to any Holder of an Allowed Claim or Interest is returned to the Reorganized Debtor as undeliverable or is otherwise unclaimed, or if the Holder of a Claim or Interest has not provided the Reorganized Debtor with a taxpayer identification number in response to a request made by the Reorganized Debtor, no further distributions shall be made to such Holder unless and until the Reorganized Debtor is notified in writing of such Holder's then-current address and/or taxpayer identification number, as the case may be.  Undeliverable and unclaimed distributions (including a Person's failure to provide a taxpayer identification number in response to a request made by the Reorganized Debtor) shall be deposited in an interest-bearing account, designated on the books and records as an "unclaimed distribution reserve" (the "Unclaimed Distribution Reserve"), for the benefit of all such similarly situated Persons until such time as a distribution becomes deliverable, is claimed or a taxpayer identification number is provided, or is forfeited under Section 7.6 of the Plan.

On each Subsequent Distribution Date, the Reorganized Debtor shall make all distributions that have become deliverable or have been claimed (or for which a taxpayer identification number has been provided) since the Distribution Date or the immediately preceding Subsequent Distribution Date, as the case may be, together with any interest actually earned thereon.

Any Holder of a Claim or Interest that does not assert a claim or interest in any undeliverable or unclaimed distribution within 90 days after the date of the issuance of the check for the first distribution that was returned as undeliverable or unclaimed, or the date of the Reorganized Debtor's first written request for a taxpayer identification number (whether or not also returned as undeliverable) shall be deemed to have forfeited its claim to or interest in such undeliverable or unclaimed distribution(s) (and all interest thereon) and all subsequent and final

distributions that may be made with respect to its Claim or Interest, and shall be forever barred
and enjoined from asserting any claim to or interest in an undeliverable or unclaimed
distribution(s) (and all interest thereon) or any subsequent or final distributions against the
Debtor's Estate, and such Holder of an undeliverable or unclaimed distribution shall thereafter be
deemed to have waived any and all of its Claims or Interest and any right to a distribution thereon.
In such cases, any Cash in the Unclaimed Distribution Reserve for distribution on account of such
claims for undeliverable or unclaimed distributions shall become the property of the Reorganized
Debtor free of any restrictions thereon and notwithstanding any federal or state escheat laws to
the contrary and shall be distributed in accordance with <u>Article VII</u> of the Plan.  Nothing
contained in the Plan, shall require the Reorganized Debtor to attempt to locate any Holder of a
Claim or Interest.

### D.    <u>Disputed Claims</u>

No payments or distributions shall be made with respect to all or any portion of a
Disputed Claim unless and until all objections to such Disputed Claim have been settled or
withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion
thereof, has become an Allowed Claim.  Any objection to Claims, whether filed by the Debtor or
other party in interest, must be filed by the Claim Objection Deadline or such extended date as
may be set by the Bankruptcy Court upon the motion of the Debtor or other party in interest.  The
Claims Objection Deadline is the later of (i) the thirtieth (30th) day after the Effective Date or (ii)
such greater period of limitation as may be fixed or extended by the Bankruptcy Court or by
agreement between the Debtor and the Holder of a Claim.

On the Effective Date (or as soon thereafter as is practicable) and each Subsequent
Distribution Date, the Reorganized Debtor shall create and fund or withhold the Disputed Claims
Reserve (either in a separate account or on the books and records) in an amount of the Estate's
Cash equal to one hundred percent (100%) of distributions to which Holders of Disputed Claims
would be entitled under the Plan as of such date if such Disputed Claims were Allowed Claims in
their full amount (or in such other amount as may be determined by the Bankruptcy Court in an
estimation proceeding pursuant to Section 502(c) of the Bankruptcy Code).  Cash withheld and
reserved for payments to Holders of Disputed Claims may be held and deposited by the
Reorganized Debtor in one or more segregated interest-bearing reserve accounts or in a
commingled account, as determined by the Reorganized Debtor, to be used to satisfy such Claims
if and when such Disputed Claims become Allowed Claims.

If, on or after the Effective Date, any Disputed Claim becomes an Allowed Claim, the
Reorganized Debtor shall, on the next Subsequent Distribution Date (or Final Distribution Date if
the next distribution is to occur on that date), distribute from the Disputed Claims Reserve to the
Holder of such Allowed Claim the amount of Cash that such Holder would have been entitled to
receive under the Plan if such Claim had been an Allowed Claim on the Effective Date. If, at any
time or from time to time after the Effective Date, there shall be Cash in the Disputed Claims
Reserve in an amount in excess of the maximum remaining payment obligations to the then
existing Holders of Disputed Claims against the Estate under the Plan, such excess funds shall
become available to the Reorganized Debtor, generally and shall, in the discretion of the
Reorganized Debtor, be used to satisfy the costs of administering and fully consummating the Plan
or become Available Cash for distribution in accordance with the Plan.

