**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**WESTERN DIVISION**

```
*************************************
                                    *
IN RE:                              *
                                    *
QR PROPERTIES, LLC                  *    CHAPTER 11
                                    *    CASE NO. 10-45514-MSH
                                    *
Debtor                              *
                                    *
*************************************
```

### OBJECTION OF WEBSTER BANK TO THE DISCLOSURE STATEMENT RELATING TO DEBTOR'S PLAN OF REORGANIZATION

Webster Bank, National Association (Webster Bank), by and through undersigned counsel and pursuant to Fed. R. Bankr. P. 3017 and MLBR 3017-1, hereby submits its objection to Debtor's Disclosure Statement for Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Disclosure Statement") and respectfully states as follows:

1.	On November 3, 2010 (the "Petition Date"), the Debtor, QR Properties, LLC (the "Debtor") filed a voluntary Chapter 11 petition for relief.

2.	Webster Bank is a national banking corporation duly organized by United States law with a usual place of business in Waterbury, Connecticut.

### JURISDICTION

3.	This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

**OBLIGATIONS AND COLLATERAL**

4. On or about July 16, 2003, the Debtor's predecessor in interest and title, Quail Ridge Country Club, LLC ("Quail Ridge") entered into, executed and delivered to Webster Bank a Loan Agreement and a Mortgage and Security Agreement to secure a loan from Webster Bank in the amount of $8,000,000.00 to be used to construct the Debtor's golf course and country club facility.

5. On or about January 6, 2005, Quail Ridge entered into, executed and delivered to Webster Bank an Amended and Restated Promissory Note dated January 6, 2005 in the original principal amount of Ten Million Five Hundred Thousand and 00/100 Dollars ($10,500,000.00) (the "Amended Note").

6. On or about January 6, 2005, Quail Ridge entered into, executed and delivered to Webster Bank an Amended and Restated Loan Agreement by and between the Lender and the Quail Ridge dated January 6, 2005 (the "Amended Loan Agreement").

7. On or about January 6, 2005, the Quail Ridge entered into, executed and delivered to Webster Bank an Amended and Restated Mortgage and Security Agreement (the "Mortgage") dated January 6, 2005 by Quail Ridge to Lender which Mortgage was recorded on January 7, 2005 in the Middlesex South District Registry of Deeds in Book 44443, Page 308.

8. On or about January 6, 2005, Quail Ridge entered into, executed and delivered to Webster Bank an Amended and Restated Assignment of Leases and Rents by Quail Ridge to Lender dated January 6, 2005 recorded on January 7, 2005 in said Deeds and Book 44443, Page 333.

9. On or about January 6, 2005, Quail Ridge entered into, executed and delivered to Webster Bank an Amended and Restated Conditional Assignment of Development Rights by Quail Ridge to Lender dated January 6, 2005, recorded on January 7, 2005 in said Deeds and Book 44443, Page 346.

10. On or about January 6, 2005, Quail Ridge entered into, executed and delivered to Webster Bank an Amended and Restated Security Agreement dated January 6, 2005 by Quail Ridge to Lender.

11. On or about January 6, 2005, Quail Ridge entered into, executed and delivered to Webster Bank a Collateral Assignment of Licenses, Contracts and Permits dated January 6, 2005 by Quail Ridge and Guarantors to Lender.

12. On or about February 24, 2009, without the prior knowledge or consent of Webster Bank, and in violation of Section 4.7 of the Loan Agreement, the Debtor purchased from Quail Ridge substantially all of the property secured by the Mortgage (the "Acquisition Deed").

13. On or about May 31, 2009, the Debtor entered into, executed and delivered to Webster Bank a Mortgage Loan Assumption Agreement dated as of May 31, 2009 (the "Assumption") by and between QR Properties, LLC ("New Borrower"), Quail Ridge, Ronald B. Peabody, A. Peter Anderson and Peabody Family, LLC (collectively, the "Guarantors").

14. All of the foregoing, and the documents executed in connection therewith are collectively referred to herein as the "Loan Documents".

