UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| |
|---|
| In re:<br><br>QR Properties, LLC<br><br>                    Debtor |

Chapter 11
Case No.   10-45514-MSH

**SECOND AMENDED PLAN OF REORGANIZATION OF QR PROPERTIES, LLC
DATED JULY 12, 2011**

# TABLE OF CONTENTS

**Page**

**ARTICLE I.**  **DEFINITIONS & RULES OF INTERPRETATION** ................................. 1
    **1.1**  **Definitions** ................................................................................. 1
    **1.2**  **Rules of Interpretation** .......................................................... 8
    **1.3**  **Documentary Supplement** ...................................................... 8

**ARTICLE II.**  **TREATMENT OF ADMINISTRATIVE CLAIMS AND
PRIORITY TAX CLAIMS** ....................................................... 8
    **2.1**  **Administrative Claims** .............................................................. 8
    **2.2**  **Priority Tax Claims** ................................................................... 9

**ARTICLE III.**  **TREATMENT OF CLAIMS AND INTERESTS** ........................ 9
    **3.1**  **Classes** ....................................................................................... 9
    **3.2**  **General Rules of Classification** ............................................ 10

**ARTICLE IV.**  **TREATMENT OF CLAIMS AND INTERESTS** ...................... 10
    **4.1**  **Other Priority Claims (Class 1)** ........................................... 10
    **4.2**  **Town of Acton Secured Claim (Class 2)** ............................. 10
    **4.3**  **Webster Bank Secured Claims (Class 3)** ............................. 10
    **4.4**  **General Unsecured Claims (Class 4)** .................................... 11
    **4.5**  **Interests (Class 5)** .................................................................. 11
    **4.6**  **Special Provision Regarding Unimpaired Claims** ............. 11

**ARTICLE V.**  **MEANS FOR IMPLEMENTATION OF THE PLAN** .............. 12
    **5.1**  **Acquistion of the Premises by Pulte Homes of New England, LLC** ............... 12
    **5.2**  **Management of the Debtor and the Estate After Confirmation** ................... 12
    **5.3**  **Sources of Cash for Plan Distributions** ............................. 12
    **5.4**  **Corporate Action** ................................................................... 12
    **5.5**  **Rights, Power and Duties of the Reorganized Debtor.** ..................... 13
    The Reorganized Debtor, shall succeed to all of the same rights, powers and
        duties of the Debtor and, shall without limitation have the following
        rights, powers and duties: .................................................... 13
    **5.6**  **Authority to Object to Claims and Interests.** ...................... 14
    **5.7**  **Implementation of Bankruptcy Code Section 1146(c)** ..................... 14

**ARTICLE VI.**  **ACCEPTANCE OR REJECTION OF THE PLAN** .................. 14
    **6.1**  **Classes Entitled to Vote** ........................................................ 14
    **6.2**  **Classes Not Entitled to Vote** ................................................ 14

**ARTICLE VII.**  **PROVISIONS GOVERNING DISTRIBUTIONS** ...................... 15
    **7.1**  **Distributions for Claims Allowed as of the Effective Date** .............. 15
    **7.2**  **Interest on Claims** .................................................................. 15
    **7.3**  **Distributions by the Reorganized Debtor** ........................... 15
    **7.4**  **Distributions on a Subsequent Distribution Date** .............. 15
    **7.5**  **Distributions on the Final Distribution Date** ..................... 15

|       |      |                                                                 |    |
|-------|------|-----------------------------------------------------------------|----|
|       | 7.6  | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 16 |
|       | 7.7  | Record Date for Distributions                                   | 17 |
|       | 7.8  | Allocation of Plan Distributions Between Principal and Interest  | 17 |
|       | 7.9  | Means of Cash Payment                                           | 17 |
|       | 7.10 | Withholding and Reporting Requirements                          | 17 |
|       | 7.11 | Time Bar to Cash Payment                                        | 18 |
|       | 7.12 | Setoffs                                                          | 18 |
|       | 7.13 | Fractional Dollars; De Minimis Distributions                    | 18 |

**ARTICLE VIII.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ............ 18
|       | 8.1  | Assumption Or Assumption And Assignment.                         | 18 |
|       | 8.2  | Rejection                                                        | 19 |

**ARTICLE IX.  EFFECTIVENESS OF THE PLAN** .......................................... 20
|       | 9.1  | Conditions Precedent                                             | 20 |
|       | 9.2  | Notice Of Effective Date                                        | 20 |

**ARTICLE X.  RELEASE AND DISCHARGE AND RELATED INJUNCTION** ......... 20
|       | 10.1 | Discharge                                                        | 20 |
|       | 10.2 | Confirmation of Release of Liens and Perfection of Liens         | 20 |
|       | 10.3 | Estate's Releases                                               | 21 |
|       | 10.4 | Injunction                                                       | 21 |
|       | 10.5 | Exculpation                                                      | 21 |
|       | 10.6 | Direct Claims                                                    | 22 |

**ARTICLE XI.  PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS** ............................................................. 22
|       | 11.1 | No Distributions Pending Allowance                              | 22 |
|       | 11.2 | Prosecution of Objections                                       | 22 |
|       | 11.3 | Estimation                                                       | 22 |
|       | 11.4 | Disputed Claims Reserve                                          | 22 |
|       | 11.5 | Investment of Disputed Claims Reserve                           | 23 |
|       | 11.6 | Allowance of Disputed Claims                                     | 23 |
|       | 11.7 | Release of Funds from Disputed Claims Reserve                    | 23 |

**ARTICLE XII.  RETENTION OF JURISDICTION** ........................................ 23

**ARTICLE XIII.  MISCELLANEOUS PROVISIONS** ..................................... 24
|       | 13.1 | Bar Date for Administrative Claims                              | 24 |
|       | 13.2 | Preservation Of Rights And Defenses                             | 25 |
|       | 13.3 | Saturday, Sunday Or Legal Holiday                               | 25 |
|       | 13.4 | Headings                                                         | 25 |
|       | 13.5 | Binding Effect                                                   | 25 |
|       | 13.6 | Modification Of The Plan                                         | 26 |
|       | 13.7 | Other Documents And Actions                                      | 26 |
|       | 13.8 | Governing Law                                                    | 26 |

**13.9    Notices** ........................................................................................................ **26**
**13.10  No Admissions** .............................................................................................. **26**

# INTRODUCTION

QR Properties, LLC, a Massachusetts corporation and the debtor in possession in case no. 10-45514-MSH pending in the United States Bankruptcy Court for the District of Massachusetts, hereby proposes this Plan pursuant to Section 1121(a) of the Bankruptcy Code.  The Disclosure Statement that accompanies this Plan discusses the Debtor's history, business, assets, and contains a summary and discussion of this Plan.  Holders of Claims and Interests and parties to executory contracts and unexpired leases are encouraged to read the Disclosure Statement.  No solicitation materials other than the Disclosure Statement and related materials transmitted therewith have been authorized by the Bankruptcy Court for use in soliciting acceptances or rejections of this Plan.  To the extent there may be any inconsistency between the Plan and the Disclosure Statement, the Plan shall control.

## ARTICLE I.  DEFINITIONS & RULES OF INTERPRETATION

**1.1**    <u>Definitions</u>

As used herein, the following terms have the respective meanings specified below, subject to the rules of interpretation set forth in <u>Section 1.2</u> hereof:

**"Additional Purchase Price"** means the Additional Purchase Price as defined in the Agreement.

**"Administrative Claim"** means any Claim for any cost or expense of administration of the Chapter 11 Case allowable under Sections 330, 331, 503(b), or 507(a)(1) of the Bankruptcy Code, including, without limitation: (a) the actual, necessary costs and expenses incurred after the Order For Relief Date of preserving the Estate and operating the business of the Debtor; (b) all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under Sections 330, 331, or 503 of the Bankruptcy Code; ; and (c) all fees and charges assessed against the Estate pursuant to Section 1930 of Title 28 of the United States Code.

**"Administrative Claims Reserve"** means the reserve maintained by the Reorganized Debtor to pay Administrative Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims that become Allowed Claims after the Effective Date.

**"Agreement"** means the Purchase and Sale Agreement between the Debtor and Pulte Homes of New England, LLC dated March 1, 2011.

**"Allowed"** means, with respect to any Claim or Interest, an Allowed Claim or Allowed Interest in a particular Class or category specified.  Any reference herein to a particular Allowed Claim includes both the secured (if any) and unsecured portions of such Claim.

**"Allowed Claim"** means, except as otherwise provided in this Plan, a Claim to the extent that all three of the following conditions apply:

(i)     a proof of claim was timely and properly filed or, if no proof of claim was filed, the Claim is listed by the Debtor on its Schedules as liquidated in amount and not disputed or contingent;

(ii)   no objection to the allowance of the Claim or request to estimate the Claim has been interposed on or before the Claims Objection Deadline, or if any timely objection or request for estimation has been interposed, such Claim has been determined by a Final Order to be allowed in favor of the respective Holder by such Final Order (in which case the Allowed Claim shall equal the allowed amount as determined by such Final Order); and

(iii)   the Claim is not otherwise a Disputed Claim.

Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Claim" shall not include interest, fees (including but not limited to late charges and attorneys fees), or penalties on such Claim accruing after the Petition Date.

**"Allowed _____ Claim" or "Allowed Class _____ Claim"** means a Claim of the type specified or in the Class specified that is also an Allowed Claim (e.g., an Allowed Class 4 Claim is a Claim classified in Class 4 that is also an Allowed Claim).

**"Available Cash"** means all Cash of the Debtor, (b) minus the sum of (i) Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims plus (ii) the amount of any Reserves, to be distributed to the Holders of Allowed Class 4 Claims. In determining whether there is any Available Cash for distribution, the Reorganized Debtor may, in its reasonable discretion, give due consideration to the possibility that there may exist unasserted or continuing claims against the Debtor or the Estate Assets and establish appropriate reserves therefor.

"**Avoidance Rights of Action**" means all Rights of Action arising under Sections 544-551 of the Bankruptcy Code.

**"Avoidance Power Cause of Action"** means any actions commenced, or that may be commenced before or after the Effective Date in the Chapter 11 Case, pursuant to Sections 544-551 of the Bankruptcy Code.

**"Bankruptcy Code" or "Code"** means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as now in effect or hereafter amended.

**"Bankruptcy Court" or "Court"** means the United States Bankruptcy Court for the District of Massachusetts, having jurisdiction over the Chapter 11 Case or any other court with jurisdiction over the Chapter 11 Case.

**"Bankruptcy Rules"** means, collectively, as now in effect or hereafter amended and as applicable in the Chapter 11 Case, (i) the Federal Rules of Bankruptcy Procedure and (ii) the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Massachusetts.

**"Base Purchase Price"** means the Base Purchase Price as defined in the Agreement.

**"Business Day"** means any day that is not a Saturday, a Sunday, or a "legal holiday" as defined in Bankruptcy Rule 9006(a).

**"QR Properties, LLC"** means the above-named Chapter 11 Debtor, QR Properties, LLC.

**"Cash"** means legal tender of the United States of America and equivalent thereof.

**"Chapter 11 Case"** means *In re QR Properties, LLC*, Chapter 11 Case, No. 10-45514-MSH, pending in the Bankruptcy Court.

"**Claim**" means a claim against the Debtor, whether or not asserted, known or unknown, as such term is defined in Section 101(5) of the Bankruptcy Code.

**"Claims Objection Deadline"** means the later of (i) the thirtieth (30th) day after the Effective Date or (ii)  such greater period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between the Debtor or the Reorganized Debtor and the Holder of a Claim.

**"Class"** means any group of Claims or Interests classified by this Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

**"Confirmation Date"** means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

**"Confirmation Hearing"** means the hearing on confirmation of the Plan.

**"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

**"Creditor"** means any Person who is the Holder of a Claim against the Debtor that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise become due, owing, and payable on or before the Order For Relief Date, including, without limitation, Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

**"Cure Payment"** means the amount that the Estate must tender to contract counterparties in order to provide cure and compensation in accordance with Section 365(b)(1)(A) & (B) of the Bankruptcy Code.

**"Debtor"** means the above-named Chapter 11 Debtor, QR Properties, LLC.

**"Disbursing Agent"** means the Reorganized Debtor.

**"Disclosure Statement"** means the disclosure statement relating to this Plan including, without limitation, all annexes and schedules thereto, as approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code as the same may be amended, modified or supplemented.

**"Disputed Claim"** means a Claim as to which any one of the following applies: (i) no proof of claim has been filed with respect to such Claim, and either (a) the Claim is not listed in the Schedules, or (b) the Claim is listed in the Schedules as unliquidated, disputed, contingent, or

unknown; (ii) the Claim is the subject of a timely objection or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable order of the Bankruptcy Court, or the Plan filed on or before the Claims Objection Deadline, which objection or request for estimation has not been withdrawn or determined by a Final Order; (iii) the Holder of the Claim is a defendant in a pending Avoidance Power Cause of Action, or has failed to pay or turn over property as required by Section 502(d) of the Bankruptcy Code; or (iv) the Claim is otherwise treated as a "Disputed Claim" pursuant to this Plan.

"**Disputed Claims Reserve**" means in the event there exists any Disputed Claim on or after the Effective Date, Cash to be set aside by the Debtor or the Disbursing Agent in amounts sufficient to pay all such Disputed Claims in accordance with the provisions of the Plan, if such Disputed Claims become Allowed Claims, and to be maintained under the Plan, as set forth more fully in Article 11 of the Plan.

"**Distribution Date**" means the date, occurring as soon as possible after the Effective Date, upon which distributions are made to Holders of Allowed Class 1, 2, 3, and 4 Claims.

"**Effective Date**" means the first Business Day after the date that the Confirmation Order becomes a Final Order Date, or such other date as may reasonably be agreed to by the Debtor and the Pulte Homes of New England, LLC., but in no event later than September 30, 2011.

"**Estate**" means the estate created in the Chapter 11 Case pursuant to Section 541 of the Bankruptcy Code.

"**Final Distribution Date**" means the date on which a final distribution of Available Cash is made pursuant to Section 7.5 of the Plan. The Final Distribution Date shall be a date as determined by the Disbursing Agent (a) which is after the liquidation into Cash or abandonment of all Estate Assets and collection of other sums due or otherwise remitted or returned to the Debtor or the Estate, and (b) on or after which a final distribution is made from the Disputed Claims Reserve pursuant to Article XI of the Plan after final resolution of all Disputed Claims.

"**Final Order**" means an order or judgment of the Bankruptcy Court or other applicable court as to which the time to appeal, to petition for certiorari, or to move for re-argument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other applicable court shall have been affirmed by the highest court to which such order or judgment was appealed, or certiorari, reargument, or rehearing has been denied, and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired.

"**General Unsecured Claim**" means any Claim against the Debtor that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, the Town of Acton Secured Claim or the Webster Bank Secured Claim. General Unsecured Claims shall include, without limitation, any and all unsecured trade, contribution, indemnification, reimbursement, if any,

employee contract, unsecured deficiency Claims, and lease and contract rejection Claims against the Debtor.

**"Holder(s)"** means the beneficial owner(s) of any Claim or Interest, which, in the case of an investment company, shall be the investment company and not its Shareholders, and which, in the case of an insurance company, shall be the insurance company and not its insured.

**"Impaired"** means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

**"Interest"** means an equity security, within the meaning of Section 101(16) of the Bankruptcy Code, in the Debtor, including but not limited to the common and preferred stock of the Debtor.

**"Lien"** means a "lien" as defined in Section 101(37) of the Bankruptcy Code; except that a lien that has been avoided in accordance with Section 544, 545, 546, 547, 548, 549, or 553 of the Bankruptcy Code shall not constitute a Lien.

**"Operating Reserve"** means Cash to be set aside by the Reorganized Debtor (in such amounts and at such times as determined by the Reorganized Debtor) to fund, among other things, the expenses of the Reorganized Debtor from the Effective Date to the date of the closing of the Chapter 11 Case.

**"Order For Relief Date"** shall mean November 3, 2010, the date on which an order for relief was entered in this Chapter 11 Case.

**"Other Priority Claim"** means a Claim, other than an Administrative Claim or Priority Tax Claim, that is entitled in payment pursuant to Section 507(a) of the Bankruptcy Code.

**"Person"** means any individual, corporation, partnership, limited liability company, joint venture, association, trust, joint-stock company, business trust, unincorporated association or organization, governmental agency, or political subdivision thereof, committee or other entity of whatever nature.

**"Petition Date"** means November 3, 2010, the date on which a voluntary petition was filed by the Debtor.

**"Plan"** means this Chapter 11 plan of reorganization, including all exhibits hereto and all documents incorporated by reference herein or contained in the Plan Documentary Supplement, either in their present form or as they may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, and this Plan.

**"Plan Documentary Supplement"** means any compilation of the forms and summaries of certain documents, as the same may be amended, supplemented, restated, or otherwise modified from time to time, that the Debtor may file in connection with this Plan.