## XI.    ALTERNATIVES TO THE PLAN

The only alternative to the Plan is a liquidation after conversion of the case to a case under
Chapter 7 of the Bankruptcy Code. If the case were converted to Chapter 7, the United States
Trustee's Office would appoint a Chapter 7 Trustee, who would be required to liquidate the
Debtors' assets and distribute the proceeds to creditors, after payment in full of all Allowed
Administrative Claims, including the Chapter 7 Trustee's statutory fees and other expenses
incurred during the Chapter 7 and Chapter 11 cases. Such liquidation proceedings are time-
consuming and likely would generate delays well beyond the Effective Date of the Plan. A
Chapter 7 Trustee would be unable to operate the golf course, unable to raise funds to complete
the permitting process and would therefore be unable to convey the Premises to Pulte Homes of
New England, LLC in accordance with the Agreement. As a result, the Debtor believes that a
sale of the Real Property in a chapter 7 case would result in a significantly lower purchase price
and would have the effect of significantly reducing or eliminating the amount of funds available to
distribute to the holders of Allowed Class 4 (general unsecured) Claims. Exhibit A annexed hereto
is the Debtor's estimate of the amounts to be produced as an Additional Purchase Price under the
Agreement.

## XII.    BEST INTERESTS OF CREDITORS

To approve the Plan, the Bankruptcy Court must determine that the Plan produces a
recovery for creditors whose Claims are Impaired or who do not accept the Plan which is at least
as much as they would receive under a Chapter 7 case. This is referred to as the "best interest of

creditors" test.  This determination is based upon an estimate of what would be realized in a Chapter 7 liquidation after deducting the costs of liquidation.  Liquidation costs would include the Chapter 7 Trustee's fees (which could exceed 3% of the funds administered) and expenses, fees and expenses for attorneys and other professionals retained by the Chapter 7 Trustee, and any Administrative Claims incurred during the Chapter 7 case.  In addition to liquidating a debtor's assets, a Chapter 7 Trustee must also decide whether to proceed with litigation against creditors or other parties for recovery of avoidable transfers, avoidance of liens, or other legal actions with potential benefit to the Estate.

There are two impaired classes of Claims in the Plan, the Class Three Secured Claim of Webster Bank and the Class Four Claims of general unsecured creditors.  A chapter 7 trustee would not have the ability to either operate the golf course in 2011 or to raise funds to complete the permitting process to enable the construction of housing units on the Premises.  The Debtor therefore believes that it is likely that, if the case were to be converted to a case under chapter 7, Webster Bank would seek and obtain relief from the automatic stay and foreclose its mortgage on the Premises.  If that were to occur, the Debtor believes that the price obtained by Webster Bank for the Premises would in all likelihood be less than (and certainly no more than) the $7,350,000 Base Purchase Price to be paid by Pulte Homes of New England, LLC pursuant to the Agreement and the Plan, that Webster Bank would receive less on its Class Three Secured Claim and that the Class Four unsecured creditors would receive nothing.   The Debtor believes that the holders of the Class 4 Claims will receive substantially more, in the form of the Additional Purchase Price, if the Plan is confirmed, than they would receive if the case were to be converted to a case under chapter 7.


XIII.      FEASIBILITY OF THE PLAN

To approve the Plan, the Bankruptcy Court must determine that the Plan is feasible; that is, that the Plan can be successfully implemented.  That determination can be made if there is a reasonable likelihood at the time of the confirmation that the Plan can be successfully consummated, and that no further reorganization of the Debtor is likely to be required.  The feasibility requirement does not mean that the Plan must be certain of success, and does not mean that creditors must be certain of receiving any particular level of recovery on their claims.

The Plan is a plan of reorganization, based primarily upon the Agreement.  Pulte Homes of New England, LLC has placed $200,000 in escrow, to be applied toward the Base Purchase Price

under the Agreement at the closing.   A closing of the transaction contemplated to occur pursuant to the Agreement is required to occur, pursuant to section 10.1 of the Agreement, "on the date which is the later of : (i) 30 days after receipt of Final Approval of all Governmental Approvals required for development of the Premises with the amendment set forth in Section 4.2,  such that the Buyer can, upon proper application, obtain unconditional building permit or 15 days after the date that the Confirmation Order becomes a final order, and (ii) all of the Pre-Conditions to Closing set forth in this Agreement are met (iii) the Seller has complied with all of its obligations pursuant to the Agreement."  As of the date of this Disclosure Statement the Debtor estimates that a closing will take place on or before July 1, 2011.  The closing will generate the $7,350,000 Base Purchase Price, which will be used to pay the Class One and Class Two Secured Claims. Based upon the amounts of the scheduled debts and estimates of the administrative claims of the professionals in the case, the Debtor estimates that the sum of approximately $30,500.00 will be necessary to pay all of the non-classified  administrative claims for fees by professionals and fees owed to the Office of the United States Trustee, priority tax claims and  Class 1 Allowed Priority Non-tax claims.  The sale contemplated by the Agreement will also ultimately generate the Additional Purchase Price, which will enable the holders of the Class Four general unsecured Claims to receive distributions.