15.     Prior to the Petition Date, Debtor defaulted according to the terms of Loan Documents, by, among other things:

(i)     the failure of Borrower to deposit with the Lender on or prior to October 10, 2009 an amount sufficient to fund an interest reserve for all interest due from December 1, 2009 to May 31, 2010 (which amount was due on or prior to September 30, 2009) as required pursuant to Section 5 of the Eighth Letter Agreement referenced above (as of the date of this letter such amount continues to remain due and unpaid);

(ii)    the failure of Borrower to deposit with the Lender on or prior to April 10, 2010 an amount sufficient to fund an interest reserve for all interest due from June 1, 2010 to November 30, 2010 (which amount was due March 31, 2010) as required pursuant to Section 5 of the Eighth Letter Agreement referenced above (as of the date of this letter such amount continues to remain due and unpaid);

(iii)   the failure of Borrower to deposit with the Lender on or prior to October 10, 2010 an amount sufficient to fund an interest reserve for all interest due from December 1, 2010 to May 31, 2011 (which amount was due September 30, 2010) as required pursuant to Section 5 of the Eighth Letter Agreement referenced above (as of the date of this letter such amount continues to remain due and unpaid);

(iv) the failure of the Borrower to make required principal payment of $125,000 on or prior to June 10, 2010 (which amount was due May 31, 2010) as required pursuant to Section 4 of the Eighth Letter Agreement referenced above (as of the date of this letter such amount continues to remain due and unpaid);

  (v) the failure of Borrower and Guarantors to deliver audited financial statements and tax returns for 2008 and 2009 as required pursuant to Section 4.8 of the Original Loan Agreement (as of the date of this letter such documents remain due);

  (vi) the failure of Borrower to make payments due under the Note due as of December 16, 2009, January 16, 2010, February 16, 2010, March 16, 2010, April 16, 2010, May 16, 2010, June16, 2010, July 16, 2010, August 16, 2010, September 16, 2010, October 16, 2010, November 16, 2010, December 16, 2010, January 16, 2011, February 16, 2011, March 16, 2011 and April 16, 2011; and

  (vii) the failure of Borrower to make payments due under the LOC due as of August 1, 2010, September 1, 2010, October 1, 2010, November 1, 2010, December 1, 2010, January 1, 2011, February 1, 2011, March 1, 2011 and April 1, 2011.

  16. As a consequence of the above-referenced Events of Default and pursuant to Section 5.3 of the Loan Agreement, Debtor owes Webster Bank, as of March 17, 2011, $7,957,838.31, consisting of principal in the amount of $7,452,952.44 and interest in the amount of $504,885.87.  Interest accrues at the current rate at a per diem rate of $1,050.72.  Costs, expenses and attorneys' fees have been incurred and will continue to be incurred.

  17. Since the Petition Date, Debtor has continued to operate its business and manage its affairs as debtor-in-possession pursuant to 11 U.S.C. sections 1107(a) and 1108.

  18. On March 3, 2011, the Debtor filed its Disclosure Statement, which is the subject of this objection, [Docket No. 35] and its Plan of Reorganization [Docket No. 34].

5

## CODE PROVISIONS

19.     A disclosure statement must contain adequate information for creditors and shareholders to make an informed judgment about a plan of reorganization. *See In re Scioto Valley Mortgage Co.*, 88 B.R. 168, 170 (Bankr. S.D. Oh. 1988). Section 1125(b) of the Bankruptcy Code provides the threshold level of information that must be included in a disclosure statement:

An acceptance or rejection of the plan may not be solicited after the commencement of the case under this title from a holder of claim or interest with respect to such solicitation, <u>unless</u>, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as <u>containing adequate information</u>.
11 U.S.C. § 1125(b).  (Emphasis added).

20.     "Adequate information" is defined under 11 U.S.C. Sec. 1125(a)(1) as "information of a kind, and in sufficient detail, as far is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interest of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan."