**"Plan Proponent"** means the Debtor.

**"Premises"** means the land owned by the Debtor, containing approximately 156 acres, including the land with buildings and improvements thereon which is shown on the plan entitled "The Residences at Quail Ridge, Senior Residence Special Permit" with a last revision date of November 14, 2008 (the "Premises") and includes, without limitation:

- Lot 1 containing 52.9018 acres more or less ("Lot 1");
- Lot 2 containing 10.535 acres, more or less ("Lot 2"),;
- Common Land Open Space Parcel A ("Parcel A") containing 92.1088 acres more or less, (Note: Purchase of Parcel A is subject to the Palmer Kennel (Kennel),which is located on Parcel A, which shall be subdivided and excluded from the Premises and shall remain property of the Reorganized Debtor, subject to the mortgage of Webster Bank.  The Kennel Land as described is in a plan which has been made an Exhibit to the Agreement).
- The fee in all roadways which provide access to the Premises;
- Any and all easements which benefit the property or which are required in order to construct the development as contemplated by and in compliance with the Governmental Approvals (as defined in the Agreement);
- Any and all rights and easements appurtenant thereto; all improvements on and to the Premises; all mineral, oil, and gas rights and profits,  water rights and sub-terrain rights; all  sewer and utility  rights allocated to the Premises and the improvements; all rights, title, and interest of Seller in and to any roads, streets and ways, public or private, serving or providing access to the Premises
- Any and all easements which benefit the property or which are required in order to construct the development as contemplated by and  in compliance with the Governmental Approvals (as defined in the Agreement);
- All furniture,  equipment, vehicles, golf carts or fixtures used in the operation or maintenance of the golf course, tennis court, pool or clubhouse., except for the leased equipment listed on Exhibit 1.1 to the Agreement
- Any and all rights and easements appurtenant thereto; all improvements on and to the Premises; all mineral, oil, and gas rights and profits, water rights and sub-terrain rights; all sewer and utility rights allocated to the Premises and the improvements; all rights, title, and interest of Seller in and to any roads, streets and ways, public or private, serving or providing access to the Premises;
- Any and all permits or approvals, rights and entitlements to the development of the Premises granted by any governmental or quasi governmental bodies or entities having jurisdiction or authority over the Premises including, without limitation, all "Governmental Approvals" as defined in the Agreement.

all as more particularly described in the Agreement.

**"Priority Tax Claim"** means a Claim entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.

"**Proceeds**" means the Base Purchase Price and the Additional Purchase Price to be paid by Pulte pursuant to the Agreement.

"**Pro Rata**" means proportionately so that the ratio of (a) the amount of consideration distributed on account of a particular Allowed Claim to (b) the allowed amount of the Allowed Claim is the same as the ratio of (x) the amount of consideration available for distribution on account of all Allowed Claims in such Class in which the particular Allowed Claim is included to (y) the amount of all Claims (whether Allowed Claims or Disputed Claims) in that Class.

"**Released Party**" means the Debtor and any current agent, representative, employee benefit plan fiduciary, employee benefit plan administrator, employee, attorney, accountant, financial advisor or other professional of the Debtor, but only if and to the extent, in each case, that such party served in such capacity on or after the Petition Date.

"**Reorganized Debtor**" means QR Properties, LLC, as reorganized and restructured under this Plan on or after the Effective Date.

"**Reserve**" means, collectively, the Administrative Claims Reserve, the Disputed Claims Reserve and the Operating Reserve.

"**Rights of Action**" means any and all claims, demands, rights, defenses, actions, causes of action, suits, contracts, agreements, obligations, accounts, defenses, offsets, powers and privileges of any kind or character whatsoever, known or unknown, suspected or unsuspected, whether arising prior to, on or after the Petition Date, in contract or in tort, at law or in equity, or under any other theory of law, held by any of the Debtor or the Estate against any Person, including but not limited to: (i) rights of setoff, counterclaim, or recoupment, and claims on contracts or for breaches of duties imposed by law; (ii) the right to object to Claims; (iii) such claims and defenses as fraud, mistake, duress and usury; and (iv) all Avoidance Rights of Action.

"**Schedules**" means the schedules of assets and liabilities, list of equity security Holders, and the statement of affairs filed by the Debtor as required by Section 521(1) of the Bankruptcy Code, Bankruptcy Rule 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6, as amended from time to time.

"**Short Service List**" means (i) counsel to the Chapter 11 Debtor (Barron & Stadfeld, PC, 100 Cambridge Street, Suite 1310, Boston, MA 02114, Attn:  Joseph G. Butler) (ii) the United States Trustee for the District of Massachusetts (Office of the United States Trustee, Department of Justice, 446 Main Street, Worcester, MA 01608), and (iii)   such other parties as are identified in the accompanying notice of the hearing on the confirmation of the Plan.

"**Stock**" means all of the outstanding shares of capital stock of and equity interests in the Debtor.

"**Subsequent Distribution Date**" means any date, as determined by the Disbursing Agent, which is after the Effective Date and prior to the Final Distribution Date, on which a distribution of Available Cash is made to Holders of Allowed Claims in accordance with Article VII of the Plan.

"**Unclaimed Distribution Reserve**" is defined in <u>Section 7.6(b)</u>.

"**Unimpaired**" means, when used in reference to a Claim or Interest, a Claim or Interest that is not impaired within the meaning of Section 1124 of the Bankruptcy Code.

"**Webster Bank**" means Webster Bank.

"**Webster Bank Secured Claim**" means the Claim arising from the Debtor's obligations to Webster Bank as evidenced by promissory note, dated January 6, 2005 and by a mortgage dated January 6, 2005, as amended and in effect on the Petition Date, and related documents.

**1.2** **Rules of Interpretation**. For purposes of this Plan, (i) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (ii) any reference in the Plan to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; (iii) any reference in the Plan to a document, schedule, annex, or exhibit to the Plan, Plan Documentary Supplement, or Disclosure Statement filed or to be filed means such document, schedule, annex, or exhibit, as it may have been or may be amended, modified, or supplemented; (iv) unless otherwise specified, all references in the Plan to articles, sections, subsections, clauses, paragraphs, schedules, and exhibits are references to articles, sections, subsections, clauses, paragraphs, schedules, and exhibits of or to the Plan; (v) the words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, clause, or paragraph contained in the Plan; (vi) a term used herein that is not defined herein shall have the meaning ascribed to that term, if any, in the Bankruptcy Code or Bankruptcy Rules; and (vii) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of the Plan or any other provision in this <u>Section 1.2</u>.

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

**1.3** **Documentary Supplement**. Certain documents referred to herein are contained in a separate Plan Documentary Supplement, which the Debtor shall file with the Bankruptcy Court and amend from time to time prior to the Effective Date. All exhibits to the Plan and all documents contained in the Plan Documentary Supplement are incorporated into and are a part of the Plan as if set forth in full herein.

## ARTICLE II. TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

Administrative Claims and Priority Tax Claims have not been classified and are excluded from the Classes set forth in Article III in accordance with Section 1123(a)(1) of the Bankruptcy Code.

**2.1** **Administrative Claims**. Unless otherwise provided for herein, each Holder of an Allowed Administrative Claim shall be paid 100% of the unpaid allowed amount of such Administrative Claim in Cash on or as soon as reasonably practicable after the Effective Date.

Notwithstanding the immediately preceding sentence: (i) any Administrative Claims for goods sold or services rendered representing liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case involving trade, service or vendor Claims, subject to compliance with any applicable bar date, shall be paid by the Debtor in the ordinary course in accordance with the terms and conditions of any agreements relating thereto; and (ii) Administrative Claims of the United States Trustee for fees pursuant to 28 U.S.C. § 1930(a)(6) shall be paid in accordance with the applicable schedule for payment of such fees.

**2.2**    **Priority Tax Claims**.  Each Holder of an Allowed Priority Tax Claim shall be paid 100% of the unpaid amount of such Allowed Claim in Cash on or as soon as reasonably practicable after the Effective Date.  Any claim or demand for penalty relating to any Priority Tax Claim shall be disallowed, and the Holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Released Parties, the Debtor's directors and officers, the Debtor's successor(s), or its property.  Notwithstanding the foregoing, the Holder of an Allowed Priority Tax Claim may receive such other less favorable treatment as may be agreed upon by the claimant and the Debtor.

### ARTICLE III.        TREATMENT OF CLAIMS AND INTERESTS

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims as described in Article II, have not been classified and thus are excluded from the Classes that follow.  The following table designates the Classes of Claims and specifies which of those Classes are (i) Impaired or Unimpaired by this Plan, and (ii) entitled to vote to accept or reject this Plan in accordance with Section 1126 of the Bankruptcy Code or deemed to reject this Plan.

**3.1**    **Classes**

| Class | Composition | Status |
|---|---|---|
| 1. | Other Priority Claims | Unimpaired – Not Entitled to Vote |
| 2. | Town of Acton Secured Claim | Unimpaired – Not Entitled to Vote |
| 3. | Webster Bank Secured Claim | Impaired – Entitled to Vote |
| 4. | General Unsecured Claims | Impaired – Entitled to Vote |
| 5. | Subordinated Claims | Impaired – Entitled to Vote |
| 6. | Interests | Deemed to have rejected the Plan |

**3.2**    **General Rules of Classification**.  Generally, a Claim is classified in a particular Class for voting and distribution purposes only to the extent the Claim has not been paid, released or otherwise satisfied and qualifies within the description of that Class, and is classified in another Class or Classes to the extent any remainder of the Claim qualifies within the description of such other Class or Classes.  For voting and distribution purposes, a Holder of more than one Claim in a Class shall be deemed to have a single Claim in such Class.

## ARTICLE IV.       TREATMENT OF CLAIMS AND INTERESTS

**4.1**    **Other Priority Claims (Class 1)**.  Class 1 is Unimpaired by this Plan.  No Holder of an Allowed Claim in Class 1 is entitled to vote to accept or reject this Plan.

Each Holder of an Allowed Other Priority Claim shall be paid 100% of the unpaid amount of such Allowed Claim in Cash on or as soon as reasonably practicable after the Effective Date.  Notwithstanding the foregoing, the Holder of an Allowed Other Priority Claim may receive such other less favorable treatment as may be agreed upon by the claimant, on the one hand, and the Debtor, on the other.

**4.2**    **Town of Acton Secured Claim (Class 2)**.

Class 2 is unimpaired by this Plan.  Each Holder of an Allowed Claim in Class 2 is not entitled to vote to accept or reject this Plan.

The holder of an Allowed Secured Claim in Class 2 will receive, from the Base Purchase Price to be paid at the closing of the sale of the Premises, payment in full of its Allowed Class 2 Claim.

Upon receipt of a distribution by the Holder, such Holder's lien or other security interest in the relevant collateral shall, to the extent not already released by operation of this Plan, be deemed released.

**4.3**    **Webster Bank Secured Claims (Class 3)**.

Class 3 is impaired by this Plan and is therefore entitled to vote to accept or reject this Plan.

The Holder of the Webster Bank Secured Claim shall be paid at the closing of the sale of the Premises, the balance of the Base Purchase Price after payment of the Allowed Class 2 Secured Claim of the Town of Acton .  In addition, Webster Bank shall receive $300,000.00 at the closing of the sale of the Premises.   Between the balance of the Base Purchase Price and the additional $300,000 payment, Webster will receive a payment at the closing of the sale of the Premises of not less than $7,481,500.00. .  Pulte Homes of New England, LLC shall, at or prior to the closing of the sale of the Premises, replace the existing letter of credit  with the Town of Acton, in the amount of $115,750.00 which is part of Webster Bank's claim, so Webster Bank can receive back its letter of credit.

Upon receipt of  the distribution of funds as set forth herein in an amount not less than $7,481,500.00 and the replacement by Pulte of the existing letter of credit, the Allowed Class 3 Claim of Webster Bank shall be deemed to have been paid in full, and Webster Bank's lien or

other security interest in the relevant collateral shall, to the extent not already released by operation of this Plan, be deemed released.

Notwithstanding the foregoing, the Holder of the Webster Bank Secured Claim may receive such other less favorable treatment as may be agreed upon by the claimant and the Debtor.

**4.4**   **General Unsecured Claims (Class 4)**.  Class 4 is impaired by this Plan.  The Holders of Allowed General Unsecured Claims in Class 4 are entitled to vote to accept or reject the Plan.

All Available Cash, after payment of the Allowed Class 3 Claim, will be distributed Pro Rata by the Reorganized Debtor to the Holders of Allowed Class 4 Claims on, or as soon as reasonably practicable after (i) the Distribution Date if such Class 4 Claim is an Allowed Class 4 Claim as of the Effective Date or (ii) the Subsequent Distribution Date after the date a Class 4 Claim becomes an Allowed Class 4 Claim.  On each Subsequent Distribution Date and the Final Distribution Date, each Holder of an Allowed Class 4 Claim shall receive from the Disbursing Agent its Pro Rata share of then Available Cash.  Notwithstanding the foregoing, the Holder of an Allowed General Unsecured Claim may receive such other less favorable treatment as may be agreed to by such Holder and the Debtor or the Reorganized Debtor.

**4.5**   **Subordinated Claims (Class 5).  Class 5 is impaired by this Plan.  The Holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.**

Class 5 shall include the claims, to the extent that they are allowed, of Brie Consulting Corp., Craig Palmer, Gloria W. Palmer, Trustee of the Palmer Family Trust, John L. Spencer, Lia Grasso, Mario F. Rolla, Peabody Family Investments, LLC, Philip M. Miller, Jr. and William B. McPherson, III, notwithstanding any mortgages or other security instruments affecting the Premises and held by those claimants.  The claims of those claimants shall be deemed to be subordinated to the Class 4 General Unsecured Claims.

All Available Cash, after payment of the Allowed Class 4 Claims, will be distributed Pro Rata by the Reorganized Debtor to the Holders of Allowed Class 5 Claims on, or as soon as reasonably practicable after (i) the Distribution Date if such Class 5 Claim is an Allowed Class 5 Claim as of the Effective Date or (ii) the Subsequent Distribution Date after the date a Class 5 Claim becomes an Allowed Class 5 Claim.  On each Subsequent Distribution Date and the Final Distribution Date, each Holder of an Allowed Class 5 Claim shall receive from the Disbursing Agent its Pro Rata share of then Available Cash.  Notwithstanding the foregoing, the Holder of an Allowed General Unsecured Claim may receive such other less favorable treatment as may be agreed to by such Holder and the Debtor or the Reorganized Debtor.

**4.6**   **Interests (Class 6)**.  It is not anticipated that the Holders of Interests in Class 6 will receive any distributions on account of those Interests.  Holders of Interests in Class 6 shall be deemed to have rejected the Plan.  The Holders of Interests in Class 6 shall retain their interest in the Reorganized Debtor in return for contributions to be made by the Holders of the Interests in Class 6 to the Debtor to fund the payment of administrative claims and other priority claims.

**4.7**   **Special Provision Regarding Unimpaired Claims**.  Except as otherwise provided in the Plan, the Confirmation Order, any other order of the Bankruptcy Court, or any document or agreement enforceable pursuant to the terms of the Plan, nothing shall affect the Debtor's, the

Estate's or the Plan Trust's rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses, setoffs or recoupments against Unimpaired Claims.

## ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN

**5.1    Acquisition of the Premises by Pulte Homes of New England, LLC**.  On the Effective Date, the Debtor shall be authorized to sell the Premises to Pulte Homes of New England, LLC in consideration of the Base Purchase Price and the Additional Purchase Price pursuant to the terms of the Agreement.   The sale is approved pursuant to 11 U.S.C. §§ 363(b) and (f) and the Premises is to be sold to Pulte Homes of New England, LLC free and clear of any and all liens, claims, encumbrances and interests of any kind or nature, with all such liens, claims, encumbrances and interests, to the extent that they are valid, attaching to the proceeds of the sale in the same order and to the same extent as such liens, claims, encumbrances and interests attached to the Premises being sold prior to the filing of the petition which commenced this case.

The Base Purchase Price shall be used to pay the Town of Acton Secured Claim and the Webster Bank Secured Claim.  The Additional Purchase Price shall be used to make subsequent distributions to the holders of Allowed Claims in Classes 4 and 5.

**5.2    Management of the Debtor and the Estate After Confirmation**

    **(a) Reorganized Company**.  On and after the Effective Date, the present Manager of the Debtor shall continue to serve as the Manager of the Reorganized Debtor.

    **(b) Debtor's Estate**.  Except as otherwise provided in this Plan, as of the Effective Date the Reorganized Debtor shall be re-vested with all of the assets and property of the Estate, including, without limitation, the Avoidance Actions.  Except as may be expressly provided in this Plan or in a Non-Appealable Order of the Bankruptcy Court, no Asset of the Estate shall be deemed abandoned and no defense, set-off, counter-claim or right of recoupment of the Debtor shall be deemed waived, released or compromised.

**5.3    Sources of Cash for Plan Distributions**.  Except as otherwise provided in the Plan or the Confirmation Order, all funds necessary for the Reorganized Debtor to make payments pursuant to the Plan shall be obtained from the Debtor's estate including the Base Purchase Price and the Additional Purchase Price and any Cash of the Debtor or the Estate as of the Effective Date, including any cash to be contributed by the members of the Debtor.  Cash payments to be made pursuant to the Plan shall be made by the Reorganized Debtor.

**5.4    Corporate Action**.  On the Effective Date, any and all corporate actions taken by the Reorganized Debtor incident to the Plan shall be deemed authorized and approved by virtue of entry of the Confirmation Order, in accordance with the Bankruptcy Code and applicable State law and without any requirement of further action by the members or directors of the Debtor or of the Reorganized Debtor.