## XIV.     TAX CONSEQUENCES OF THE PLAN

The Debtor cannot project the tax consequences of the Plan for any particular creditor or class of creditors or interests.

**CREDITORS AND MEMBERS OF THE DEBTOR ARE STRONGLY ADVISED TO CONSULT THEIR OWN ATTORNEYS, ACCOUNTANTS, OR TAX ADVISORS AS TO ANY TAX CONSEQUENCES OF THE PLAN IN THEIR PARTICULAR CIRCUMSTANCES.  THE DEBTOR MAKES NO REPRESENTATIONS AND PROVIDES NO ADVICE WITH RESPECT TO SUCH TAX CONSEQUENCES WHICH MAY ARISE FROM THE IMPLEMENTATION OF THE PLAN.**

## XV.     STANDARDS FOR CONFIRMATION OF THE PLAN

Bankruptcy Code Section 1129(a) provides that the Court shall confirm a plan if each Impaired Class of Claims and Interest holders accepts or is deemed to have accepted the plan.  A Class of Claims has accepted the plan if, of those who cast ballots, the holders of at least two-

thirds (2/3) in dollar amount and more than one-half (1/2) in number of such Claims have voted to accept the plan.  A Class of Interests has accepted the plan if, of those who cast ballots, the holders of at least two-thirds (2/3) in amount of such Interests have voted to accept the plan.  Any Class receiving nothing on account of its Claim or Interest is deemed by law to have rejected the plan.

With respect to the Plan, there are two impaired classes of claims, the Class Three Secured Claim of Webster Bank and the Class Four Claims of general unsecured creditors.  The Debtor anticipates that one or both of the impaired classes will vote to accept the Plan and believes that the Plan will meet either the standards for confirmation under Section 1129(a) of the Bankruptcy Code or Section 1129(b) (if only one impaired class votes to accept the Plan) and will request the Bankruptcy Court to confirm the Plan on that basis.

## XVI.    RETAINED JURISDICTION

After confirmation, the Bankruptcy Court will retain all authority and jurisdiction as provided under the Bankruptcy Code and other applicable law and this Plan to enforce the provisions, purposes, and intent of this Plan or any modification hereof, including, without limitation, the matters or proceedings listed in Article XII of the Plan.

## XVII.    EFFECT OF CONFIRMATION OF THE PLAN

Upon Confirmation, the provisions of the Plan will be binding upon the Debtor and the Estate, any person or entity acquiring property under the Plan, and any creditor of or interest holder in the Debtor, whether or not the Claim or Interest of such creditor or interest holder is Impaired, and whether or not such creditor or interest holder has accepted or rejected the Plan.

Except as otherwise expressly provided in Section 1141 of the Bankruptcy Code or the Plan, the distributions made pursuant to and in accordance with the applicable terms and conditions of the Plan are in full and final satisfaction, settlement, release, and discharge as against the Debtor of any debt of the Debtor that arose before the Effective Date, any debt of the Debtor of a kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, and all Claims against the Debtor of any nature, including, without limitation, any interest accrued thereon from and after the Petition Date, whether or not (i) a proof of Claim based on such debt, obligation, or equity interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) such Claim is an Allowed Claim under Section 502 of the Bankruptcy Code, or (iii) the Holder of such Claim has accepted the Plan.

## XVIII.    NON-SUBSTANTIVE MODIFICATIONS OF PLAN

The Debtor may, after such notice as the Bankruptcy Court determines to be appropriate, modify the Plan prior to the Effective Date, if the Bankruptcy Court determines that such modification does not materially and adversely affect or impair the interest of any holder of a Claim who has not accepted such modification.

## XIX.    CONCLUSION

The Debtor believes that the Plan offers the best available recovery for all Classes of creditors and interests and that the Plan is in the best interests of the Estate, its creditors and the holders of interests in the Debtor.

QR PROPERTIES, LLC

By Its Attorneys,

DATED: March 3, 2011

/s/ Joseph G. Butler
Joseph G. Butler. (BBO# 544284)
BARRON & STADFELD, PC
Counsel to QR Properties, LLC
100 Cambridge Street
Suite 1310
Boston, MA  02114
(617) 723-9800
jgb@barronstad.com