21.     Courts have denied approval of a disclosure statement where the allegations contained in the statement were "unsupported by factual information so that voting parties were unable to independently evaluate the merits of the plan." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N. D. NY 1988) (internal citations omitted).  Congress intended the disclosure statement to be the primary source of information that will allow creditors and

shareholders to make informed decisions regarding the proposed plan. *In re Scioto*, *supra.*, citing *In re Egan*, 33 B.R. 672, 675 (Bankr. N.D. Ill 1983).

    22.    Bankruptcy courts exercise broad discretion when deciding whether to approve or reject a disclosure statement. In making a determination, courts often look at whether the disclosure statement contains the following types of information:

1. the circumstances that gave rise to the filing of the bankruptcy petition;
2. a discussion of assets available and their value;
3. a summary of what the debtor anticipates to do going forward;
4. where the information used in the disclosure statement came from;
5. a disclaimer stating that no statements or information regarding the debtor, its assets or securities are authorized, other than those included in the disclosure statement;
6. the debtor's condition during its bankruptcy proceeding;
7. claim information;
8. an analysis showing what creditors would receive from the debtor were it liquidated under chapter 7;
9. the accounting and valuation methods used in the disclosure statement;
10. information regarding the debtor's management going forward;
11. a summary of the plan of liquidation or reorganization;
12. a summary of the administrative expenses, including bankruptcy professional fees;
13. a review of the debtor's accounts receivables;
14. financial information necessary to allow a creditor to decide whether to approve or reject the plan;
15. information regarding the risks being taken by the creditors;
16. the amount expected for recovery through avoidance actions;
17. a discussion of non-bankruptcy litigation;

18. tax consequences of the plan; and,

19. the debtor's relationship with any affiliates.

*See In re Scioto Valley Mortgage Co. supra.*, 88 B.R. at 170-71.

    23.    The purpose of the disclosure statement hearing is to determine whether the proposed disclosure statement contains "adequate information" and, hence, whether it should be approved by the court for dissemination to creditors and equity interest holders. See 11 U.S.C. § 1125(b). Disclosure statement hearings may be utilized by the Court as a vehicle for assessing objections to confirmation of the proposed plan of reorganization. See, e.g., *In re Abijoe Realty Corp.*, 943 F.2d 121 (1st Cir. (Puerto Rico) 1991) (Dismissal of Chapter 11 case for cause was not abuse of discretion, where proposed reorganization plan and disclosure statement contained no financial statement, minimal identification of assets, and no valuation of assets, and neither disclosure statement nor proposed plan identified prospective tenants or provided cash flow or expense projections for regional industrial park); *In re M.J.H. Leasing*, 328 B.R. 363 (Bankr. D. Mass. 2005) (observing that it is appropriate to consider an objection related to the capability of confirmation at a disclosure statement hearing) (citations omitted); *In re Felicity Assocs.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) (observing that "it has become standard Chapter 11 practice that 'when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face'") (citations omitted); *In re Bjolmes Realty Trust*, 134 B.R. 1000 (Bankr. D. Mass. 1991) (observing that courts may rule on confirmation issues at the disclosure statement hearing when the plan is facially unconfirmable); *In re O'Leary*, 183 B.R. 338 (Bankr. D. Mass. 1995) (noting courts may refuse to approve disclosure statements that describe plans that cannot be confirmed); *In re Moorpark Adventure*, 161 B.R. 254 (Bankr. C.D. Cal. 1993) (denying approval of the debtor's disclosure statement when the

8

court determined that the plan could not be confirmed due to the debtor's separate classification of an unsecured deficiency claim for the sole purpose of gerrymandering votes); *In re E. Me. Elec. Co-op., Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991) (finding if confirmation is impossible because of a "fatally flawed" plan, court should exercise its discretion not to consider adequacy of disclosure).

## BASIS FOR OBJECTION

24. Webster Bank opposes the approval of the Disclosure Statement because it contains inaccurate or at best inadequate information as to (a) the Debtor's dealings with insiders; (b) the treatment of Webster Bank's secured claim, and; (c) amounts and sources of necessary funding for post-confirmation costs of operation of the Debtor's business.

25. Debtor provides no future financial information that would shed light on the fundamental shortcomings of the Debtor's plan and the Disclosure Statement.