**5.5**    **Rights, Power and Duties of the Reorganized Debtor.**

The Reorganized Debtor shall succeed to all of the same rights, powers and duties of the Debtor and, **shall without limitation have** the following rights, powers and duties:

(i)    Investing Estate's Cash, including, but not limited to, the Cash held in the Reserves in (A) direct obligations of the United States of America or obligations of any agency or instrumentality thereof which are guaranteed by the full faith and credit of the United States of America; (B) money market deposit accounts, checking accounts, savings accounts or certificates of deposit, or other time deposit accounts or overnight investments that are issued or administered by a commercial bank or savings institution organized under the laws of the United States of America or any state thereof; or (C) any other investments that may be permissible under (I) Section 345 of the Bankruptcy Code or (II) any order of the Bankruptcy Court entered in the Chapter 11 Case;

(ii)    calculating and paying all distributions to be made under the Plan and other orders of the Bankruptcy Court to Holders of Allowed Claims and Interests including, without limitation, calculating, reporting and paying all fees and charges assessed against the Debtor or the Estate pursuant to Section 1930 of Title 28 of the United States Code, whether arising before or after the Effective Date;

(iii)    Employing, supervising and compensating professionals retained to represent the interests of and serve on behalf of the Reorganized Debtor without further Bankruptcy Court approval;

(iv)    Making and filing tax returns for the Reorganized Debtor;

(v)    Objecting to Claims or Interests filed against the Debtor's Estate;

(vi)    Seeking estimation of contingent or unliquidated Claims under Section 502(c) of the Bankruptcy Code;

(vii)    Seeking determination of tax liability under Section 505 of the Bankruptcy Code;

(viii)    Commencing, prosecuting, settling, dismissing or otherwise disposing of Rights of Action;

(ix)    Commencing, prosecuting, settling, dismissing or otherwise disposing of any action to subordinate any Claims or Interests;

(x)    Investigating Rights of Action against any Person other than a Released Party;

(xi)    Requesting entry of a final decree closing the Chapter 11 Case; and

(xii)    Taking any and all other actions necessary or appropriate to implement or consummate the Plan.

The Reorganized Debtor will be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6) until the Debtor's chapter 11 case is closed.  After confirmation, the Reorganized Debtor will serve the United States Trustee with a quarterly financial report for each quarter (or portion thereof) the case remains open.  The quarterly financial report shall include the following:

> (1)  a statement of all disbursements made during the quarter (or portion thereof) in question, whether or not pursuant to the Plan; and
>
> (2)  a summary, by class, of amounts distributed or property transferred to each recipient under the Plan and an explanation of the failure to make any distributions or transfers of property under the Plan.

**5.6**  **Authority to Object to Claims and Interests.**

From and after the Effective Date but no later than the Claim Objection Deadline, the Reorganized Debtor shall be authorized to object to any Claims or Interests filed against the Debtor's Estate.

**5.7**  **Implementation of Bankruptcy Code Section 1146(c)**.  Any transfers or other transactions that occur pursuant to or in connection with this Plan or the Confirmation Order, including without limitation the transfer of the Premises by the Reorganized Company to Pulte Homes of New England, LLC contemplated to be effected on or soon after the Effective Date, may not be taxed under any federal, State, or local law imposing a stamp tax, real estate transfer tax, recording tax, or similar tax.

### ARTICLE VI.     ACCEPTANCE OR REJECTION OF THE PLAN

**6.1**  **Classes Entitled to Vote**.  Each Holder of an Allowed Interest in Class 3, 4 and  5 shall be entitled to vote to accept or reject the Plan as provided for in the order entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

**6.2**  **Classes Not Entitled to Vote**

*Presumed Acceptance of Plan.*  Each Unimpaired Class of Claims or Interests is conclusively presumed to accept the Plan and, therefore, is not entitled to vote to accept or reject the Plan.

*Presumed Rejection of Plan.*  The holder of Allowed Interests in Class 6 are deemed to have rejected the Plan.

## ARTICLE VII.      PROVISIONS GOVERNING DISTRIBUTIONS

**7.1     Distributions for Claims Allowed as of the Effective Date**.  Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Distribution Date or as soon thereafter as is practicable, and any distribution to be made on the Effective Date pursuant to the Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or within 20 days of the Effective Date.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.  Distributions on account of Claims that first become Allowed Claims after the Effective Date shall be made pursuant to this Article VII.

**7.2     Interest on Claims**.  Except as otherwise specifically provided for in the Plan or Confirmation Order, or required by applicable bankruptcy law or ordered by the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

**7.3     Distributions by the Reorganized Debtor**.  The Reorganized Debtor shall make all distributions of Cash required to be distributed under the applicable provisions of the Plan.  The Reorganized Debtor may employ or contract with other entities to assist in or make the distributions required by the Plan.

**7.4     Distributions on a Subsequent Distribution Date**.  Unless otherwise provided in  the Plan, to the extent Cash is available subsequent to the Effective Date from any source including, among other things, (i) the Additional Purchase Price, (ii) the prosecution and enforcement of Rights of Action (including, without limitation, Avoidance Rights of Action), (iii) the release of funds from the Disputed Claims Reserve in accordance with Section 11.7 of  the Plan, or (iv) the return of unclaimed, undeliverable or time-barred distributions to Holders of Allowed Claims pursuant to  Section 7.6 of the Plan, the Reorganized Debtor shall, on any Subsequent Distribution Date, distribute such Cash to the Holders of Claims or Interests entitled thereto that were Allowed on the Effective Date or subsequently have become Allowed on or before the Subsequent Distribution Date in amounts necessary to cause such Holders to have received aggregate distributions of Cash in respect of such Allowed Claims equal to the distributions that such Holders would have received in respect of such Allowed Claims on the Effective Date if (a) such Cash had been available for distribution on the Effective Date, (b) such Allowed Claims had been Allowed on the Effective Date in the amounts in which they are Allowed on the Subsequent Distribution Date, and (c) Claims or portions thereof that have become disallowed subsequent to the Effective Date and on or before the Subsequent Distribution Date had been disallowed on the Effective Date.

**7.5     Distributions on the Final Distribution Date**.  Unless otherwise provided in the Plan, to the extent Cash is available subsequent to the Effective Date from any source including, among other things, (a) the Additional Purchase Price, (b) the prosecution and enforcement of Rights of Action (including, without limitation, Avoidance Rights of Action), (c) the release of funds from the Disputed Claims Reserve in accordance with Section 11.7 of the Plan, or (d) the return of unclaimed, undeliverable or time-barred distributions to Holders of Allowed Claims pursuant to Section 7.6 of the Plan, the Reorganized Debtor shall, on the Final Distribution Date (other than

in connection with a Deemed Distribution) distribute such Cash to the Holders of Claims or Interests entitled thereto that were Allowed on the Effective Date or subsequently have become Allowed on or before the Final Distribution Date in amounts necessary to cause such Holders to have received aggregate distributions of Cash in respect of such Allowed Claims equal to the distributions that such Holders would have received in respect of such Allowed Claims on the Effective Date if (i) such Cash had been available for distribution on the Effective Date, (ii) such Allowed Claims had been Allowed on the Effective Date in the amounts in which they are Allowed on the Final Distribution Date and (iii) Claims or portions thereof that have become disallowed subsequent to the Effective Date and on or before the Final Distribution Date had been disallowed on the Effective Date; provided, however, that in no event shall the foregoing impair the right of the Reorganized Debtor to use excess funds in the Disputed Claims Reserve to satisfy the costs of administering and fully consummating the Plan.

**7.6    Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

(a)    **Delivery of Distributions in General**.  Distributions to Holders of Allowed Claims or Interests shall be made at the addresses set forth in the Schedules or, if a proof of claim was filed, on the proof of claim, unless prior to the time of the distribution, the Reorganized Debtor has received in writing a notification of change of address.

(b)    **Undeliverable and Unclaimed Distributions**.

(i)    Holding and Investment of Undeliverable and Unclaimed Distributions.  If the distribution to any Holder of an Allowed Claim or Interest is returned to the Reorganized Debtor as undeliverable or is otherwise unclaimed, or if the Holder of a Claim or Interest has not provided the Reorganized Debtor with a taxpayer identification number in response to a request made by the Reorganized Debtor, no further distributions shall be made to such Holder unless and until the Reorganized Debtor is notified in writing of such Holder's then current address and/or taxpayer identification number, as the case may be.  Undeliverable and unclaimed distributions (unclaimed distributions shall include a Person's failure to provide a taxpayer identification number in response to a request made by the Reorganized Debtor) shall be deposited in an interest-bearing account, designated on the books and records as an "unclaimed distribution reserve" (the "Unclaimed Distribution Reserve"), for the benefit of all such similarly situated Persons until such time as a distribution becomes deliverable, is claimed or a taxpayer identification number is provided, or is forfeited under this Section 7.6 of the Plan.

(ii)    After Distributions Become Deliverable.  On each Subsequent Distribution Date, the Reorganized Debtor shall make all distributions that have become deliverable or have been claimed (or for which a taxpayer identification number has been provided) since the Distribution Date or the immediately preceding Subsequent Distribution Date, as the case may be, together with any interest actually earned thereon.

(iii)    <u>Failure to Claim Undeliverable Distributions</u>. Any Holder of a Claim or Interest that does not assert a claim or interest in any undeliverable or unclaimed distribution within 90 days after the date of the issuance of the check for the first distribution that was returned as undeliverable or unclaimed, or the date of the Reorganized Debtor's first written request for a taxpayer identification number (whether or not also returned as undeliverable) shall be deemed to have forfeited its claim to or interest in such undeliverable or unclaimed distribution(s) (and all interest thereon) and all subsequent and final distributions that may be made with respect to its Claim or Interest, and shall be forever barred and enjoined from asserting any claim to or interest in an undeliverable or unclaimed distribution(s) (and all interest thereon) or any subsequent or final distributions against the Debtor's Estate, and such Holder of an undeliverable or unclaimed distribution shall thereafter be deemed to have waived any and all of its Claims or Interest and any right to a distribution thereon. In such cases, any Cash in the Unclaimed Distribution Reserve for distribution on account of such claims for undeliverable or unclaimed distributions shall become the property of the Reorganized Debtor free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be distributed in accordance with <u>Article VII</u> of the Plan. Nothing contained in the Plan, shall require the Reorganized Debtor to attempt to locate any Holder of a Claim or Interest.

**7.7    <u>Record Date for Distributions</u>.** The Reorganized Debtor will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim or Interest that occurs after the close of business on the Confirmation Date and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims who are Holders of such Claims, or participants therein, as of the close of business on the Confirmation Date. The Reorganized Debtor shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official claims register as of the close of business on the Confirmation Date.

**7.8    <u>Allocation of Plan Distributions Between Principal and Interest</u>.** To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the claim, to the portion of such Claim representing accrued but unpaid interest.

**7.9    <u>Means of Cash Payment</u>.** Except as otherwise provided in the Plan, payments of Cash made pursuant to the Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the Reorganized Debtor, by (a) checks drawn on or (b) wire transfer from a domestic bank selected by the Reorganized Debtor.

**7.10    <u>Withholding and Reporting Requirements</u>.** In connection with the Plan and all distributions thereunder, the Reorganized Debtor shall comply with all withholding and reporting

- 17 -

requirements imposed by any federal, state or local taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

**7.11    Time Bar to Cash Payment**.  All uncashed distributions shall be handled in accordance with this Section 7.11 unless provided otherwise by applicable law.  Checks issued by the Reorganized Debtor in respect of Allowed Claims or Interests shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof and thereafter shall be treated under the Plan as an unclaimed distribution subject to Section 7.6 of the Plan.  The Holder of the Allowed Claim or Interest to whom such check originally was issued shall make requests for re-issuance of any check to the Reorganized Debtor.  Any claim in respect of such a voided check shall be made on or before the earlier of (i) forty five (45) days after the expiration of the ninety (90) day period following the date of issuance of such check, and (ii) thirty (30) days prior to the Final Distribution Date.  After such date, all funds held on account of such voided check shall, in the discretion of the Reorganized Debtor, be used to satisfy the costs of administering and fully consummating the Plan or become Available Cash for distribution in accordance with the Plan, and the Holder of any such Claim or Interest shall not be entitled to any other or further distribution under the Plan on account of such Claim or Interest and shall be deemed to have waived its Claim or Interest and any right to a distribution thereon.

**7.12    Setoffs**.  The Reorganized Debtor may, pursuant to Section 558 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtor or its Estate may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Estate of any such Claim that the Estate may have against such Holder.

**7.13    Fractional Dollars; De Minimis Distributions**.  Notwithstanding any other provision of the Plan (a) the Reorganized Debtor shall not be required to make distributions or payments of fractions of dollars, and whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made may be rounded to the nearest whole dollar (up or down), with half dollars being rounded down, and (b) the Reorganized Debtor shall have no obligation to make a distribution on account of an Allowed Claim or Interest from any Reserve or account to a specific Holder of an Allowed Claim or Interest if the amount to be distributed to that Holder on the particular Distribution Date or Subsequent Distribution Date would be $10.00 or less in the aggregate, unless a request therefore is made in writing to the Reorganized Debtor.  Any unclaimed distributions pursuant to this Section 7.13 will become Available Cash for distribution on the Final Distribution Date to be distributed in accordance with Article VII of this Plan

## ARTICLE VIII.        EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**8.1    Assumption Or Assumption And Assignment.**

**(a)            Assumption And Assignment Generally**.  Effective upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the executory contracts and unexpired leases that are listed in Schedule A to the Plan provided that such assumption does not constitute

an admission by the Debtor or the Reorganized Debtor  (i) that any contract or lease so listed is an executory contract or unexpired lease within the meaning of Section 365 of the Bankruptcy Code, (ii)  that the Reorganized Debtor must assume such contract or lease in order to continue to receive or retain rights, benefits, or performance thereunder, or that any Claim arising under such contract or lease must be paid or default cured; or (iii) that  the contract or  lease exists or is valid  against the Debtor or the Reorganized Debtor.  The Debtor reserves the right to amend the list of contracts and leases to be assumed through the conclusion of the Confirmation Hearing.

**(b)**     **Cure Payments**.  Schedule A to the Plan specifies the Cure Payment, if any, that the Debtor acknowledges must be tendered in order to provide cure and compensation in accordance with Section 365(b)(1)(A) and (B) of the Bankruptcy Code.  In the event that any party to a contract or lease listed on Schedule A contends that the Cure Payment amount is incorrect, such party must file with the Bankruptcy Court and serve upon counsel for the Debtor and the Short Service List a written statement and an accompanying affidavit in support thereof specifying the amounts allegedly owing under Section 365(b)(1)(A) and (B) of the Bankruptcy Code no later than the deadline established by the Bankruptcy Court in its order scheduling the Confirmation Hearing.  Failure to timely file and serve such statement shall result in the determination that the Debtor's tender of the Cure Payment as specified in Schedule A shall provide cure and compensation for any and all defaults and unpaid obligations under such contract or lease, and that no other amounts are owing thereunder as of the Confirmation Date.  All Cure Payments that may be required by Section 365(b)(1) of the Bankruptcy Code shall be made by the Reorganized Debtor from the Estate Assets on the later of (i) thirty (30) days after the Effective Date, or as soon thereafter as is practicable, (ii) thirty (30) days after resolution by a Final Order of any dispute with respect to such Cure Payment, and (iii) such time as may otherwise be agreed by the parties to any particular contracts or leases.

**8.2**     **Rejection**.

**(a)**     **Rejection Generally**.  Effective upon the Effective Date, the Debtor hereby rejects all executory contracts and unexpired leases that exist between the Debtor and any other entity that are not expressly assumed by the Reorganized Debtor pursuant to Section 8.1 of the Plan .

**(b)**     **Damage Claims**.  All Allowed General Unsecured Claims arising from the rejection of executory contracts or unexpired leases, whether under the Plan or by separate proceeding, shall be treated as Claims in Class 4 under the Plan.  All Claims arising from the rejection of executory contracts or unexpired leases under the Plan shall constitute claims against the Reorganized Debtor and must be filed with the Bankruptcy Court within thirty (30) days after notice of the entry of the Confirmation Order.  The Reorganized Debtor shall have sixty (60) days after notice of the entry of the Confirmation Order to object to any proof of claim filed pursuant to this Section 8.2(b).  Any such Claims that are not filed within such time will be forever barred from assertion against the Debtor and its Estate, and shall not share in any distributions under this Plan.

## ARTICLE IX.          EFFECTIVENESS OF THE PLAN

**9.1**    **Conditions Precedent**.  The Plan shall not become effective unless and until the following conditions shall have been satisfied or waived in writing by the Plan Funder:

> (i)    the Confirmation Order shall have been entered on the docket of the Bankruptcy Court in the Chapter 11 Case for at least fourteen (14) days (as calculated in accordance with Bankruptcy Rule 9006(a));

> (ii)    the Confirmation Order shall have been entered and no stay of the Confirmation Order shall be in effect;

> (iii)    all actions, other documents and agreements necessary to satisfy the conditions to Closing under the Agreement shall have been executed, delivered, and, if necessary, properly recorded, and shall have become effective.

**9.2**    **Notice Of Effective Date**.  As soon as practicable after the Effective Date has occurred, the  Reorganized Debtor shall file with the Bankruptcy Court an informational notice specifying the Effective Date, as a matter of record.

## ARTICLE X. RELEASE AND DISCHARGE AND RELATED INJUNCTION

**10.1**    **Discharge**.  Except as otherwise expressly provided in the Plan or the Confirmation Order, entry of the Confirmation Order shall, subject only to occurrence of the Effective Date, constitute the complete discharge and release as against the Reorganized Debtor of any liability, debt, or obligation of, or claim or cause of action against, or Interest in, the Debtor or the Estate that arose before the Effective Date, including, without limitation, any Claims against the Debtor of a kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, any Claims against the Debtor of any other nature, including, without limitation, any interest accrued thereon from and after the Petition Date, and any equity interest in the Debtor, whether or not (i) a proof of Claim or Interest based on such liability, debt, obligation, claim, cause of action or  Interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) such Claim or Interest is an Allowed Claim or Interest, or (iii) the Holder of such Claim or Interest has accepted the Plan.