26. The purchase and sale agreement between Debtor and Pulte contains seven pages of conditions that the Debtor is required to obtain or comply with before Pulte is required to close, but the Disclosure Statement lacks an analysis of how the Debtor will comply with these conditions.

27. Based on the lack of information or certainty Debtor's plan and the Disclosure Statement and the treatment of Webster Bank's large, secured claim, the Disclosure Statement cannot be approved as it lacks adequate information.

28.   In sum, the Disclosure Statement does not contain adequate information since it does not provide sufficient details that would permit a creditor to determine whether it would be in its best interests to vote in favor of, or against, the plan of reorganization.

### THE COURT SHOULD NOT APPROVE THE DISCLOSURE STATEMENT BECAUSE THE PLAN IS UNCONFIRMABLE

29.   The Disclosure Statement should not be approved because it describes a Plan that is unconfirmable on its face. The Debtors should not engage in a wasteful exercise of distributing a futile Disclosure Statement to creditors and soliciting votes for a Plan that has no hope of success.  *See In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988) (denying approval of disclosure statement describing unconfirmable plan "to avoid . . . a wasteful and fruitless exercise" that would "further delay a debtor's attempts to reorganize").

30.   Webster Bank is mindful of the distinction between issues that are appropriately addressed at the disclosure statement hearing and those more typically reserved for consideration at confirmation. However, it is well established that courts may consider substantive plan issues at the disclosure statement hearing and deny approval to disclosure statements predicated upon facially unconfirmable plans. *See, e.g.*, *id.*; *In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) ("It has become standard Chapter 11 practice that when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face.") (internal quotation omitted); *In re Market Square Inn, Inc.*, 163 B.R. 64, 68 (Bankr. W.D. Pa. 1994) ("Where it is clear that a plan of reorganization is not capable of confirmation, it is appropriate to refuse the approval of the disclosure statement."); *In re Dakota Rail, Inc.*, 104 B.R. 138, 145 (Bankr. D. Minn. 1989) (denying approval of "facially defective disclosure

10

statement" describing infeasible plan); *In re S.E.T. Income Props., III*, 83 B.R. 791, 794 (Bankr. N.D. Okla. 1988) (denying approval of disclosure statement because "the disclosure statement . . . demonstrates that the debtor's proposed plan of reorganization is not feasible").

31. The Plan cannot be confirmed because it is not feasible. The Debtors' proposed Plan is patently unconfirmable because the Debtor cannot satisfy Section 1129(a)(11) of the Bankruptcy Code. That provision requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). Section 1129(a)(11) requires that "courts scrutinize carefully the plan to determine whether it offers a reasonable prospect of success and is workable." *In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003). The Debtors' proposed Plan in this case is not feasible for two principal reasons, each of which is independently fatal to confirmation.

32. The proposed Plan is not feasible because the Debtors will lack sufficient cash to exit bankruptcy at consummation. *See In re M&S Assocs., Ltd.*, 138 B.R. 845, 848-52 (Bankr. W.D. Tex. 1992) (King, J.); *see also In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202, 239-44 (Bankr. W.D. Tex. 2008). The Debtor has provided no information as to who will provide financing for the operation of the 18 hole golf course and ancillary facilities on the property. This year's operation will in all probability cost several hundred thousand dollars, but there is no provision in the Disclosure Statement or the plan to raise the funds to pay these costs.

33. Debtor has provided no projection of the cash costs of exiting bankruptcy, especially regarding the operation of the golf course facility. Debtor has no cash on hand and has offered no evidence that a sudden rapid cash inflow will be forthcoming.

34. Further, Debtor has offered no explication of the future financial projections for or of the probability of the success of the real estate venture by Pulte which will be used to fund the "Additional Purchase Price" described in the purchase and sale agreement between Debtor and Pulte. The Debtor has no commitment from any lender to provide the credit they will require to exit bankruptcy. The Plan therefore places "a substantial burden of the debtor's risk of failure on the secured creditor"; the Debtors should not be permitted to "gamble, with [Webster Bank's] money, on the . . . possibility of a drastic improvement in the . . . market." *In re M & S Assoc.*, 138 B.R. at 850, 852.