**10.2**    **Confirmation of Release of Liens and Perfection of Liens**.  Except as otherwise specifically provided in the Plan or in any agreement, instrument or document created in connection with the Plan: (i) each Holder of: (1) a Secured Claim or (2) a judgment, personal property or ad valorem tax, mechanics' or similar lien Claim, in each case regardless of whether such Claim is an Allowed Claim, shall, on or immediately after the Effective Date and regardless of whether such Claim has been scheduled or proof of such Claim has been Filed: (a) turn over and release to the Reorganized Debtor, any and all property of the Debtor or the Estate that secures or purportedly secures such Claim; and (b) execute such documents and instruments as the Reorganized Debtor reasonably requires to evidence the discharge of such Claim Holder's lien or encumbrance pursuant to the Plan and/or Confirmation Order.  In any event, the Reorganized Debtor shall be entitled to file a copy of the Confirmation Order in any appropriate recording office to evidence of record the discharge of any such liens, claims or encumbrances. In addition, (i) no distribution hereunder shall be made to or on behalf of any such Claim Holder

unless and until such Holder executes and delivers to the Debtor such release of property, liens or encumbrances, and (ii) any such Holder that fails to execute and deliver such release within 180 days after the Effective Date shall be deemed to have no Claim against the Debtor or the Estate, in respect of such Claim and shall not participate in any distribution under the Plan on account of such Claim.

**10.3** **Estate's Releases**. The Debtor, for itself and as representative of the Estate, hereby waives, releases and discharges all Released Parties from any claim (as such term "claim" is defined in Section 101(5) of the Bankruptcy Code) arising from the Petition Date through the Effective Date that constitutes property of the Estate, related to such party's acts or omissions to act as an, employee, agent, representative, attorney, accountant, financial advisor or other professional of the Debtor, in that capacity. The waiver, release and discharge effected hereby shall, as to the Released Parties, not be applicable to any claim which arose prior to the Petition Date. The release of all such claims in favor of the Released Parties shall bind all Creditors, shareholders/members, or other parties in interest in the Chapter 11 case. Any such release shall additionally act as an injunction against any claimant or Interest Holder of the Debtor from commencing or continuing any action, employment of process or act to collect, offset or recover any claim that is so released.

**10.4** **Injunction**. All Persons who have held, hold or may hold Claims against or Interests in the Debtor shall, with respect to any such Claims or Interests, be permanently enjoined from and after the Confirmation Date from taking any of the following actions (other than actions to enforce any rights or obligations under the Plan): (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Estate or the Reorganized Debtor or any of their respective property; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtor, the Estate or the Reorganized Debtor or any of their respective property; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Estate or the Reorganized Debtor or any of their respective property; (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Debtor, the Estate or the Reorganized Debtor or any of their respective property, except as contemplated or allowed by the Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (vi) prosecuting or otherwise asserting any right, claim or cause of action released pursuant to the Plan.

**10.5** **Exculpation**. The Released Parties and any professionals retained by such parties, will not have or incur any liability to any Person for any act taken or omission occurring on or after the Petition Date in connection with or related to the Debtor, including but not limited to (i) the commencement and administration of the Chapter 11 Case, (ii) the operation of the Debtor during the pendency of the Chapter 11 Case, (iii) formulating, preparing, disseminating, implementing, confirming, consummating or administrating the Plan (including soliciting acceptances or rejections thereof); (iv) the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken in connection with the Plan; or (v) any Distributions made pursuant to the Plan, except for acts

constituting willful misconduct or gross negligence, and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  The entry of the Confirmation Order shall constitute the determination by the Court that the Debtor and its present officers, managers, directors, professionals, employees, members, trustees, agents, attorneys, financial advisors, partners and accountants shall have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, pursuant to, among others, Sections 1125(e) and 1129(a)(3) of the Bankruptcy Code, with respect to the foregoing.

**10.6    Direct Claims**.  Notwithstanding anything herein to the contrary, this Plan shall in no manner act or be construed to waive, release or enjoin any direct, non-derivative claims or actions held by a non-Debtor against any third party including, without limitation, any Released Party based upon any act or occurrence, or failure to act, taking place prior to the Petition Date.

## ARTICLE XI.    PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS

**11.1    No Distributions Pending Allowance**.  Notwithstanding any other provision of the Plan, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

**11.2    Prosecution of Objections**.  The Debtor may file objections to Claims with the Bankruptcy Court and shall serve such objections upon the Holders of each of the Claims to which objections are made.  Any objection to Claims, whether filed by the Debtor or other party in interest, must be filed by the Claim Objection Deadline, or such extended date as may be set by the Bankruptcy Court upon the motion of the Debtor or other party in interest.  Subject to the limitations set forth in the Plan,  the Debtor shall be authorized to, and shall, resolve all Disputed Claims by withdrawing or such objections thereto, or by litigating to judgment in the Bankruptcy Court or such other court having jurisdiction over the validity, nature and/or amount thereof, or, subject to the approval of the Bankruptcy Court except as otherwise set forth in this Plan, settling such objections.

**11.3    Estimation**.  The Debtor may, at any time prior to the Effective Date, request that the Bankruptcy Court estimate any Disputed Claim for the purpose of allowance pursuant to Section 502(c) of the Bankruptcy Code regardless of whether an objection has previously been filed; the Allowed Amount of such Claim shall not exceed the amount estimated by the Bankruptcy Court.

**11.4    Disputed Claims Reserve**.  On the Effective Date (or as soon thereafter as is practicable) and each Subsequent Distribution Date, the Reorganized Debtor shall create and fund or withhold the Disputed Claims Reserve (either in a separate account or on the books and records) in an amount of the Estate's Cash equal to one hundred percent (100%) of distributions to which Holders of Disputed Claims would be entitled under the Plan as of such date if such Disputed Claims were Allowed Claims in their full amount (or in such other amount as may be determined by the Bankruptcy Court in an estimation proceeding pursuant to Section 502(c) of the Bankruptcy Code).  Cash withheld and reserved for payments to Holders of Disputed Claims

may be held and deposited by the Reorganized Debtor in one or more segregated interest-bearing reserve accounts or in a commingled account, as determined by the Reorganized Debtor, to be used to satisfy such Claims if and when such Disputed Claims become Allowed Claims.

**11.5    Investment of Disputed Claims Reserve**.  The Reorganized Debtor shall be permitted, from time to time, to invest all or a portion of the Cash in the Disputed Claims Reserve in United States Treasury Bills, interest-bearing certificates of deposit, money market accounts, overnight investments or investments permitted by Section 345 of the Bankruptcy Code or otherwise authorized by the Bankruptcy Court, using prudent efforts to enhance the rates of interest earned on such Cash without inordinate credit risk or interest rate risk.  All interest earned on such Cash shall be held in the Disputed Claims Reserve and, after satisfaction of any expenses incurred in connection with the maintenance of such Disputed Claims Reserve, including taxes payable on such interest income, if any, shall be transferred out of such Disputed Claims Reserve and, in the discretion of the Reorganized Debtor be used to satisfy the costs of administering and fully consummating the Plan or become Available Cash for distribution in accordance with the Plan.

**11.6    Allowance of Disputed Claims**.  If, on or after the Effective Date, any Disputed Claim becomes an Allowed Claim, the Reorganized Debtor shall, on the next Subsequent Distribution Date (or Final Distribution Date if the next distribution is to occur on that date), distribute from the Disputed Claims Reserve to the Holder of such Allowed Claim the amount of Cash that such Holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim on the Effective Date.

**11.7    Release of Funds from Disputed Claims Reserve**.  If, at any time or from time to time after the Effective Date, there shall be Cash in the Disputed Claims Reserve in an amount in excess of the maximum remaining payment obligations to the then existing Holders of Disputed Claims against the Debtor or the Estate under the Plan, such excess funds shall become available to the Reorganized Debtor, as the case may be, generally and shall, in the discretion of the Reorganized Debtor, be used to satisfy the costs of administering and fully consummating the Plan or become Available Cash for distribution in accordance with the Plan.

**ARTICLE XII.    RETENTION OF JURISDICTION**

Following the Confirmation Date, and further following the Effective Date, the Bankruptcy Court shall retain jurisdiction of all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(1)    to determine any and all adversary proceedings, applications, motions, and contested matters arising in or related to the Chapter 11 Case;

(2)    to ensure that distributions to Holders of Allowed Administrative Expenses and Allowed Claims and Allowed Interests are accomplished as provided herein;

(3)    to hear and determine any objections to Administrative Expenses, to proofs of claims, and to proofs of Interests filed both before and after the Confirmation

Date, and to allow, estimate, or disallow any Disputed Administrative Expense or Disputed Claim or Interests, in whole or in part;

(4)     to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(5)     to enforce the Plan and issue orders in aid of execution of the Plan and to issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any entity;

(6)     to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including, without limitation the Confirmation Order;

(7)     to hear and determine all applications for compensation and reimbursement of expenses of professionals under Sections 330, 331, and 503(b) of the Bankruptcy Code, and to resolve any disputes regarding payment for professional services incurred after the Effective Date for purposes of implementing the Plan or administering the Chapter 11 Case;

(8)     to hear and determine any disputes arising in connection with the interpretation, implementation, execution, or enforcement of the Plan, the Confirmation Order, any other order of the Bankruptcy Court, and the Agreement;

(9)     to recover all assets of the Debtor and property of the estate, wherever located;

(10)    to hear and determine any matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

(11)    to resolve any controversy or claim arising out of or relating to implementation of the Plan or of the Debtor's rights and obligations under the Plan Funding Agreement or any breach thereof;

(12)    to hear any other matter not inconsistent with the Bankruptcy Code; and

(13)    to enter a final decree closing the Chapter 11 Case.

### ARTICLE XIII.     MISCELLANEOUS PROVISIONS

**13.1     Bar Date for Administrative Claims**.  Proofs of claim or applications for payment of Administrative Claims arising before the Effective Date must be filed with the Court, with copies to the parties listed in the Short Service List, on or before the Claims Objection Deadline.  Any Person that fails to file such a proof of claim or application with the Court within that time shall be forever barred from asserting such an Administrative Claim against any of the Debtor, the

Estate, or the Reorganized Debtor or their property, or commencing or continuing any action, employment of process, or act to collect, offset, or recover any such Administrative Claim.

**13.2    Preservation Of Rights And Defenses**.  Except to the extent such rights, claims, causes of action, defenses, and counterclaims are expressly and specifically released in connection with the Plan or in any settlement agreement approved during the Chapter 11 Case, (i) any and all rights, claims, causes of action, defenses, and counterclaims accruing to the Debtor or its estate (including, without limitation, Avoidance Power Causes Of Action) shall vest in the Reorganized Debtor, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such rights, claims, causes of action, defenses, and counterclaims have been Scheduled or otherwise listed or referred to in this Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, and (ii) neither the Debtor nor the Reorganized Debtor waives, relinquishes, or abandons (nor shall they be estopped or otherwise precluded from asserting) any right, claim, cause of action, defense, or counterclaim that constitutes property of the Debtor's estate, (a) whether or not such right, claim, cause of action, defense or counterclaim has been listed or referred to in the Schedules, this Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, (b) whether or not such right, claim, cause of action, defense, or counterclaim is currently known to the Debtor, and (c) whether or not a defendant in any litigation relating to such right, claim, cause of action, defense, or counterclaim filed a proof of claim in the Chapter 11 Case, filed a notice of appearance or any other pleading or notice in the Chapter 11 Case, voted for or against this Plan, or received or retained any consideration under this Plan.  Without in any manner limiting the scope of the foregoing, notwithstanding any otherwise applicable principle of law or equity, including, without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, or refer to a right, claim, cause of action, defense, or counterclaim, or potential right, claim, cause of action, defense, or counterclaim in the Debtor's Schedules, this Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, shall in no manner waive, eliminate, modify, release, or alter the Reorganized Debtor's right to commence, prosecute, defend against, settle, and realize upon any rights, claims, causes of action, defenses, or counterclaims that the Debtor has or may have as of the Confirmation Date.  The Reorganized Debtor may commence, prosecute, defend against, recover on account of, and settle all rights, claims, causes of action, defenses, and counterclaims in its sole discretion in accordance with what is in the best interests, and for the benefit, of the Holders of Allowed Claims and the Reorganized Debtor.

**13.3    Saturday, Sunday Or Legal Holiday**.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.

**13.4    Headings**.  Headings are used in this Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

**13.5    Binding Effect**.  The Plan shall be binding upon and inure to the benefit of the Debtor, Reorganized Company, Holders of Claims, Holders of Interests, and their respective successors, assigns, heirs, and beneficiaries.

**13.6    Modification Of The Plan**.  The Plan Proponent may, alter, amend, or modify the Plan pursuant to Section 1127 of the Bankruptcy Code.  The provisions of this Plan shall not be severable unless such severance is agreed to by the Plan Proponent.

**13.7    Other Documents And Actions**.  The Debtor and the Reorganized Debtor may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under this Plan.

**13.8    Governing Law**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the Commonwealth of Massachusetts (without reference to its conflict of law rules) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specifically provided in such agreements, documents, or instruments.

**13.9    Notices**.  Any notice to the Debtor, or the Reorganized Debtor, or the Short Service List required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) reputable overnight delivery service, freight prepaid, to be addressed as follows (as applicable):

| | |
|---|---|
| Debtor | Joseph G. Butler<br>Barron & Stadfeld, P.C.<br>100 Cambridge Street<br>Suite 1310<br>Boston, MA 02114 |
| | QR Properties, LLC<br>32 Sandy Pine Road<br>Templeton, MA 01468 |
| United States Trustee for the District of Massachusetts | Office of the United States Trustee<br>446 Main Street<br>Worcester, MA 01608 |

**13.10    No Admissions**.  Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by the Estate with respect to any matter set forth herein, including, without limitation, liability on any Claim or the propriety of a Claim's classification.

QR PROPERTIES, LLC

By its attorneys,

DATED:          July 12, 2011          /s/ Joseph G. Butler
                                       Joseph G. Butler. (BBO# 544284)
                                       BARRON & STADFELD, PC
                                       Counsel to QR Properties, LLC

100 Cambridge Street
Suite 1310
Boston, MA  02114
(617) 723-9800
jgb@barronstad.com

UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>QR Properties, LLC<br><br>                 Debtor | Chapter 11<br>Case No.   10-45514-MSH |

**PLAN SUPPLEMENTARY DOCUMENT FOR
SECOND AMENDED PLAN OF REORGANIZATION OF QR PROPERTIES, LLC
Dated July 12, 2011**

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("Agreement") is made and entered into this 1st day of March, 2011, by and between QR Properties, LLC, a Massachusetts Limited Liability Company having a place of business at 32 Sandy Pine Road, Templeton, Massachusetts, ("Seller"), and Pulte Homes of New England, LLC, a Michigan limited liability company having a place of business at 115 Flanders Road, Suite 200 Westborough, Massachusetts, its successors and assigns ("Buyer").

WHEREAS, Seller is the owner of all of the land located in Acton, Middlesex County, Massachusetts, which is shown on a Plan of Land entitled "The Residences at Quail Ridge" and which is more fully described as on Exhibit 1 hereto; and

WHEREAS, Seller desires to sell and Buyer desires to purchase the Premises, as defined below, pursuant to the terms, provisions and conditions herein; and

WHEREAS, Seller has filed a Petition in the US Bankruptcy Court for the District of Massachusetts ("Court") [Docket Number 10-45514-MSH] pursuant to Chapter 11 and the parties intend that the Seller will, within 10 days after the Effective Date, file a plan and disclosure statement, which plan will be based upon a closing of the transactions contemplated in this agreement and which will provide for a sale of the Premises to the Buyer free and clear of all liens, claims, encumbrances and other interests in the Premises (the "Chapter 11 Plan").

NOW, THEREFORE, in consideration of Ten Dollars ($10.00), cash in hand paid, the receipt and sufficiency of which are hereby acknowledged, the Premises, the mutual covenants and conditions set forth herein and other good and valuable consideration, and intending to be legally bound hereby, the parties hereby agree as follows:

1.    REAL PROPERTY

1.1.   Premises. Seller agrees to sell and Buyer agrees to purchase the following:

(a) The land with buildings and improvements thereon which is shown on the plan entitled "The Residences at Quail Ridge, Senior Residence Special Permit" with a last revision date of November 14, 2008 (the "Premises") and includes, without limitation:
- Lot 1 containing 52.9018 acres more or less ("Lot 1");
- Lot 2 containing 10.535 acres, more or less ("Lot 2"), ;
- Common Land Open Space Parcel A ("Parcel A") containing 92.1088 acres more or less, ; Note: Purchase of Parcel A is subject to the Palmer Kennel (Kennel),which is located on Parcel A, which shall be subdivided and excluded from the Premises,  the Kennel shall then be conveyed to Craig Palmer or his Nominee upon the Closing for $100.00. The Kennel Land as described is in a plan which has been made an Exhibit to this Agreement;
- The fee in all roadways which provide access to the Premises;
- Any and all easements which benefit the property or which are required in order to construct the development as contemplated by and  in compliance with the Governmental Approvals (as defined below);
 All furniture, equipment, vehicles, golf carts or fixtures used in the operation or maintenance of the golf course, tennis court, pool or clubhouse., except for the leased equipment or personal property as listed on Exhibit 1.1

(b)    Any and all rights and easements appurtenant thereto; all improvements on and to the Premises; all mineral, oil, and gas rights and profits, water rights and sub-terrain rights; all sewer and utility rights allocated to the Premises and the improvements; all rights, title, and interest of Seller in and to any roads, streets and ways, public or private, serving or providing access to the Premises;

(c)    Any and all permits or approvals, rights and entitlements to the development of the Premises granted by any governmental or quasi governmental bodies or entities having jurisdiction or authority over the Premises including, without limitation, all "Governmental Approvals" as defined below;

(d) Lot 1, Lot 2, Parcel A and all of the other rights and interests listed in Subparagraph 1.1 shall be referred to as the "Premises"

1.2    Definitions.  For the purposes of this Agreement the following terms shall be defined as follows:

(a) "Project" shall mean the development known as "The Residences at Quail Ridge" to be constructed on the Premises, which includes a age-restricted residential condominium to be constructed on Lot 1, with the remaining 9 hole's of the existing 18 hole golf course, which is located on Parcel A (the "Golf Course") and the clubhouse, pool,  tennis court ("Clubhouse Facilities") on Lot 2, and all other infrastructure and facilities required for the same.