35. For each of these reasons, the Disclosure Statement is inadequate, incomplete, and misleading. The Debtors should be required to disclose the most up-to-date financial projections available, including a disclosure of their "sources and uses," in the Disclosure Statement, and to demonstrate that the Plan will be feasible based upon an inclusive comparison of all expected exit funding obligations and availability at consummation. *See, e.g.*, *In re J.D. Mfg., Inc.*, 2008 WL 4533690, at *2 (Bankr. S.D. Tex. Oct. 2, 2008) (denying motion to approve disclosure statement containing "outdated" information). The Disclosure Statement completely fails to explain how the Debtors intend to address each of the substantial obstacles to the feasibility of the proposed Plan identified in this Objection.

36. The purchase and sale agreement between Debtor and Pulte contains a provision to enter into a site development contract with Northwest Development, LLC. The site

development contract is worth as much as nine million, five hundred thousand ($9,500,000.00) dollars. (See Section 15 of the Purchase and Sale Agreement). The Disclosure Statement fails to explain that Northwest Development, LLC is owned by insiders of the Debtor, Michael Rolla, Ronald Peabody, and Phillip Miller.  Assuming a usual management fee of 15%, this contract could be worth as much as one million, four hundred and twenty five thousand ($1,425,000.00) dollars to these insiders.

      37.     Neither the Disclosure Statement, nor the plan, nor the purchase and sale agreement between Debtor and Pulte adequately describes the status of the wastewater treatment permit application now pending at the Massachusetts Department of Environmental Protection. As of March 23, 2011, the Massachusetts Department of Environmental Protection (MDEP) informed Webster Bank that the application for a ground water discharge permit for Quail Ridge Country Club has been on hold since July 18, 2009.  The Groundwater Permit file number is 866-0 and the Wastewater Treatment permit application file number is W164359.  The application was originally reviewed by MDEP.  As a result of the initial review, MDEP prepared a five page deficiency letter regarding the application.  The applicant was given until July 18, 2009 to amend the application and remedy the noted deficiencies.  The applicant has not submitted the revisions required under the deficiency notice that MDEP issued. Quail Ridge has done nothing to remedy the deficiencies in the application.  Further, the application was not prepared by a registered professional engineer. The MDEP is ready to notify Quail Ridge that the application is deemed withdrawn and that MDEP will close its file.  How long it will take to make these revisions and obtain review and approval of the application from MDEP is a matter of speculation and conjecture.  As of now, the application has languished without the Debtor's attention for two years.

38.     Unsecured creditors Brie Consulting Corp. ($1,4108,302.00), Craig Palmer ($64,036.00), Gloria W. Palmer, Trustee of the Palmer Family Trust ($3,900,000.00), John L. Spencer ($64,036.00), Lia Grasso ($812,754.00), Mario F. Rolla ($3,127,876.00), Peabody Family Investments, LLC ($1,114,000.00), Philip M. Miller, Jr. ($625,526.00) and William B. McPherson, III ($635,000.00)(collectively, the "Junior Lien Holders") are included in the same class as the "unsecured" portion of Webster Bank's secured debt.  The plan provides that the Claims of the Junior Lien Holders will all be deemed to be unsecured and that the Claims will be general unsecured Claims and shall receive the same treatment as all other allowed general unsecured claims, namely Webster Bank.  Debtor doses not disclose that the Junior Lien Holders are also insiders of the Debtor.  (See List of Equity Security Holders filed with the Petition) The Disclosure Statement fails to explain why the Debtor intends to make payments to insiders holding security interests at the same rate to and within the same voting class as Webster Bank.  These insiders should be in a separate voting class and should have their security converted to equity.