(b) "Special Permit" shall mean the Special Permit Decision 08-02 for "The Residences at Quail Ridge- Senior Residence Special Permit", dated February 12, 2008, as amended by the "Supplemental Decision" dated October 14, 2008.

(c) "Final Approval" shall mean that all Governmental Approvals including, without limitation, all modifications to the Special Permit required or named hereunder, including any modification to the current zoning, have been issued by the appropriate authority with conditions acceptable to Buyer, and no appeal has been taken within the appeal period or if an appeal is taken, it has been resolved on terms and conditions acceptable to the Buyer.

(d) "Governmental Approvals" shall mean all permits and approvals required for the development of the Project on the Premises, including, without limitation, the Special Permit.

(e) "Senior Housing Condominium" shall mean the age-restricted condominium component of the Project to be constructed on Lot 1 in accordance with the Governmental Approvals.

(f) "Unit" shall mean a condominium unit in the Senior Housing Condominium for which Seller has obtained Final Approval of all Governmental Approvals, so that Buyer can obtain an unconditional building permit. It is understood that building permits may be subject to the requirements that the Buyer post an  infrastructure bond, and/or complete any off-site improvement, which the Seller represents has been completed by the Town as a result of the Town taking a bond/letter of credit, which the Buyer shall replace. The Buyer shall be responsible for the completion of the items set forth Section 3.3.1 of the Special Permit and posting or replacement of any of any bonds or Letters of Credits.

(g) "Market Rate Unit" or "MRU" shall mean a Unit that has no governmental/municipal restriction on the retail pricing.

(h) Affordable Unit" or "AFU" shall mean a Unit which shall be subject to an affordable housing restriction in accordance with the Governmental Approvals.

(i) "Unit Closing Price" shall mean the price paid by a third party for the MRU which includes the lot premium and all options/allowances purchased.

(j) "Base Sales Price" is defined as the Unit Closing Price less all options and allowances and inclusive of lot premiums which culminate in a purchase of a MRU by a third party.

(k) "Living Area" shall be defined as to include calculating the finished first and second floor area of two story vaults, but excluding seasonal rooms, interior garage space, driveways, basements, patios, decks, attics, crawl spaces, unfinished storage spaces, exterior steps, and interior structural space of partition walls, bearing walls or exterior walls.

(l) "Threshold Square Footage Price" shall mean $233 per square foot  of Living Area as adjusted in accordance with Section 2.2 hereof

(m) "Additional Purchase Price" shall mean the additional amounts paid to Seller at a MRU closing as more particularly defined in Section 2.2

(n) "Maximum Square Footage Price" shall mean $268 per square foot of Living Area.

## 2.    PURCHASE PRICE AND DEPOSIT.

2.1    Base Purchase Price. The Base Purchase Price for the Property shall be SEVEN MILLION THREE HUNDRED FIFTY THOUSAND DOLLARS ($7,350,000.00) (the "Base Purchase Price")

2.1. (a) The Buyer may not re-sell the Project, as a permitted but un-developed site, without the express written consent of the Seller.

2.2    Additional Purchase Price. In addition to the Base Purchase Price set forth above, the Buyer shall pay to Seller, subject to adjustments as hereinafter provided and subject to the Buyer's right of offset as hereinafter provided, an Additional Purchase Price calculated as follows:

A.  Base Purchase Price Adjustment.

(a) If the Base Sales Price of a MRU is greater than the Threshold Square Footage Price of the Living Area but less than the Maximum Square Footage Price of the Living Area, the Seller shall be paid sixty five percent (65 %) of the amount over the Threshold Square Footage Price per square foot of the Base Sales Price up to the Maximum Square Footage Price.

(b) If the Base Sales Price of a MRU is above the Maximum Square Footage Price of the Living Area, the Seller shall first be paid sixty five percent (65 %) of the amount between Threshold Square Footage Price and the Maximum Square Footage Price as set forth in Subparagraph (a) above, and then Fifty percent (50%) of the Base Sales Price over the Maximum Square Footage Price of the Living Area.

(c)    For MRU's with a Base Sales Price below the Threshold Square Footage Price of Living Area, the Seller shall not be entitled to any payment of Additional Purchase Price.

(d)    The Threshold Square Footage Price of $233 shall increase 2% every 12 months from the date of the Closing.  For example, the first increase shall be the addition of $4.66 per sqft, which would bring the Threshold Square Footage Price to $237.66. The Maximum Square Footage Price of $268 shall not increase but stay constant.  For the purposes of the calculation, the Base Sales Price for a MRU shall be the Base Sales Price in effect as of the date of the Closing of a MRU.

(e)    The following is an example of how the Additional Purchase Price would be calculated: Example: for a 2000 Square Foot of Living Area

| MRU Closing Sales Price | $620,000 |
|---|---|
| Options/allowances | -$ 20,000 |
| Base Sales Price | $600,000 |

Page 3

(k) "Living Area" shall be defined as to include calculating the finished first and second floor area of two story vaults, but excluding seasonal rooms, interior garage space, driveways, basements, patios, decks, attics, crawl spaces, unfinished storage spaces, exterior steps, and interior structural space of partition walls, bearing walls or exterior walls.

(l) "Threshold Square Footage Price" shall mean $233 per square foot of Living Area as adjusted in accordance with Section 2.2 hereof

(m) "Additional Purchase Price" shall mean the additional amounts paid to Seller at a MRU closing as more particularly defined in Section 2.2

(n) "Maximum Square Footage Price" shall mean $268 per square foot of Living Area.


2.    PURCHASE PRICE AND DEPOSIT.

2.1    Base Purchase Price. The Base Purchase Price for the Property shall be SEVEN MILLION THREE HUNDRED FIFTY THOUSAND DOLLARS ($7,350,000.00) (the "Base Purchase Price")

2.2    Additional Purchase Price. In addition to the Base Purchase Price set forth above, the Buyer shall pay to Seller, subject to adjustments as hereinafter provided and subject to the Buyer's right of offset as hereinafter provided, an Additional Purchase Price calculated as follows:

A.    Base Purchase Price Adjustment.
        (a) If the Base Sales Price of a MRU is greater than the Threshold Square Footage Price of the Living Area but less than the Maximum Square Footage Price of the Living Area, the Seller shall be paid sixty five percent (65 %) of the amount over the Threshold Square Footage Price per square foot of the Base Sales Price up to the Maximum Square Footage Price.

        (b)    If the Base Sales Price of a MRU is above the Maximum Square Footage Price of the Living Area, the Seller shall first be paid sixty five percent (65 %) of the amount between Threshold Square Footage Price and the Maximum Square Footage Price as set forth in Subparagraph (a) above, and then Fifty percent (50%) of the Base Sales Price over the Maximum Square Footage Price of the Living Area.

        (c)    For MRU's with a Base Sales Price below the Threshold Square Footage Price of Living Area, the Seller shall not be entitled to any payment of Additional Purchase Price.

        (d)    The Threshold Square Footage Price of $233 shall increase 2% every 12 months from the date of the Closing. For example, the first increase shall be the addition of $4.66 per sqft, which would bring the Threshold Square Footage Price to $237.66. The Maximum Square Footage Price of $268 shall not increase but stay constant. For the purposes of the calculation, the Base Sales Price for a MRU shall be the Base Sales Price in effect as of the date of the Closing of a MRU.

        (e)    The following is an example of how the Additional Purchase Price would be calculated:

                Example: for a 2000 Square Foot of Living Area

                | MRU Closing Sales Price | $620,000 |
                | Options/allowances | -$ 20,000 |
                | Base Sales Price | $600,000 |

Base Sales Price of $600,000/2000(sq ft of Living Area) = $300/per sq ft of Living Area

Since $300 exceeds the Maximum Square Footage Price ($268) then Buyer would pay to Seller 65% of the Base Sale Price over the Threshold Square Footage Price but less than the Maximum Square Footage Price (amount between $233 and $268) and 50% of the Base Sales Price over the Maximum Square Footage Price.

$268-$233=$35 x 2000= $70,000 @ 65% = $45,500
$300-$268=$32 x 2000= $64,000 @ 50% = $32,000
$45,500 + $32,000 = $77,500 (Additional Purchase Price to Seller)

B.)    Additional Purchase Price- Options
Seller shall also be entitled to be paid fifteen percent (15%) of the amount paid to Buyer from the sale of MRU's to third party buyers for options/allowances under the following terms:  If the Base Sales Price of a MRU is at or below the Threshold Square Footage Price (initially $233 per square foot) of Living Area when the options/allowances are calculated and included into the Base Sales Price of a MRU, then the Seller shall not be entitled to the 15% on the option.  If the Base Sale Price is over the Threshold Square Footage Price, then Seller shall receive 15% of the amount attributed to options/allowances paid to the Buyer at closing.  An example of this calculation is provided below.

Example: For 2000 Square Foot MRU

| | |
|---|---|
| Purchase Sales Price | $620,000 |
| Options/allowances | - $20,000 |
| Base Sales Price | $600,000 |

2000@$233=$466,000 since above $233 sqft, Seller shall be entitled to 15% of options
15%x$20,000=$3000 (total additional purchase price for options/allowances)


No Additional Purchase Price shall be due to Seller for the sale of any AFU.

Within 10 days of the closing of an MRU to an third party the Buyer shall send to the Seller a summary of the transaction setting forth the calculation of the Additional Purchase Price along with a check representing the Additional Purchase Price payable for the unit, if any.

The Seller may not assign its rights to receive the Additional Payments set forth in this section as they are subject to the Buyer's right of Offset pursuant to Section 15, provided, however, that the Seller may assign such rights to a related entity or relative of a member as long as the Buyer consents to said assignment, and such assignment shall not be unreasonably withheld, and the assignee agrees in writing that its right to receive any payment is subject the Buyer's right of offset set forth in Section 15 and all of Seller's obligations as set forth in this Agreement and such assignment is allowed or approved by the Bankruptcy Court

It is the intention of the Buyer to achieve market absorption of an average of two to three units sold per month over any given twelve month period. The time period to calculate the initial market absorption shall commence at the closing of the first unit to a third party. The Buyer shall have the sole right to adjust

Page 4

the Unit Closing Price for the purpose of obtaining the intended market absorption of an average of two to three units sold per month over a twelve month period.

2.3    Deposit. The Buyer shall pay a Deposit in the amount of Two Hundred Thousand and 00/100 ($200,000.00) Dollars within Ten (10) days of the execution of this Agreement. The Deposit shall be placed in escrow with Commonwealth Land Title Insurance Company ("Escrow Agent") in accordance with the terms of the Escrow Agreement attached as Exhibit 3 hereto. The Deposit shall be returned to the Buyer in the event the Buyer elects not to proceed with the Agreement at the close of the Feasibility Period (defined in Section 5) or in the event that the Seller is in default or the Agreement terminates by its own terms or in the event that the Bankruptcy Court does not approve the sale of the Premises free and clear to the Buyer of any interest in the Premises of an entity other than the estate pursuant to the terms of this Agreement, as it may be amended with the consent of the Buyer.    All of the Deposit shall, pursuant this Paragraph shall be applied to the Base Purchase Price at the Closing.  All of the Deposit is fully refundable until such time as all Pre-Conditions to Closing have been satisfied.

2.4 The payment of the Base Purchase Price shall be made by an Attorney's IOLTA check drawn on a Massachusetts Bank.

3.    TITLE.

3.1    Title to the Premises and all easements required to service the Premises and the development of the Project thereon or any utilities servicing or necessary to serve the Premises or the Project shall be free and clear of all encumbrances, other than those allowed per written consent of Buyer, and shall be both marketable and insurable at regular rates by a title company acceptable to Buyer and licensed to do business in the Commonwealth of Massachusetts. Subsequent to the execution of this Agreement, Seller or Mortgagee shall not further encumber the premises in any fashion whatsoever, including executing any mortgages, offers to purchase, listing agreements, without the written approval of Buyer and if any encumbrance is recorded, the Seller shall remove such encumbrance within 7 days written notice by the Buyer or of having been made aware of the encumbrance.

3.2    Intentionally left blank.

3.3    Thirty days prior to the expiration of the Feasibility Period, Buyer shall deliver to Seller a list of Buyer's objection to title, which Seller must cure prior to Closing.
If, at the time set for the Closing, Seller cannot deliver good, clear record and marketable title as contemplated herein after exerting such efforts, Buyer (at its sole option) may  choose from the following options; (i) terminate this agreement and receive all monies paid under this agreement; (ii) accept such title as Seller is able to convey without deduction or adjustment to the Purchase Price; (iii) extend the date of Closing to allow the Seller to deliver possession in accordance with the Agreement. If the Buyer elects to extend the Closing date, then the new Closing date shall be 30 days after the Seller has resolved all title objections to the satisfaction of the Buyer. The Buyer may, during the extended period, elect to terminate the Agreement and upon such election all Deposits shall be repaid to the Buyer, and neither party shall have recourse against the other in law or in equity.

4.    GOVERNMENTAL APPROVALS

4.1    Seller's Permits.  The Seller shall provide to Buyer, at no cost to the Buyer, copies of all Governmental Approvals existing as of the date hereof, a list of which is attached hereto as Exhibit 4 (the "Seller's Permits"). Seller hereby represents and warrants that it has obtained Final Approval of all

Governmental Approvals (except the final DEP permit for the WWTP) ("DEP WWTP Permit") required for the development and construction of the Project and the Senior Housing Condominium and as outlined in the Special Permit Decision and the Supplemental Decision of October 2008 . Under the existing Seller's Permits, the plans for the Senior Housing Condominium contains 174 Units, consisting of 50 duplexes and 88 detached single family residential Units, and 36 garden style Units, 8 of which are to be designated as AFUs. All remaining 166 units are designated as MRU's. The Seller represents and warrants to Buyer that other than the items set forth in Section 3.2 .4 thru 3.2.28 of the Special Permit, the Seller's Permits are all of the Governmental Approvals relating to the Premises and the development thereof. Seller shall deliver to the Buyer at Closing, an Assignment of all Governmental Approvals for the development of the Premises (including, without limitation any additional permits or modifications obtained after the date hereof) and an Assignment of all engineering plans, survey plans, and any architectural plans relating to the Premises and the proposed development thereof. Seller shall provide to Buyer an agreement from any surveyor, engineer, architect who has provided plans to Seller for this Project that the Buyer may use said plans and without the payment of any additional sums of money and that these, surveyors, engineers and architects have been paid in full for all such work. Such documents are provided to Buyer with the representation and warranty that the Seller does not know of any statements or facts set forth in the Seller's Permits that are materially in error, false or misleading and the Seller is not aware of any of the Seller's Permits being incomplete or having been rescinded, revised, revoked or lapsed. The Seller further represents and warranty's that no oral agreements have been made to any party that conflicts or constitutes additional terms to or with the Seller's Permit.

    4.2    Modifications of Governmental Approvals. Buyer shall have the right, at its option, to seek new Governmental Approvals or seek modifications of the Governmental Approvals/Seller's Permits in order to accomplish the following;

a.    To reduce the number of Units so that there will be approximately 153 Units in the Senior Housing Condominium, which will consist of 58 duplexes and 95 detached single family residential Units. The 153 Units will include 145 MRUs and 8 AFUs. The actual total number of approved Units may vary, but the final total unit count shall be at a minimum of 145 Units. The Buyer has the right, at its sole option, to eliminate 36 Units located in the proposed (12 unit per building) garden style buildings and replace these Units with a reduced total unit count number consisting of Duplex style building or single family detached buildings.

b.    To obtain the Governmental Approvals, exclusively for the Buyers selected architecture/product. The Buyer shall have sole determination of the architectural product.

c.    To modify or to confirm that the approvals allow the golf course to operate on Parcel "A" and in the event a golf course does not operate on the Premises, the project will remain in full compliance with the permits.

d.    In the event: (a) that the Town of Acton agrees to modify the Governmental Permits to modify the age restriction so as to allow persons 45 years old or older to purchase the units, which modification shall apply to all of the units, and, such modification is deemed full compliance with all state, local and federal laws and regulations, or (b) in the event that the Town of Action modifies the permits so as to permit the sale of all Units to homebuyers without age-restriction; then the Additional Purchase Price in Section 2.2 of this Agreement shall be increased by $2,000,000. The payment of this amount shall be evenly divided by the number of remaining MRU's approved and payable, to the Seller upon the closing of each unit to a third party. In this event, as stated in this paragraph (a) and (b) above (in Section 4 of this Agreement) the Buyer shall have the right to convey the golf course to the Town of Acton, and pay the Seller the amount as defined above in Section 4.2.d.(b).. See Example below

Example  Number of units 153
Number of MRU's 145    $2,000,000 divided by 145 = $13,793.10 (per unit)

e.  To modify the landscape plans.

Buyer shall be responsible for all costs and expenses of seeking such modifications and the Seller shall fully cooperate with the Buyer in seeking said modifications or reapplications. The Buyer may, at its expense, retain the Seller's attorney (or any Attorney of the Buyer's choice) who has represented the Seller in the permitting; to assist the Buyer in seeking the modifications set forth above.