39.     The Debtor contends that the up-front purchase price contained in the purchase and sale agreement between Debtor and Pulte is the current fair market value of the Debtor's sole asset, its real estate.  The Disclosure Statement fails to explain that the present value of the real estate is actually much higher.  The Debtor ignores the fact that the purchase price does not include deferred payments to the Debtor based on the additional purchase price formula, which will be paid by Pulte to Debtor post-sale.  The Debtor also ignores the fact that the purchase price does not include payments to several insiders of the Debtor based on the development contract contained in the purchase and sale agreement worth as much as nine million, five hundred thousand ($9,500,000.00) dollars. (See Section 15 of the Purchase and Sale Agreement).

14

Because the Debtor does not take into account these future payments, it ignores the true value of the real estate. The Debtor's valuation of the real estate is suppressed by this omission. The Court should not allow the Debtor to devalue its real estate to the detriment of the priority secured creditor.

40. The Disclosure Statement fails to explain that the purchase and sale agreement between Debtor and Pulte contains seven pages of conditions that the Debtor is required to obtain or comply with before Pulte is required to close. The purchase and sale agreement contains no firm closing date for the transfer of the real estate. The date for the real estate closing can be extended by Pulte unilaterally for any length of time, assuming the wastewater treatment plant permit approvals are still outstanding. The wastewater treatment permit approval process is in the sole control of the Debtor. The MA DEP has advised Webster Bank that the application for the wastewater treatment plant permit is insufficient in its current form. The date of closing is so open ended as to make the purchase and sale agreement nearly illusory.

41. The Disclosure Statement fails to explain that the plan of reorganization is not feasible. It contains no analysis of the probability of obtaining all of the modified permits required by Pulte, the proposed absorption rate of the new condominium units or the pricing structure that Pulte intends to utilize to market the new condominium units. Determinations as to feasibility of proposed Chapter 11 plan must be firmly rooted in predictions based on objective fact. 11 U.S.C.A. § 1129(a)(11)

42. The Disclosure Statement fails to state whether the Debtor has firm commitments from investors to fund the cost of the additional work to comply with the closing conditions in the Pulte purchase and sale agreement.

43. The Disclosure Statement fails to explain how the Debtor will raise the capital needed to open and operate the golf course for the 2011 golfing season.

44. The Disclosure Statement fails to explain why the Debtor is transferring a valuable asset of the Debtor, the Palmer Kennel property, to Craig Palmer, an insider, for the nominal consideration of one hundred ($100.00) dollars.

45. Webster Bank is aware of several interested parties that would be willing to participate in a public auction of the Debtor's real estate. Because Debtor has not shown why a private sale to Pulte is in the best interest of the estate, and the most beneficial method to dispose of this asset, Webster Bank requests that the Court require a public auction of the real estate.

46. The Disclosure Statement fails to provide notice to the secured party of its ability to credit bid pursuant to 11 U.S.C.A. § 1129(b)(2)(A)(ii) and 11 U.S.C.A. § 363(k).

47. The Disclosure Statement fails to provide notice to the secured party of its ability to elect to treat its lien pursuant to 11 U.S.C.A. § 1111(b)(2).

48. The Disclosure Statement contains no chapter 7 analysis.

49. The Disclosure Statement contains no specific information about compensation of professionals.

**RESERVATION OF RIGHTS**

50. Discovery on the foregoing issues with respect to approval of the Disclosure Statement and the contested Plan confirmation litigation is only just beginning. Webster Bank expressly reserves all rights to object to confirmation of the Plan, to any modification of the

Disclosure Statement, and to any amended disclosure statement or modification of any subsequent plan, on any and all grounds, whether or not set forth herein.

## CONCLUSION

51.    Webster Bank has filed an Objection to the Debtor's Disclosure Statement claiming, *inter alia*, the Disclosure Statement failed to provide "adequate information" regarding Debtor's assets and liabilities and the feasibility of the Debtors' plan.  Because the Disclosure Statement contains inaccurate or at best inadequate information as to (a) the Debtor's dealings with insiders; (b) the treatment of Webster Bank's secured claim; (c) the time it will take to obtain all of the approvals, obligations, requirements and permits necessary to fulfill the conditions precedent to closing the purchase and sale agreement between Debtor and Pulte, and (d) amounts and sources of necessary funding for post-confirmation costs of operation of the Debtor's business, the Court should not approve Debtor's Disclosure Statement.