4.3    Permitting Period.  Buyer shall during the Feasibility Period, seek to obtain new Governmental Approvals or such modifications to the existing Governmental Approvals as Buyer deems necessary. The Feasibility Period shall be extended if the Buyer has not received from Seller,  the Final Approval of the DEP WWTP Permit and all engineering data, plans, CAD disk information, etc,(Engineering Data) from the Projects current engineering firm "Stamski & McNary". It shall be Seller's obligation, at its sole cost and expense, to obtain the DEP WWTP Permit and release of the Engineering Data. .

(a)    It is the intention of both the Buyer and the Seller to modify the Governmental Approvals, and more specifically the Special Permit, in a manner which will not result in an "appealable event." However, if it is determined that a public hearing must be opened (or any other course of action) to obtain either amendments to the current Governmental Approvals/Special Permit/Zoning Amendment (Approvals) or new Approvals, the Buyer shall have the right to open a public hearing or seek a new Approvals or zoning modifications. The Seller shall sign all applications required to be signed by the Seller.
If there is an appeal of any modification to any of the  Approvals within the Feasibility Period, or if, within the Feasibility Period, the Buyer is unable to obtain all such modifications or Approvals acceptable to the Buyer or the Buyer believes that it will be unlikely to obtain all modifications, then the Buyer shall have the right to;
(i)     proceed as the site is currently permitted or;
(ii)    litigate the appeal post-Closing or;
(iii)   terminate this Agreement by providing written notice to Seller and upon such termination, all Deposits returned to the Buyer and there shall be no further obligations by the Buyer or the Seller hereunder.

4.5    The Premises shall be sold, pursuant to 11 U.S.C. §363(f), "free and clear" of all liens, claims, encumbrances and other interests in the Premises and an order of the United States Bankruptcy Court confirming the Chapter 11 Plan.

5.    FEASIBILITY STUDY PERIOD.

5.1    Seller hereby acknowledges that there are the following material contingencies to Buyer's acquisition of the Premises: review of Governmental Approvals, Approvals, environmental studies, satisfactory Geotechnical soils study, satisfactory evidence of drinking water and sewage disposal capacity for each unit, and approval by the Buyer's Asset Management Committee. Accordingly, notwithstanding anything to the contrary contained in this Agreement, prior to the "Feasibility Termination Date", Buyer shall have the right, in its sole discretion, to confirm that it will proceed with this transaction or terminate this Agreement for any reason whatsoever. If the Buyer elects to proceed with this Agreement, then it shall deliver to the Seller by the Feasibility Termination Date, notice that it elects to proceed with the Agreement. If the Buyer does not give such notice as provided herein then this Agreement shall terminate and neither party shall have recourse against the other in law or in equity. The

Feasibility Termination Date shall be the date which is the later of (a) Ninety (90) days from the Effective Date of this Agreement or (b) thirty (30) days from the date of the final Bankruptcy Court approval of the sale to the Buyer pursuant to the terms of this Agreement. As used herein Final Approval shall mean the date in which the appeal period has expired with no appeal taken or if an appeal is taken it has been resolved on terms acceptable to the Buyer.

5.2     For the period commencing on the Effective Date of the Agreement and expiring on the Feasibility Termination Date (" Feasibility Period"),  Buyer shall have the right to meet with Town officials, conduct investigations, tests, soil borings, ledge probes, inspections and market studies in order to satisfy itself as to the feasibility and marketability of the development of the Premises in accordance with Buyer's plans and Buyer and its agents shall have the right to enter onto the Premises for the purpose of surveying, testing and examining same. It is the intent of the Buyer that during the Feasibility Period the Buyer shall have the right to apply and obtain approval for the modification described in Section 4 (labeled "Governmental Approvals) of this Agreement. Seller will assist Buyer and cooperate with its efforts to obtain approval of such modification. Buyer shall provide Seller with proof of adequate liability insurance prior to entering the Premises for any subsurface testing.  All investigations, tests, soil borings, ledge probes, inspections and market studies shall be performed at the sole expense of Buyer, and Seller shall incur no liability for the same. Prior to testing occurring on the Premises and Buyer and the Seller shall agree on a "Testing Plan" in which the location of the testing is agreed and determine on a course of action in which will disturb the Premises in the least invasive manner. Without the prior consent of the Seller, the Buyer shall not perform testing on any "greens or tee areas" during the golfing season.

5.3     The Buyer may undertake an investigation of the Premises for the presence thereon of Hazardous Waste (the "Initial Hazardous Waste Investigation"). Buyer shall also have the right, at Buyer's expense, to undertake additional investigations of the Premises after the Initial Hazardous Waste Investigation. Any disposal or release (or threat of release) of Hazardous Waste on the Premises subsequent to the end of the Feasibility Termination Date not identified in the Initial Hazardous Waste Investigation shall be referred to herein as a "Subsequent Hazardous Waste Event".

"Hazardous Waste" shall mean and include, without limitation, asbestos and any substance containing asbestos, the group of organic compounds known as polychlorinated biphenyls, flammable explosives, radioactive materials, chemicals known to cause cancer or reproductive toxicity, pollutants, effluents, contaminants, emissions or related materials and any items included in the definition of hazardous or toxic wastes, materials or substances under the Hazardous Material Laws including oil or other petroleum products. Hazardous Material Laws shall mean and include all federal, state and local environmental statutes, ordinances and the regulations, orders, decrees now or hereafter promulgated thereunder, regulating the transfer, use, disposal or release (including threats of release) of Hazardous Waste. For purposes of this Agreement, solid waste or ash that must be removed to facilitate the Buyer's proposed development of the site or is subject to a closure plan under applicable law shall be treated as Hazardous Waste.

5.4     Seller shall provide Buyer within 5 days  of the execution of this Agreement, all of the available material and documents relating to the Property ("Seller's Documents'), which shall include, without limitation, (i) a CAD disk ( the Seller has an obligation to make such payments to the Sellers engineering firm for the release of all engineering materials,  (showing topography elevations, utilities, drainage, water and sewer, roadway, curbs, sidewalks); (ii) Copies of all permits and approvals obtained; and (iii) copies of all applications submitted to any local or state board.  Such documents are provided to Buyer without any representation or warranty other than Seller does not know of any statements or facts set forth in the Seller's Documents that are in error, false or misleading and Seller is not aware of any of the Seller's Documents being incomplete or having been rescinded or revised.

5.5     The Buyer shall have the right post Feasibility Period, and throughout the contract period, to continue entering and performing tests on the site upon 24 hour notification to the Seller.

6.     ADDITIONAL COVENANTS OF SELLER.

In addition to all other covenants of the Seller, Seller hereby covenants and agrees with Buyer as follows:

6.1     Seller shall not, without the prior written approval of Buyer, (a) make or permit to be made any material changes or alterations to any part of the Premises; (b) enter into any agreement affecting any part of the Premises; (c) permit any liens, mortgages, deeds of trust, or other encumbrances not currently of record to be placed against, or to affect any part of the Premises or title to the Premises, Seller shall not commit any default under or take or fail to take any action that with the giving of notice and the passage of time, or either, would constitute a default under any mortgage lien, except for the existing default under the Mortgage with Webster Bank affecting the Property as has been disclosed to Buyer (the "Webster Default").

6.2     Seller shall promptly notify Buyer of any material changes that occur with respect to any of the matters set forth in Seller's representations and warranties contained in this Agreement. Seller shall promptly notify Buyer of, and promptly deliver to Buyer a true and complete copy of any notice, communication, correspondence, application, agreement, plan or other item that it, or any agent of Seller sends or provides or receives from the Town of Acton or any other governmental authority or any notice of default issued to Seller by the holder of any mortgage lien.

6.3     Seller shall take all steps necessary to keep in full force and effect all Sellers's Permits (Approvals) and in connection therewith shall timely file all required requests for extensions. Seller shall prior to the filing of any such items provide a copy to Buyer for Buyer's review and comment, and approval, which such approval shall not be unreasonably withheld, conditioned or delayed. In the event that the Seller fails to take all steps necessary to keep all permits and approvals in full force and effect, the Buyer shall have the right, at its sole discretion, to take any steps or acts to keep all permits and approvals in full affect and the Seller shall fully cooperate with the Buyer efforts.

7.     REPRESENTATIONS AND WARRANTIES OF SELLER.

In addition to all other covenants of the Seller, Seller hereby covenants and agrees as follows:

7.1.     The Seller represents and warrant to the Buyer: (a) that all documents executed or to be executed by Seller which are to be delivered to Buyer at or before the Closing will be duly authorized, executed, and delivered by Seller, and will be legal, valid, and binding obligations of Seller; and (b) that the representations and warranties set forth on Exhibit 5 to the best of the Seller's knowledge are true as of this date and will be true as of the Closing Date to the best of Seller's knowledge. In addition, the Seller acknowledges that Buyer is relying upon each of the representations and warranties as a material inducement in Buyer's purchase of the Premises and the transactions contemplated hereunder and that none of its shareholders, directors and officers, as the case may be, have any knowledge which is contrary to the representations and warranties. The representation set forth above and on Exhibit 5 shall survive the Closing.

7.2.     Seller shall not, without the prior written approval of Buyer, (a) make or permit to be made any material changes or alterations to any part of the Premises; (b) enter into any agreement affecting any part of the Premises; (c) permit any liens, mortgages, deeds of trust, or other encumbrances

not currently of record to be placed against, or to affect any part of the Premises or title to the Premises;
(d) commit any default under or take or fail to take any action that with the giving of notice and the
passage of time, or either, would constitute a default under any existing mortgage lien, except for the
default of the mortgage held by Webster Bank which has been disclosed to Seller

7.3.   Seller shall promptly notify Buyer of any material changes that occur with respect to any
of the matters set forth in Seller's representations and warranties contained in this section and Exhibit 4.
Seller shall not take any action or refrain from taking any action that would result in any of Seller's
representations or warranties set forth herein to be materially inaccurate or false. Seller shall promptly
notify Buyer of, and promptly deliver to the other, a true and complete copy of any notice,
communication, correspondence, application, agreement, plan or other item that it, or any agent of Seller
sends or provides or receives from the Town of Acton or any other governmental authority or any notice
of default issued to Seller by the holder of an existing mortgage lien.

7.4.   Seller shall take all steps necessary to keep in full force and affect all Governmental
Approvals relating to the Premises and the proposed development therein and in connection therewith
shall timely file all required requests for extensions.

7.5   Seller hereby represents and warrants that the Lease Agreement between QR Members,
LLC and Seller has expired or been terminated and QR Members, LLC has no rights as tenant thereunder.
Seller may not re-new this lease or any other lease without the written permission of the Buyer. In
addition, Seller certifies that as of the date hereof it has not received written notice from QR Members,
LLC of its election to exercise its right to extend the term of the Lease or to exercise its option to
purchase the Premises. Seller hereby agrees to indemnify, defend and hold Seller harmless from any
claims made by QR Members, LLC relating to said Lease.

7.6   Seller shall provide notice of any bar date for filing claims in its chapter 11 case to each
and every member of the Quail Ridge Country Club (as described in Section 16 of this Agreement) and
shall further provide notice of the filing of the Plan and of the hearing on confirmation of the Plan to
every member of the Quail Ridge Country Club who files a claim in the chapter 11 case.

8.   ENVIRONMENTAL REPRESENTATIONS AND INDEMNITY.

Seller hereby represents and warrants the following:

8.1   During Seller's ownership of the Premises, and to the best of Seller's knowledge during
any previous ownership of the Premises, there has been no discharge, spillage, controlled loss, seepage or
filtration (a "Spill") of oil, petroleum or chemical liquids or solids, liquid or gaseous products or asbestos
and any substance containing asbestos, the group of organic compounds known as polychlorinated
biphenyls, flammable explosives, radioactive materials, chemicals known to cause cancer or reproductive
toxicity, pollutants, effluents, contaminants, emissions or related materials and any hazardous waste or
hazardous substance, as those terms are used in the Comprehensive Environmental Response,
Compensation and Liability Act of 1980, as amended, the Massachusetts Hazardous Material Release
Prevention and Response Act,  or in any other federal, state or local law, order or regulation governing
hazardous substances, as such laws, orders or regulations may be amended from time to time
(collectively, the "Hazardous Waste Laws") at, upon, under or within the Premises or, to the best of
Seller's knowledge, any contiguous real estate, or directly or indirectly into any waterway flowing upon,
under or near any of said lands;

Page 10

8.2     Seller has not caused or to its knowledge permitted to occur, and shall not permit to exist, any conditions on the Premises which may cause a Spill at, upon, under or within the Premises. Seller is not aware of any spill on any contiguous real estate;

8.3     Seller will not knowingly permit any person or entity to engage in any activity on the Premises that could lead to the imposition of liability under the Hazardous Waste Laws on any such person or entity, or on Seller or Buyer.

8.4     To the best of Seller's knowledge, there are no underground storage tanks on the Premises, and, to the best of Seller's knowledge, there were no underground storage tanks on the Premises prior to Seller's ownership of the Premise

8.5     In the event any such hazardous material as described above are discovered on the Premises any time prior to Closing, the Buyer may, at its option, terminate the Agreement and upon such termination the Deposit shall be paid to the Buyer or the Buyer may require the Seller to correct any such condition to the standards set Massachusetts Department of Environmental Protection or by any regulatory agency having jurisdiction over the release of such materials. If the Seller shall fail or refuse to do so, then Buyer shall have the option to either: (a) terminate this Agreement and receive the return of the Deposit; or (b) accept the premises "as is" and accept the responsibility of compliance with the requirements of any public agency or (c) clean the site and deduct the cost thereof from the Additional Payments due the Seller hereunder up to $500,000. Buyer may at Buyer's expense, obtain a report from a qualified engineer, showing that the premises comply with any state or federal law relating to hazardous substances and shall have the right to enter the Premises for such testing.

8.6     Seller hereby indemnifies and holds Buyer, its officers, directors, employees and agents, and their successors and assigns, harmless from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses of every kind and nature whatsoever,, which arise as a result of a breach of any of the representations and warranties set forth in this Section and which the Seller, or its Managers and Members were aware of and failed to disclose in writing to the Buyer prior to Closing. This indemnity shall survive Closing.

8.7     The foregoing representations are a material part of this Agreement and Buyer is specifically relying upon these representations. The representations set forth above shall survive the delivery of the deed.

9.      PRECONDITIONS TO CLOSING.

9.1     In addition to all other conditions contained elsewhere herein, the obligations of Buyer to purchase the Premises are subject to the following subparagraphs:

a.      Receipt of Final Approval of all Governmental Approvals, (Approvals) including the modifications or amendments to the existing Governmental Approvals described in Section 4.2, for the construction of approximately 153 condominium units, consisting of 58 duplex units, removal of all flat or garden style buildings and 95 detached single-family dwelling units, of which 145 will be market rate units and eight (8) will be affordable rate units (AFU's)(representing no more than 5% of the total unit count shall be AFUs).

c.      Buyer shall have the right to change or adjust the numerical amounts of differing unit types or styles. Buyer may not adjust the unit types in a manner that would cause the total unit count to be less than 145.

d.     Buyer's selected architecture/product has been placed on the Senior Housing
       Condominium and approved by any applicable governmental/municipal agency. The
       selection of such architecture/product shall be the sole domain of the Buyer.

e.      Buyer shall have the right to obtain permits to allow the use of the existing septic system,
       the Seller represents that there is additional capacity in the existing system

f.     The Buyer and Northwest Development have entered into the Land Development
       Agreement, attached as Exhibit 6 pursuant to Section 15.

g.     A final examination of title to the Premises at Closing shall evidence no title exceptions
       other than those approved in writing by Buyer.

h.     From the date of execution of this Agreement until the Closing, there shall not have
       occurred any material change in the physical condition of the Premises to which Buyer
       has not consented.

i.     Seller shall have performed and observed all covenants required under this Agreement.

j.     The representations and warranties made by Seller in Paragraphs 7 and 8 shall be true and
       correct on the date of Closing, and Seller shall not have knowingly misrepresented any
       fact or circumstance or be aware of any facts or circumstances inconsistent with any such
       representations and warranties.

k.     No governmental agency shall have initiated or have threatened to initiate any action
       against any part of the Property, except as the Seller shall have disclosed.

l.     Any moratorium or other action by an appropriate governmental entity preventing
       applications for or issuance of approvals, building permits, utility hook-ups or the like,
       shall have expired or otherwise been lifted, repealed or terminated.

m.     There has been no claim against the Premises, other than those listed on the Schedule of
       Secured Creditors.

n.     The Seller has completed the Previous Unfinished Obligations set forth in Section 3.3.1
       of the Special Permit, as outlined previously herein.

o.     At or prior to the Closing, the Seller shall obtain the approval of a Conservation
       Restriction, in a form acceptable to the Buyer and which meets the requirements of the
       Special Permit. The Restriction shall be executed by all parties that are required to
       execute it. The executed Restriction shall be provided to the Buyer in a recordable form
       and be recorded by the Buyer at the Buyer's election at the Closing or post Closing so
       that the Restriction satisfies the requirement of the Special Permit.

p.     The Seller has satisfied all requirements in Section 3 of this agreement.

q.     The obtaining of an Order from the US Bankruptcy Court for the District of
       Massachusetts confirming the Chapter 11 Plan which order shall specifically authorize
       the sale of the Premises to Buyer pursuant to 11 U.S.C. §363(f) of the Premises "free and

Page 12

clear" of all liens, claims, encumbrances and other interests in the Premises (the "Confirmation Order")

9.2     In the event that the conditions precedent to Buyer's obligations set forth above in this Section are not timely satisfied by the Seller, Buyer shall have the right, in its sole discretion, to terminate this Agreement by written notice to Seller and receive a return of the Deposit or the Buyer may extend this Agreement until the preconditions are satisfied.