**WHEREFORE**, Webster Bank requests entry of an Order (i) denying approval of the Disclosure Statement; and (ii) for such other and further relief as this Court deems just and proper.

**Webster Bank, National Association**
By its attorneys,

/s/Stephen A. Izzi
Stephen A. Izzi (#547488)
Moses & Afonso, Ltd.
160 Westminster Street, Suite 400
Providence, Rhode Island 02903
Ph: (401) 453-3600
Fx: (401) 453-3604
sizzi@mosesafonso.com

**CERTIFICATE OF SERVICE**

      I, Stephen A. Izzi, Esquire, hereby certify that on this 18th day of April, 2011, I caused to be served a true and accurate copy of the foregoing document, by first class mail, or by electronic mailing (ECF), upon the following:

**Richard King, Esquire**
Office of the US Trustee
446 Main Street
Worcester, MA 01608
USTPRegion01.WO.ECF@USDOJ.GOV

**Ronald W. Dunbar, Jr., Esquire**
**Frederick Watson, Esquire**
Dunbar Law, P.C.
10 High Street
Suite 3700
Boston, MA 02110
617-244-3550
watson@dunbarlawpc.com

**Joseph G. Butler**
Barron & Stadfeld, P.C.
100 Cambridge Street
Suite 1310,
Boston, MA 02114
(617) 723-9800
JGB@Barronstad.com


**Michael Theodore**
Cohn and Dussi, LLC
300 Trade Center, Suite 3700
Woburn, MA 01801
781 494-0200
781 494-0208 (fax)
mtheodore@cohnanddussi.com

**Mark B. Johnson**
JOHNSON & BORENSTEIN, LLC
12 Chestnut Street
Andover, MA 01810
(978) 475-4488
mark@jbllclaw.com

**Thomas O. Bean**
McDermott, Will & Emery
28 State Street
Boston, MA  02109-1775
(617) 535-4426
TBean@MWE.com

| | | |
|---|---|---|
| Peter Anderson<br>815 Depot Road<br>Boxborough, MA  01719 | Brie Consulting Corp.<br>c/o Ronayne Hackling & Rolla<br>441 Sawmill River Road<br>Yonkers, NY  10701 | Craig Palmer<br>8 Franklin Place<br>Acton, MA  01720 |
| Gloria W. Palmer, Trustee<br>Palmer Family Trust<br>352 Great Road<br>Acton, MA  01720 | Internal Revenue Service<br>P.O. Box 21126<br>Philadelphia, PA  19114 | John L. Spencer<br>40 Lewis Farm Road<br>Duxbury, MA  02332 |
| Lia Grasso<br>P.O. Box 454<br>Waccabuc, NY  10597 | MA Dept. of Revenue<br>Bankruptcy Unit<br>P.O. Box 9564<br>Boston, MA  02114-9564 | Mario F. Rolla<br>7 Thompson Road<br>Hubbardston, MA  01452 |
| Peabody Family Investments, LLC<br>P.O. Box 434<br>Bolton, MA  01740 | Philip M. Miller, Jr.<br>P.O. Box 726<br>Falmouth, MA  02541 | Quail Ridge Country Club, LLC<br>354B Great Road<br>Acton, MA  01720 |
| Ronald B. Peabody<br>P.O. Box 434<br>Acton, MA  01740 | Town of Acton<br>Office of Tax Collector<br>472 Main Street<br>Acton, MA  01720 | Webster Bank, N.A.<br>One First Fed Park<br>Swansea, MA  02777 |
| William B. McPherson III<br>50 Bay Point Path<br>Marshfield, MA  02050 | QR Members, LLC<br>Attn:  LLC Manager<br>354B Great Road and Skyline Drive<br>Acton, MA  01720 | Christopher C. Tsouros<br>Posternak Blankstein Lund<br>800 Boylston Street<br>Boston, MA  02199 |

/s/Stephen A. Izzi

QR Properties, LLC Bk.10-45514\Plan of Reorganization\Objection to Disclosure Statement 4.18.11.docx