9.3     Any of the conditions to the obligations of Seller and Buyer set forth herein may be waived, at Buyer's option; provided that the waiver of any conditions shall be in writing and agreed to by Buyer.

9.4     Notwithstanding the foregoing, the Buyer acknowledges that the Seller's obligations pursuant to the Agreement are subject to the approval of the Court and the condition set forth in 9.1.q (B) may not be waived.

10.     CLOSING

10.1    Provided that the Buyer has elected to proceed with this Agreement on or before the Feasibility Termination Date (as herein defined), and the Buyer has received the Final Approval on the modification of the Governmental Approvals pursuant to Section 4, and all Pre-Conditions to Closing set forth above have been met, the Closing ("Closing") shall occur on the date which is the later of : (i) 30 days after receipt of Final Approval of all Governmental Approvals required for development of the Premises with the amendment set forth in Section 4.2,  such that the Buyer can, upon proper application, obtain unconditional building permit or 15 days after the date that the Confirmation Order becomes a final order, and (ii) all of the Pre-Conditions to Closing set forth in this Agreement are met (iii) the Seller has complied with all of its obligations pursuant to the Agreement.

10.2    At the Closing, Seller shall deliver to Buyer, in a form and substance reasonably satisfactory to Buyer's counsel, the following:

(a)     A recordable Quitclaim Deed, with covenants, conveying the Premises in fee simple to Buyer, or its assigns, as provided in Paragraph 14.8.
(b)     A certificate as to resolutions of the Seller authorizing the sale of the Premises to Buyer, certified by Seller's secretary or clerk;
(c)     Any and all other documents, instruments, and agreements necessary or appropriate in the reasonable opinion of Buyer's attorney to transfer and convey the Property and all interest therein to Buyer in accordance with this Agreement or as may be required by the title insurer, provided that such documents do not expand the liability or obligations of the Seller or are contrary to the terms of this Agreement.  Such other documents, instruments and agreements shall be furnished to Seller's attorney at least five (5) days prior to Closing, provided Buyer has requested them in writing at least 2 days prior to closing.
(d)     A certified copy of the Confirmation Order as referred to in Paragraph 9.1 (q)
(e)     Assignment of Governmental Approvals for the Premises
(f)     Assignment of all Contracts, plans and specification
(f)     Agreement by all engineers and architects that the plans can be used without further payment of any sum of money
(g)     Declaration as described in Section 1.3 in the form acceptable to Buyer;

    (h)    Conservation Restriction on the Open Space approved by the planning and signed by all required parties;

    (i)    All documents that have to be approved by the Town of Acton have been approved.

    (j)    All other documents the Seller is obligated to obtain pursuant to this Agreement.

10.3    At the Closing, Buyer shall deliver to Seller the balance of the Base Purchase Price in accordance with the Confirmation Order of the United States Bankruptcy Court in readily available funds after application of the Deposit previously tendered, which funds shall be held in escrow until the recording of the deed.

10.4    Seller shall pay the cost of Seller's attorneys' fees. Buyer shall pay the cost of preparing and recording the Deed, all costs of the title company selected by the Buyer set forth herein to insure title, and the cost of owner's title insurance policy. Real estate taxes and utilities shall be prorated between the parties as of the Closing on the basis of the fiscal year for which they are assessed. Seller shall each pay all state, local and county realty transfer taxes due in connection with the transfer of the Property. Seller shall be responsible for all roll-back taxes or agricultural transfer taxes and any other form of taxes or county assessments which become due as a result of the transfer of title to Buyer.

10.5    Exclusive possession of the Premises shall be delivered to Buyer immediately upon completion of the Closing.

10.6    If at the time of Closing, the Premises, or any part thereof, shall be or have been affected by a special governmental assessment or assessments which are or may become payable in annual installments of which the first installment is then due or has been paid, then for the purpose of this Agreement, all of the unpaid installments of any such assessment, including those which are to become due and payable after the delivery of the Deed shall be deemed due and payable and to be liens upon the Property affected thereby and shall be paid and discharged by Seller on or before the Closing. Unconfirmed improvements or assessments, if any, shall be paid and allowed by Seller on account of the Purchase Price if the improvement or work has been commenced on or before the date hereof. Seller represents and warrants that there are no unconfirmed improvements or assessments for improvements contemplated for the Property.

11.    RISK OF LOSS CONDITION.

11.1    Prior to Closing, Seller shall bear all risk of loss to the Premises and all liabilities arising from the Premises except as to the additional permitting the Buyer may undertake pursuant to section 4.2.

11.2    In the event of a condemnation, Buyer shall have the option to terminate this Agreement and receive a return of the Deposit and costs, including accrued interest thereon, or to proceed to Closing with any condemnation award paid or credited to Buyer at Closing. Seller shall provide any notices that it receives with respect to any condemnation promptly to Buyer. Buyer shall have the right to participate in any and all condemnation actions and value actions brought against the Property. Seller shall not settle or compromise any condemnation or action for value without Buyer's prior written consent.

12.    REMEDIES.

12.1    In the event Seller fails to perform or breaches any of its representations, warranties or covenants to be performed by Seller under this Agreement, or Seller misrepresents any fact or circumstance, and the continuance thereof for a period of thirty (30) days following written notice from

Buyer, Buyer shall be entitled (a) to enforce specific performance of this Agreement and bring suit for damages and to recover all costs of suit and reasonable fees of attorneys and other consultants incurred in connection with such action; or (b) to bring suit for all damages suffered by reason of such or (c) to terminate the agreement and have all Deposits returned to Buyer. The parties acknowledge that the damage amounts set forth above represent reasonable efforts to ascertain the damages to Buyer in the event of a Seller default, which damages are difficult or impossible to quantify. The foregoing remedies shall be the Buyer's sole remedy in law or in equity for a breach by the Seller.

12.2    In the event that the Buyer gives notice that it will proceed with this Agreement pursuant to Section 5, and in the event that the Buyer defaults in its performance of any term, covenant, condition, or obligation under this Agreement, including the obligation of Buyer to purchase the Premises if all conditions precedent to such obligations have been satisfied, and the continuance thereof for a period of thirty (30) days following written notice from Seller, Seller shall be entitled to receive the Deposit as liquidated damages. The parties acknowledge that the Deposit represents a reasonable effort to ascertain the damages to Seller in the event of a Buyer default, which damages are difficult or impossible to quantify. Seller waives all other remedies. The foregoing remedies shall be the Seller's sole remedy in law or in equity for a breach by the Buyer.

12.3    A failure by either party to perform any act required by it under this Agreement, other than the requirement to close if all conditions have been met, shall not be deemed a default under this Agreement until such party has received written notice from the other party setting forth the alleged failure, and such failure has not been cured within thirty (30) days of receipt of such notice.

13.    BROKERAGE COMMISSION.

The parties represent and warrant to each other that to the extent either has dealt with or engaged any other broker, finder or other person in connection with the transaction contemplated herein, that such party solely is obligated for any and all commissions claimed by such person, and that such party agrees to indemnify and hold the other harmless and defend on account of any loss, damage, liability or expense, including reasonable attorneys' fees, incurred by reason of a demand for payment by such broker, finder or other person. The provisions of this paragraph shall survive delivery of the deed.

14.    GENERAL PROVISIONS.

14.1    The terms and conditions of this Agreement shall be binding upon, and inure to the benefit of the parties hereto and their respective successors and assigns

14.2    All representations, warranties, and indemnities contained in this Agreement or in any instrument, document or agreement delivered pursuant hereto shall survive the delivery of the Deed and the transfer and conveyance of the Premises to the Buyer for a period of three (3) years.

14.3    Any notice required or permitted hereunder shall be deemed to have been received either (a) when delivered by hand and the party giving such notice has received a signed receipt thereof, or (b) one (1) day following the date deposited with Federal Express or other recognized overnight courier, or (c) when sent after sending notice via e-mail, where such notice is allowed, and not having received any indication the e-mail message was not received by the intended recipient or (d) three (3) days following the date deposited in the United States mail, postage prepaid, by registered or certified mail, return receipt requested, addressed as follows (or addressed in such other manner as the party being notified shall have requested by written notice to the other party) for:

If to the Buyer:

Page 15

James McCabe
Pulte Homes of New England LLC
115 Flanders Road, Suite 200
Westborough, MA 01581
Jim.McCabe@pulte.com

With a copy to:

Mark B. Johnson, Esquire
JOHNSON & BORENSTEIN, LLC
12 Chestnut Street
Andover, MA 01810
Telephone:     (978) 475-4488
Facsimile:     (978) 475-6703
E-mail: mark@jbllclaw.com

If to the Seller:

Quail Ridge Properties, LLC
Mario F. Rolla, Manager
32 Sandy Pine Road
Templeton, Mass
 01468
mfrolla@msn.com

Ronald Peabody Family Investment, LLC
P.O. Box 434
Bolton, Mass
01740
buddypeabody@comcast.net

With a copy to:

Steven R. Graham, Esq.
Graham & Harsip, P.C.
289 Great Road, Suite 101
Acton, MA 01720
Phone: 978-264-0480
Facsimile: 978-264-4990
E-mail: SGraham@graham-harsip.com

14.4    Whenever used herein, unless expressly provided otherwise, the term "days" shall mean consecutive calendar days, except that if the expiration of any time period measured in days occurs on a Saturday, Sunday, legal holiday or other day when federal offices are closed in Washington, D.C., such expiration shall automatically be extended to the next business day.

14.5    This Agreement constitutes the entire agreement between the parties concerning the Property and supersedes all prior agreements or undertakings.

14.6    This Agreement may not be modified except by the written agreement of the parties.

14.7    In the event any one or more of the provisions contained in this Agreement are held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability will not

Page 16

affect any other provisions hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had not been contained herein.

14.8 This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns. This Agreement may not be assigned by the Seller to any person, firm, corporation or other entity, without prior written consent and approval of Buyer, which consent shall not be unreasonably withheld. This Agreement may be assigned by Buyer in its sole discretion to any other entity which controls, is controlled by, or which is under common control with Buyer or is owned by a Pulte entity (a "Related Entity"). An assignment by Buyer that is not to a Related Entity shall require the written consent of the Seller, which consent shall not be unreasonably withheld, conditioned or delayed.

14.9 Any paragraph headings or captions contained in this Agreement shall be for convenience of reference only and shall not affect the construction or interpretation of any provisions of this Agreement.

14.10 This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts and is contingent upon the confirmation of the Chapter 11 Plan by the United States Bankruptcy Court in the Seller's chapter 11 case.

14.11 The parties hereby agree to indemnify and defend the Escrow Agent from any and all suits, actions or claims if the Escrow Agent acts in good faith on the written notice and direction of the parties delivered in accordance with the terms hereof.

14.12 The parties agree that the Buyer shall have full control in determining which unit types/style to market, setting pricing of units, marketing of the site and whichever other project management items are required.

14.13 The Effective Date of this Agreement shall be the date on which it is dated or if it is not executed simultaneously, the date on which it is executed by the last of Seller or Buyer which date will be inserted at the top of the first page hereof.

15. SITE DEVELOPMENT WORK.

At the Buyer's election, the Buyer shall enter into a "Site Development Agreement" with Northwest Development, LLC (Northwest Development) in the form attached hereto as Exhibit 6 (Master Trade Agreement with Exhibits A-2 and B-1, B-2), whereby Northwest Development will perform the site work for the Project, which is set forth in the Agreement, including, without limitation; construction of all roadways for the Project, installation of all roadway and common area landscaping, import/export of material, utility installations, cuts and fills, ledge blasting crushing removal, foundation excavation, construction of Waste Water Treatment Plant, any modification of the remaining 9-hole Golf Course relating to the subject work as according to approved plan, utility connections to Units, asphalt binder and finish coat of hot top of driveways is excluded from the base MTA price but the gravel and the complete prep work for all driveways shall be included in the base MTA price, backfill, spreading of loam. The Road "A" entrance shall be designed built and installed to the Buyer's satisfaction, as per plan, to provide sufficient landscaping, through the use of berming and landscape planting; also decorative entrance walls may be used subject to Buyers review and approval of type and materials. The amount paid to Northwest for work performed under the Site Development Agreement shall not exceed Nine Million Five Hundred Thousand ($9,500,000) Dollars. As part of the Site Development Agreement a "Schedule of Values" shall be included in which the proposed work will be broken down into categories of tasks to be performed by Northwest Development, LLC. The Buyer will pay for these items according to this "Schedule of Values".

The Site Development Agreement shall provide assurance to the Buyer that the work will be completed in a timely manner as well as security to insure that all parties who could file a mechanics lien will be promptly paid. Northwest Development, LLC shall provide the Buyer with signed lien waivers (from Northwest Development and all sub-contractors) as a condition of payment pursuant to the Master trade Agreement and the Schedule of Values.

The Seller provides a guarantee and indemnification of the obligations of Northwest Development, LLC as provided herein, to secure the Sellers obligations hereunder, the Buyer shall have the following rights if Northwest Development fails to perform its obligation under the Site Development Agreement: (i) a right of offset for sums due the Seller under Section 2.2 "Additional Purchase Price" of this Agreement, including the right of offset for any amount paid by Buyer to release liens filed against the property and not removed by the Northwest Development, LLC after 3 days written notice; as well as offset for damages that the Buyer anticipates it will suffer as a result of Northwest Development's failure to perform and (ii) if Buyer reasonably believes that any such failure could delay the Buyer's sale of a Unit to a third party, then Buyer shall have the right to complete such site work and receive a credit against the amount due to Northwest Development under this Agreement in an amount equal to costs incurred by Buyer in completing such site work. If the Buyer believes that its damages will be greater than the sums remaining to be paid to the Seller pursuant to the Additional Purchase Price, it shall have the right to immediately offset payments. In the event this Agreement is terminated for any reason, then the Site Development Agreement may be automatically terminated at the Buyer's sole discretion. Notwithstanding the foregoing, the maximum amount of offset the Buyer shall be entitled to pursuant to the Site Development Agreement and this paragraph is a total of One Million ($1,000,000) Dollars.

16.   Quail Ridge Country Club, LLC.

The Seller has disclosed to the Buyer that the members of the Quail Ridge Country Club have certain rights as set forth in the Bylaws including the "Right of First Offer" (RFO). The Seller represents and warrants that the RFO has been waived in accordance with its terms and indemnifies the Buyer from any and all damages, including reasonable attorney fees and costs, as a result of any claim by a member against the Premises or the Buyer.

17,   SELLER'S OBLIGATION TO SEEK BANKRUPTCY COURT APPROVAL

The Seller agrees to file the Chapter 11 Plan in its chapter 11 case in the United States Bankruptcy Court for the District of Massachusetts and to seek an order confirming the Chapter 11 Plan. The Chapter 11 Plan will be based, in large part, upon the closing of the transactions contemplated in this Agreement. The Base Purchase Price and the Additional Purchase Price shall be used exclusively to fund, in whole or in part, the Chapter 11 Plan. The order confirming the Chapter 11 Plan shall authorize the sale of the Premises to the Buyer, pursuant to 11 U.S.C. §363(f), free and clear of all liens, claims, encumbrances or other interests in the Premises.

Buyer has expended significant resources in negotiating the terms of this Agreement, has commenced due diligence in connection with its offer and will commence its Feasibility Study.

18. LEASE OR SALE OF GOLF COURSE AND CLUBHOUSE AMENITIES
In the event that the Buyer elects not to convey the golf course to the town of Acton (subject to Section 4.2. d) or its nominee, a Non-Profit entity managed by the Seller may lease the Golf Course and Clubhouse Facilities provided that :

1.  It commences operation of the Golf Course and Clubhouse Facilities not later than the start of the first golf season subsequent to the Closing;

2. It enters into a lease on terms acceptable to the Buyer, in the Buyer's sole discretion, that shall provide, but not be limited to the following:

    a. the Seller, and Seller's successors and assigns, shall indemnify Buyer and Buyer's successors and assigns from any and all liability and damages as a result of the use of Parcel A and Lot 2 as a 9 hole golf Course and the Clubhouse Facilities;

    b. The Seller shall obtain insurance –both liability as well as liability for the sale of alcohol naming the Buyer and the Senior Housing Condominium as an additional insured in a form and with limits acceptable to the Buyer;

    c. All activities shall be in strict compliance with the terms of any Government Approvals that affect the Premises;

    d. The Seller shall be responsible its share of the maintenance and costs for all common infrastructure and facilities serving Lot 1, Parcel A and Lot 2;

    e. The operation of the Golf Course shall not interfere in any way with the development, permitting, construction or marketing of the proposed Project, as it may be modified;

    f. the Lease shall be subject to an easement for the benefit of the Buyer and the Buyer's successors and assigns who may own any portion of the Project to take all action on the Leased Premises as may be required for the development of the Proposed Project including the granting of all easements that the Buyer, in the Buyer's sole discretion may require.

    g. Required Social Membership. As long as the Golf Course and the Clubhouse Facilities (defined as Clubhouse fitness area, including pool, tennis courts, maintenance building and restaurant pad) are open year-round and the Seller is continuing to operate the Golf Course and the Clubhouse Facilities, there shall be an obligation of the first or initial owner of any MRU that has been purchased from the Buyer, to become a Social Member (defined as someone that has full access and use of the Clubhouse Facilities only). Membership is required for the first twenty four (24) month period, after the purchase of the MRU from the Buyer and shall be at a rate of $100 a month, after the initial twenty four (24) month period there shall be no further obligation by a MRU owner to be a Social Member or make additional payments. The owners of Affordable Units shall not be required to become Social Members, but may elect to be a member (Social or Golf Course) at the same rate offered to the owners of MRUs. This obligation shall be incorporated into the Homeowner Association Rules and Regulations documents. However, in the event that the Seller ceases to operate the Golf Course and Clubhouse Facilities, for a period of 16 months in any 24 month period, or the Clubhouse Facilities are not open year-round, or the Golf Course is conveyed to the Town of Acton, then this requirement is null and void.

    h. The Buyer and the owner of the Senior Housing Condominium shall have the right to, and all required easements necessary for the construction, operation, use and maintenance and replacement of the WWTP by the Project.

3. The foregoing notwithstanding, the Lease amount to the Seller shall be one Dollar per year, however the Seller shall be obligated to pay all costs, relating to the Golf Course and the Clubhouse Facility, including but not limited to, management costs, maintenance, operation, capital improvements, Real Estate taxes, utility bills, insurance, etc.

In the event that the parties for any reason do not agree on the terms of the lease, the Buyer shall have no obligation to enter into a lease and neither party shall have recourse against the other in law or in equity. However, the Buyer shall make reasonable efforts to enter into a lease agreement, which lease agreement shall not be unreasonable with held .

In the event that the Seller has leased and continuously operated the Golf Course and Clubhouse Facilities as provided above and is not in breach of any term of the lease and this Agreement, and the Buyer has not conveyed the Golf Course to the Town of Acton or its nominee, the Seller shall, in the event that the Town of Acton does not accept the conveyance of the Golf Course, and /or Clubhouse Amenities pursuant to Section 4.2 have the right to have the golf course (remaining 9 holes) and the Clubhouse Facilities located on Lot 2  conveyed to them or their nominee, 180 days after the last to occur: (a) the completion of the Project and; (b) all of the Buyers bonds have been released by the Town of Acton and; (c) all units have been sold to third parties. The sale price of the re-conveyance, to the Seller shall be $100.00 and the terms of the sale shall be in strict conformity with the all permits, Governmental Approvals and the Special Permit. The deed shall contain the restrictions set forth in the Lease as well as other restrictions that the Buyer believes is required to be in compliance with all Governmental Approvals. The deed shall provide that the in the event that the Golf Course ceases to operate for a period of 16 months in any 24 month period, the land shall revert to the Condominium Association and the owner of the golf Course shall take all action to effectuate such conveyance. The owner of the Golf Course and Clubhouse Facilities shall not encumber the Golf Course or the Clubhouse Facilities or any portion of Lots 2 or Parcel A without the prior written consent of the Buyer, which consent may not be unreasonably withheld. This restriction shall be in the deed to the Seller.

Notwithstanding the foregoing, if at any time the Buyer conveys the Golf Course to the Town of Acton, as outlined in Section 4.2.d, of this Agreement or its nominee, any lease shall terminate on the date set forth in the notice from the Buyer to the Seller. And neither party shall have any recourse against the other in law or in equity for such termination.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the dates written below.

SELLER:

QR Properties, LLC

Date: 3|1|11

By: _____
Mario F. Rolla, Manager

BUYER:

PULTE HOMES OF NEW ENGLAND, LLC

Date: 3/1/11

By: _____
James R. McGabe, duly authorized

Page 20

EXHIBIT 1

Plan of Land

<u>EXHIBIT 2</u>

Intentionally left Blank

## EXHIBIT 3
Form of Escrow Agreement

ESCROW AGREEMENT
DATE:  _____, 2011

TO:              COMMONWEALTH LAND INSURANCE COMPANY (Escrow Agent)
PREMISES:        "The Residences at Quail Ridge" Acton,, MA
SELLER:          QR Properties, LLC
BUYER:           Pulte Homes of New England, LLC

Reference is made to a Purchase and Sales Agreement by and between the Buyer and Seller. Any capitalized terms not otherwise defined herein shall have the meaning as set forth in such Agreement.

You are hereby requested to act as Escrow Agent in the above captioned real estate transaction. The following instructions are submitted to you for the purpose of governing the holding of the Deposit and Additional Deposit referred to as "Deposit".

1.       The Parties have entered into an Agreement of Sale relative to the above Premises. The Agreement provides for the escrowing of the Deposit and Additional Deposit in accordance with the Agreement. (Individually, or collectively, the "Deposit")

2.       The "Deposit" is to be held by the Escrow Agent and shall not be subject to pledge, assignment or offset.

3.       Upon the release of the "Deposit" in accordance with the Purchase and Sales Agreement, this Agreement, and all rights and obligations of the Escrow Agent shall be deemed to have been satisfied and the Buyer and Seller shall have no recourse against the Escrow Agent.

4.       You are instructed to release the "Deposit" either (1) as directed pursuant to written instructions signed by Buyer and Seller; or (2) to either party in the event you receive a sworn affidavit from a party that it is entitled to all or part of the "Deposit" (referred to as "Demand") pursuant to the terms of the Agreement of Sale and you have given written notice, sent certified mail/return receipt requested to the other party (and to such parties' lawyer) of such "Demand" and you have not received within ten business days of the other party's receipt of the "Demand" a written objection thereto.

5.       The duties of the Escrow Agent shall be determined solely by the express provisions of this Agreement and are purely ministerial in nature.  If there is any dispute between the parties hereto as to whether or not the Escrow Agent is obligated to disburse or release the "Deposit" held pursuant to this Agreement, the Escrow Agent shall not be obligated to make such disbursement or delivery, but in such event shall hold the "Deposit" until receipt by the Escrow Agent of authorization, in writing, signed by all persons having an interest in said dispute, directing the disposition of the "Deposit", or in the absence of such authorization, the Escrow Agent shall hold the "Deposit" until a final determination of the rights of the parties by agreement of the parties or by a court of competent jurisdiction beyond all appeal period.  If such written authorization is not given, or proceedings for such determination are not begun and diligently continued, the Escrow Agent may, but is not required to, retain counsel and bring an appropriate action or proceeding for leave to deposit the "Deposit" pending such determination.  The Escrow Agent shall be reimbursed for all costs and expenses incurred by it in connection with such action or proceeding, including reasonable attorney's fees and disbursements, by the parties hereto.  Upon delivery of the "Deposit" as provided herein, the Escrow Agent shall have no further liability hereunder.  If threatened with litigation, the Escrow Agent is hereby authorized by the undersigned to interplead all interested parties in any court of competent jurisdiction and to deposit the "Deposit" with the clerk of the court and thereupon the Escrow Agent shall be fully relieved and discharged of any further responsibility under this Agreement.

6.      The Escrow Agent shall not be liable for any mistake of fact or error of judgment or any acts or omissions of any kind unless caused by its willful misconduct or gross negligence. Parties hereto each release the Escrow Agent from liability for any act done or omitted to be done by the Escrow Agent in good faith in the performance of its obligations and duties hereunder. The Escrow Agent shall be entitled to rely on any instrument or signature believed by Escrow Agent to be genuine and may assume that any person purporting to give in writing, notice, or instruction in connection with this Agreement is duly authorized to do so by the party on whose behalf such writing, notice, or instruction is given.

7.      The undersigned hereby jointly and severally indemnify the Escrow Agent for and hold it harmless against any loss, liability, or expenses incurred without negligence or bad faith or willful misconduct on the part of the Escrow Agent arising out of or in connection with the acceptance of or the performance of its duties under this Agreement, as well as the costs and expenses, including reasonable attorney's fees and disbursements, of defending against any claim or liability arising under this Agreement.

8.      This Agreement may not be changed or modified except as agreed in writing signed by each of the parties hereto. This Agreement shall be binding and inure to the benefit of the parties and their respective heirs, successors and assigns.

9.      This Agreement shall be construed in accordance with the laws of the State of CT.

10.      This Escrow Agreement supplements and does not supersede the previous agreements between Buyer and Seller. As between Buyer and Seller the terms of such agreements shall prevail.

11.      Delivery or return of any "Deposit" notice or other communication concerning the Escrow may be made to any party by hand delivery (including overnight delivery services) or by registered or certified mail to the addresses set forth below:

TO BUYER:      Pulte Homes of New England LLC
Attention: James McCabe
115 Flanders Road, Suite 200
Westborough, Massachusetts 01581
Tel: (508) 870-9999
Fax: (508) 870-0408

With Copy to:
Johnson & Borenstein, LLC
Attention: Mark B. Johnson, Esq.
12 Chestnut Street, Andover, MA 01810
Tel: (978) 475-4488
Fax : (978) 475-6703);
mark@jbllclaw.com

TO SELLER:      Quail Ridge Properties, LLC
Mario F. Rolla, Manager
7 Thomas Road
Hubbardson, Mass
01452-1336
mfrolla@msn.com

Ronald Peabody
178 Great Road
Acton, Mass
01720
buddypeabody@comcast.net

With a copy to:
Steven R. Graham, Esq.
Graham & Harsip, P.C.
289 Great Road, Suite 101
Acton, MA 01720
Phone: 978-264-0480
Facsimile: 978-264-4990
E-mail: SGraham@graham-harsip.com

Either party may designate a different person or entity or place at which notices shall be given by sending a written notice to that effect to the other party in the matter provided herein.

12.     We, the undersigned, do hereby jointly and severally agree that the Escrow Agent shall incur no liability whatsoever in connection with its good faith performance under this Escrow Agreement, and do hereby jointly and severally release and waive any claims we may have against the Escrow Agent which may result from its performance in good faith of its function under this agreement, including but not limited to, a delay in the electronic wire transfer of funds. The Escrow Agent shall be liable only for loss or damage caused directly by its acts of negligence or bad faith or willful misconduct while performing as Escrow Agent under this Escrow Agreement.

13.     The Escrow Agent shall be entitled to rely upon the authenticity of any signature and the genuineness and validity of any writing received by Escrow Agent relating to this Escrow Agreement. Escrow Agent may rely upon any oral identification of a party notifying Escrow Agent orally as to matters relating to this Agreement if such oral notification is permitted thereunder.

14.     In the event of any disagreement between the parties hereto resulting in conflicting instructions to, or adverse claims or demands upon the Escrow Agent with respect to the release of the Deposit, the Escrow Agent may refuse to comply with any such instruction, claim or demand so long as such disagreement shall continue and in so refusing the Escrow Agent shall not release the Deposit. The Escrow Agent shall not be, or become liable in any way for its failure or refusal to comply with any such conflicting instructions or adverse claims or demands and it shall be entitled to continue to refrain from acting until such conflicting instructions or adverse claims or demands (a) shall have been adjusted by agreement and it shall have been notified in writing thereof by the parties hereto; or (b) shall have finally been determined in a court of competent jurisdiction, beyond all applicable appeal periods. In the alternative, Escrow Agent may, but shall not be obligated to, file a suit in interpleader for a declaratory judgment for the purpose of having the respective rights of the claimants adjudicated and may deliver to the court the Deposit.

15.     The Escrow Agent may at its sole discretion resign by giving (30) days' written notice thereof to the parties hereto. The parties shall furnish to the Escrow Agent written instructions for the release of the Deposit. If the Escrow Agent shall not have received such written instructions within the thirty (30) days, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor Escrow Agent and upon such appointment deliver the Deposit to such successor. Costs and fees incurred by the Escrow Agent may, at the option of the Escrow Agent, be deducted from any funds held pursuant hereto.


        In witness whereof, the parties hereto have affixed their hands and seals as of the date first set forth above.

COMMONWEALTH LAND TITLE INSURANCE COMPANY
ESCROW AGENT


_____
BY

Page 25

(as Buyer)

Pulte Homes of New England, LLC
By: _____
Name: _____
Title: Duly Authorized

(as Seller)
QR Properties, LLC

By: _____
Manager

EXHIBIT 4

Seller's Permits

EXHIBIT 5

## Warranties

1.      That, subject to the encumbrances which shall be discharged at or prior to closing, Seller owns the Premises and Seller has the requisite power and authority to enter into and carry out the terms of this Agreement, and no further approval of any party, public or private, is necessary to permit Seller to consummate this Agreement or to execute any other document to be executed and delivered by Seller in accordance with this Agreement. The execution of this Agreement by Seller, its delivery to Buyer, and the consummation of the transaction contemplated hereby do not and will not: **(i)** conflict with any agreement or arrangement (except for the Right of First Refusal which shall be addressed in accordance with Section 16 of the Agreement), however denominated, to which Seller is a party or by which it is bound and which relates to or affects the Premises' or (ii) conflict with, result in a breach of, or constitute a default or violation under any statute, decree, judgment, regulation, order or rule of any court or government authority which is binding on Seller or which relates to or affects the premises. The Seller represents and warrants that the total amount of the financial encumbrances do not exceed $_____.

2.      The Seller represents and warrants that it has obtained final approval or all permits and approvals required for the construction of 174 units, 50 duplexes and 88 detached single family residential units, and 36 garden style units which will include 8 affordable rate units.
Said permits and approvals include but are not limited to any orders of conditions required for the construction of the units or infrastructure to support said units, road opening permits, town water and waste water treatment permits, and all of the permits, consents and approvals listed remain in full force and effect and Seller has no knowledge of (i) any such approvals being amended, modified, rescinded, terminated or revoked, or (ii) any appeal or other challenge being taken with respect to any such permit, consent or approval which has not been resolved.

3.      No suit, action, arbitration, or legal, administrative, or other proceedings is pending or has been threatened against the Property or against the Seller with respect to the Property.

4.      To the best of Seller's knowledge, there currently exist no adverse subsurface conditions affecting the Property such as underground mines, caves, or unusual rock formations.

5.      There are no outstanding violations with respect to the Property, nor have any notices of any uncorrected violations of any laws, statutes, ordinances, rules or regulations been received, and any such notices hereafter issued prior to Closing shall be satisfied prior to Closing by Seller at Seller's sole cost and expense.

6.      Seller is the fee owner of the Property, and no other party has any interest, including by way of example only, a life estate, in the Property.

7.      There are no leases, tenancies, options, rights of first refusal, licenses, or operating or other agreements applicable to or affecting the Premises; no third party has any right to utilize or possess the Premises; and other than this Agreement, there are no contracts or agreements relating to the sale, exchange or transfer of the Premises or any part thereof. Seller has not granted to anyone other than the Buyer any possessory rights in or rights to acquire the Premises, and has no knowledge of any such rights having been granted to or acquired by any other person.

8.      The Property is currently, and at Closing shall be, free and clear of all tenancies or rights of possession.

9.      Seller is not a foreign person, as that term is defined in Section 1445 of the Internal Revenue Code as amended by the Foreign Investment in Real Property Tax Act of 1980 ("FIRPTA"), and Seller shall provide Buyer with an affidavit to that effect in compliance with FIRPTA at Closing.

10. There are no pending or, to the best of Seller's knowledge, contemplated special assessments, betterments, eminent domain or condemnation proceedings affecting or which may affect any portion of the Property.

11. As of the date of this Agreement and as of the Closing Date, Seller has no knowledge or notice of any work being done or about to be done, or of any assessment, violation or other notice issued or about to be issued by any federal, state, municipal or public body or authority, relating to, or with respect to or otherwise affecting the Property or abutting streets. Seller agrees to pay for all work done or ordered to be done by or required in order to comply with the requirements of any federal, state, municipal or public body or authority prior to the Closing Date, of which Seller then has notice, whether or not presently assessed or ordered to be done, on or with respect to or otherwise affecting with any existing assessment, violations or similar notice.

12. Seller has not received any notice from any city, county, or state authority or other political, governmental or quasi-governmental authority or subdivision having jurisdiction over the Premises requiring or specifying that any work be done to the Premises, and Seller has no actual knowledge that any work is required to be done to the Premises.

13. There are not any existing, pending or, to Seller's actual knowledge, anticipated litigation, condemnation or similar proceedings against or involving the Premises, including, without limitation, any water, sewer, building or other construction moratoria against the Premises or, to Seller's actual knowledge, any other claim, action, suit or other proceeding threatened or pending which would materially and/or adversely affect the Buyer's right, title and/or interest in and to, or enjoyment or use of the Premises.

14. Seller will provide Buyer with all information of any kind which Seller has in its possession or has knowledge of which would assist Buyer in evaluating the Premises during the Feasibility Review Period or thereafter.

15. Seller shall give Buyer immediate written notice if any of the warranties and representations set forth in this Agreement should become untrue or incorrect.

16. There are no actions, suits or proceedings pending against Seller relating to the Premises or affecting any of its rights with respect to the premises, at law or in equity, or before any federal, state, municipal or other governmental court, agency or instrumentality, nor are there any facts which might result in any such action, suit or proceeding.

17. Seller has no knowledge, nor any reason to have any knowledge, of any state of facts or circumstances affecting the Premises, or any portion thereof, or the use, condition, or repair of the Premises, and which have, or which will have a material adverse affect on Buyer's intended use thereof.

18. To Seller's actual knowledge, there are not any adverse claims of adjoining property owners against the Premises; there are no adverse parties in possession of the Premises or any part thereof; and there are no encroachments by Seller on the property of others or by others on the Premises.

19. Prior to the Closing, Seller shall have paid in full (or provided bonds therefor) all contractors, subcontractors, laborers, materialmen and all other parties having lien rights in connection with any work, if any, performed on the Premises or affecting the Premises (other than by or on behalf of Buyer or its affiliates) for which a lien right may exist, and Seller shall have paid in full and removed any and all debts and monetary obligations encumbering the Premises whether or not recorded or specified as an encumbrance or exception to title on the Title Report, and Seller shall furnish to Buyer at closing a Mechanic's lien affidavit that no work has been done, or if work has been done a lien release executed by all persons who have performed services for the Seller relative to the Premises.

20. Seller has no actual knowledge there are sites of historical or archaeological importance on the Premises that in any way would impede, curtail, limit or restrict the development of the Premises for Buyer's intended use as a residential subdivision.

Page 29