UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

|  |  |
|---|---|
| In re:<br><br>QR PROPERTIES, LLC<br><br>Debtor | Chapter 11<br>Case No. 10-45514-MSH |

**MEMORANDUM OF DECISION AND ORDER ON DEBTOR'S OBJECTIONS TO CLAIMS**

QR Properties, LLC, the debtor in this case, has objected to 32 proofs of claim arising from country club membership subscription agreements between the claimants and Quail Ridge Country Club, LLC ("QRCC"), a predecessor to the debtor in ownership of the Quail Ridge Country Club in Acton, Massachusetts.[1] Based on the evidence introduced and the written submissions of the parties, I will sustain the debtor's objections and in doing so render the following findings of fact and rulings of law.

QRCC, a Massachusetts limited liability company, was formed on October 12, 2000, and thereafter acquired land in Acton, Massachusetts to build a golf course and recreational facility. QRCC also marketed membership subscriptions to the public. Each claimant entered into a membership subscription agreement with QRCC. In connection with these agreements, claimants paid membership deposits to QRCC in amounts ranging

---

[1] The claims as docketed on the court's claims register are numbered 2, 3, 4, 5, 6, 7, 8, 10, 11, 12, 15, 16, 17, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, and 37. At the evidentiary hearing on the debtor's objection to the claims held on May 2, 2012, counsel for the claimants indicated that claims 30 and 32 would be withdrawn. To date no withdrawal has been filed.

from approximately $50,000 to $90,000. The agreements provide that pursuant to the bylaws of QRCC, under certain circumstances, membership deposits are refundable. The bylaws include an obligation of QRCC to refund a membership deposit if QRCC "recalls" a membership. The bylaws state that QRCC may not "permanently discontinue operation of the Club and Club's Facilities without recalling all Memberships." The bylaws define "Club" as the Quail Ridge Country Club and "Club Facilities" as "(i) an 18-hole golf course (the 'Golf Course'), (ii) a driving range, (iii) a golf practice facility, (iv) a clubhouse, (v) a Pro Shop, (vi) swimming pool, (vii) tennis courts, (viii) a fitness room and (ix) one or more overnight guest rooms."

On October 27, 2008, Ronald Peabody, as manager of QRCC, signed a purchase and sale agreement on behalf of QRCC agreeing to sell the club's approximately 160 acres of land, including its 18-hole golf course and associated structures and all state and local permits, to QR Properties, LLC, a Massachusetts limited liability company formed on October 16, 2008. Mario ("Mike") Rolla signed the agreement as manager on behalf of QR Properties. QR Properties' certificate of organization filed with the Secretary of the Commonwealth of Massachusetts lists Mr. Rolla as its resident agent and manager. The members[2] of QR Properties include Mr. Rolla, the Palmer Family Trust, Brie Consulting Corp., Craig Palmer, John Spencer, Lia Grasso, Peabody Family Investments LLC, Phillip Miller and William B. McPherson, III.

---

[2] The country club members – those who play golf and use the facilities and are the claimants in this matter – are not the same as the members of the limited liability companies which own or owned the country club. To avoid confusing the two types of members, the latter group will hereinafter be referred to as "equity owners."

The sale from QRCC to QR Properties closed on or about February 23, 2009. QR Properties acquired the Acton property through a deed by the terms of which it paid cash of $100 and took the premises subject to nine mortgages securing outstanding debt approaching $20 million. The mortgages were held by Webster Bank, the Palmer Family Realty Trust,[3] Traywick Family LLC, Peabody Family Investments LLC, The Residences at Quail Ridge LLC, William McPherson III, Phillip Miller, Jr. and Mr. Rolla. The mortgages held by Peabody Family Investments LLC, The Residences at Quail Ridge LLC, William McPherson III, Phillip Miller, Jr. and Mr. Rolla were all recorded in September of 2008, approximately one month before QR Properties entered into the purchase and sale agreement with QRCC.

By letter dated February 25, 2009, Mark Laviano, general manager of the country club, writing on behalf of QR Properties LLC to members of the country club, including the claimants, notified the members that QR Properties had purchased the country club and was offering them the option to continue on as members.[4]

On November 3, 2010, QR Properties filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") commencing this case. On November 30, 2011, I granted a motion by QR Properties to sell the Acton real estate and associated facilities, including the golf course, to Pulte Homes of New England LLC pursuant to §§ 363(b) and (f) of the Bankruptcy Code. (11 U.S.C. § 101 *et seq.*)

---

[3] The Palmer Family Realty Trust and the Palmer Family Trust, an equity owner of QR Properties, appear to refer to the same entity. See debtor's schedules which list the Palmer Family Trust as holder of the mortgage.

[4] The February 25, 2009 letter was admitted into evidence as an exhibit to Exhibit 1.

3

The court established June 10, 2011, as the bar date or deadline by which proofs of claim against the debtor were to be filed in this case. It is undisputed that the claimants filed timely proofs of claim based on membership subscription agreements entered into with QRCC. On September 8, 2011, the debtor filed its objections to these claims. Seven claimants timely filed responses to the debtor's objections, and a hearing where the parties presented evidence to support their positions was held on May 2, 2012.

QR Properties objects to each claim arising from a subscription agreement on the grounds that it was not a party to any of those agreements. The claimants on the other hand argue that the February 2009 sale of the country club by QRCC to the debtor divested QRCC of substantially all its assets which triggered QRCC's obligation under its bylaws to refund the membership deposits because it no longer operated the country club, and that QR Properties should be liable to the claimants to refund their deposits based on principles of successor liability.[5]

Before addressing the merits of the parties' arguments it is necessary to lay some procedural groundwork. A proof of claim filed pursuant to the Federal Rules of Bankruptcy Procedure represents prima facie evidence of the validity of the claim. Fed. R. Bank. P. 3001(f); *see also In re Long,* 353 B.R. 1, 13 (Bankr. D. Mass. 2006). The

---

[5] Claimants also allude to the argument that the debtor should be equitably estopped from objecting to their claims. As the claimants themselves suggest, the factors for determining whether equitable estoppel applies include whether there is: "(1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission." *Bongaards v. Millen*, 440 Mass. 10, 15, 793 N.E.2d 335, 339 (2003). The claimants have failed to put forth any evidence that either a representation by QR Properties to induce their reliance or an act or omission by them in reliance on any representation of QR Properties has occurred in this case. To the extent claimants intended to make a case for equitable estoppel they have utterly failed to do so.

party objecting to the claim must provide "substantial evidence" to refute the prima facie validity of the claim. *Id. citing United States v. Clifford (In re Clifford)*, 255 B.R. 258, 262 (D. Mass. 2000). If the objecting party successfully rebuts the prima facie validity of the claim, the burden then shifts back to the claimant to demonstrate that the claim is valid. *In re Long*, 353 B.R. at 13 *citing Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.)*, 993 F.2d 915, 925 (1st Cir. 1993). The claimant must so demonstrate by a preponderance of the evidence. *In re MacMillan*, 02-11808-JMD, 2003 WL 22454871 (Bankr. D.N.H. Oct. 20, 2003) *citing In re Colonial Bakery, Inc.*, 108 B.R. 13, 15 (Bankr. D.R.I. 1989).

The proofs of claim filed by the country club members based on subscription agreements with the debtor's predecessor in interest, whose memberships the debtor recognized, are sufficient to establish the claims' prima facie validity under R. 3001. The burden, therefore, shifted to the debtor to offer substantial evidence that the claims are invalid. *In re Long*, 353 B.R. at 13. The debtor objects to the claims at issue primarily on the grounds that it has no obligation to refund the deposits because the debtor was not a party to the membership subscription agreements, claimants did not pay the membership deposits to the debtor, and QRCC did not turn over these deposits to the debtor at any time. These facts are undisputed. The debtor has, therefore, demonstrated a lack of involvement in the transactions underlying the claims at issue and thus has successfully rebutted the prima facie validity of the claims. As a result, the claimants reacquired the burden to establish by a preponderance of the evidence that their claims are valid.

Having recounted the salient history and disposed of the procedural formalities, it is time to examine the merits of this dispute which boil down to whether or not the debtor

5

should be deemed a successor of QRCC for purposes of QRCC's obligations to the claimants.

Successor liability is a state law concept that varies from state to state. *In re Gen. Motors Corp.*, 407 B.R. 463, 500 (Bankr. S.D.N.Y. 2009) *aff'd sub nom. In re Motors Liquidation Co.*, 428 B.R. 43 (S.D.N.Y. 2010) and *aff'd sub nom. In re Motors Liquidation Co.*, 430 B.R. 65 (S.D.N.Y. 2010) (internal citations omitted). In keeping with basic precepts of corporate law, Massachusetts courts generally do not impose the liabilities of a corporation upon a purchaser of its assets. Four exceptions to this foundational principle have developed. *Milliken & Co. v. Duro Textiles, LLC*, 451 Mass. 547, 556, 887 N.E.2d 244, 254 (2008) (hereinafter "*Duro*") quoting *Guzman v. MRM/Elgin,* 409 Mass. 563, 566, 567 N.E.2d 929 (1991). Successor liability arises when "(1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor." *Id.*

Claimants argue that two of these exceptions apply here. They assert first that the debtor should be held liable for the membership deposits because QRCC transferred its assets to the debtor with the fraudulent intent to hinder, delay, or avoid its creditors and second that the debtor is a mere continuation of QRCC.

Massachusetts courts have identified a number of factors for determining whether a transfer was made with fraudulent intent. These factors include "'(1) actual or

threatened litigation against the [transferor];[6] (2) a purported transfer of all or substantially all of the [transferor's] property; (3) insolvency or other unmanageable indebtedness on the part of the [transferor]; (4) a special relationship between the [transferor] and the transferee; and (5) retention by the [transferor] of the property involved in the putative transfer.' Lack of, or inadequate, consideration is also an indication of possible fraudulent intent." *Palmer v. Murphy*, 42 Mass. App. Ct. 334, 345-46, 677 N.E.2d 247, 255-56 (1997) *citing Federal Deposit Ins. Corp. v. Anchor Properties*, 13 F.3d 27, 31-32 (1st Cir. 1994) (internal citations omitted).

The February 2009 transfer between QRCC and the debtor exhibits several of the enumerated criteria. The letter to members signed by Mark Laviano as general manager of the country club,[7] dated February 25, 2009, the day after the transfer to the debtor, states that "[QR Properties'] decision to purchase QRCC was made in order to avoid a foreclosure." This letter establishes the existence of both impending litigation and "unmanageable indebtedness."

At the evidentiary hearing held on May 2, 2012, Mr. Rolla, manager of QR Properties, testified that by September 2008, QRCC was facing foreclosure by Webster Bank, that QR Properties was formed for the purpose of purchasing the assets of QRCC and that he did not know of any assets retained by QRCC after the transfer. At the same hearing, Ronald Peabody, co-manager of QRCC, testified that apart from some equipment, QRCC had no assets after the February 2009 sale to QR Properties. This

---

[6] The court in *Palmer v. Murphy* uses the term "debtor" to describe the party making the transfer. To avoid confusion, "transferor" has been substituted for "debtor" for the purposes of this excerpt.

[7] Based on the evidence presented, Mark Laviano served as general manager of the country club both before and after the transfer.

7

testimony establishes that QRCC was in financial distress, that the debtor, QR Properties, was formed in order to acquire the assets of QRCC, and that QRCC transferred substantially all its assets to QR Properties.

The record contains considerable evidence supporting a finding of a special relationship between QRCC and the debtor. Paragraph two of the February 25, 2009, letter explains that "[the debtor] is an investment group of which some of the individuals were original investors in QRCC." Mr. Rolla testified that by the end of 2008, he had loaned between $3,000,000 and $3,500,000 to QRCC. The purchase and sale agreement between QRCC and the debtor reflects the debtor's agreement to assume a note and mortgage in favor of Mr. Rolla in the amount of $3,252,000.

In addition to the obligation to Mr. Rolla, QRCC granted mortgages to other equity owners of the debtor approximately one month prior to signing the purchase and sale agreement. The debtor assumed several of the obligations secured by these mortgages, including those to Peabody Family Investments LLC and The Residences at Quail Ridge LLC. The involvement of many of the same individuals and entities on both sides of the transaction between QRCC and QR Properties is indicative of a special relationship between the two entities.

The record establishes that both Ronald Peabody and Mr. Rolla continued to work together on matters related to the country club even after the February 2009 transfer. A December 2011 letter (Exhibit 26), reporting on the status of country club operations and the proposed sale to Pulte Homes, signed "Ron and Mike," indicates that both Mr. Peabody, manager of QRCC, and Mr. Rolla, managing agent of the debtor, were involved in the operations of the club. At the May 2012 hearing, Mr. Rolla testified that Mr.

8

Peabody assisted QR Properties in obtaining permits and remained involved in negotiations with Pulte Homes, the purchaser of the debtor's assets in this case.

Finally, as consideration for the February 2009 transfer, QR Properties assumed several mortgage obligations of QRCC, including a $7.3 million obligation to Webster Bank, and took title to the Acton property subject to nine mortgages securing almost $20 million in debt. Nevertheless, QR Properties paid no cash to QRCC so that after the February 2009 sale, creditors of QRCC could look neither to the assets of the company nor to the proceeds of the sale to seek repayment.[8] Several of the mortgage obligations assumed by QR Properties were in favor of its own equity owners. Additionally, at the May 2012 hearing Mr. Rolla testified that in preparation for the acquisition of QRCC by QR Properties, "not much" due diligence was performed and no appraisal occurred.

All of this evidence is compelling, but I do not believe it establishes that the sale by QRCC to QR Properties was with intent to defraud QRCC's creditors. Rather the evidence supports claimants' assertions that QR Properties should bear successor liability because it is a mere continuation of QRCC.

The Massachusetts Supreme Judicial Court has articulated four factors for determining whether a purchasing entity is a mere continuation of the seller: "whether (1) there is a continuation of the enterprise of the seller corporation so that there is continuity of management, personnel, physical location, assets, and general business operations; whether (2) there is a continuity of shareholders which results from the purchasing

---

[8] "A valuable consideration negotiated at arm's-length between two distinct corporate entities normally is presumed 'adequate,' particularly if the divesting corporation's creditors can continue to look to the divesting corporation and/or the sales proceeds for satisfaction of their claims." *Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.*, 124 F.3d 252, 270 (1st Cir. 1997).

9

corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; whether (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and whether (4) the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation." *Duro*, 887 N.E.2d at 255 *quoting Cargill, Inc. v. Beaver Coal & Oil Co., Inc.,* 424 Mass. 356, 360, 676 N.E.2d 815, 818 (1997).

Several federal courts have outlined general factors to consider in determining whether one entity is a mere continuation of another, including: "(1) the divesting corporation's transfer of assets; (2) payment by the buyer of less than fair market value for the assets; (3) continuation by the buyer of the divesting corporation's business; (4) a common officer of the buyer and divesting corporations who was instrumental in the transfer; and (5) inability of the divesting corporation to pay its debts after the assets transfer." *United States v. Davis*, 261 F.3d 1, 53 (1st Cir. 2001) *citing Ed Peters Jewelry Co. v. C & J Jewelry Co.,* 124 F.3d at 268 (1st Cir. 1997). After setting out these factors, the courts in both *United States v. Davis* and *Ed Peters Jewelry Co. v. C & J Jewelry Co.* went on to apply state law to each case. *See United States v. Davis*, 261 F.3d at 54 (applying Connecticut law) and *Ed Peters Jewelry Co. v. C & J Jewelry Co.,* 124 F.3d at 268-269 (applying Rhode Island law). The "mere continuation" analysis ultimately turns on whether "the purchaser represents merely a 'new hat' for the seller." *In re Bellingham Ins. Agency, Inc.*, 11-35162, 2012 WL 6013836 at *16 (9th Cir. Dec. 4, 2012) *quoting*

*Cashar v. Redford,* 28 Wash.App. 394, 624 P.2d 194, 196 (Wash.Ct.App. 1981) (applying Washington law).[9]

Imposing successor liability under the mere continuation theory requires a fact-intensive analysis of the evidence. *Ed Peters Jewelry Co. v. C & J Jewelry Co.,* 124 F.3d at 269 *citing H.J. Baker & Bro. v. Orgonics, Inc.,* 554 A.2d 196, 205 (R.I. 1989) ("The *Baker* court was careful to note that the 'mere continuation' inquiry is multifacteted, and normally requires a cumulative, case-by-case assessment of the evidence by the factfinder.")

In this case, the parties do not dispute that the physical location, assets, and general business operations remained unchanged as a result of the February 2009 sale. In reference to ongoing operations after the transfer, the February 25, 2009 letter to members states that QR Properties would "[keep] many of the current staff, including [Mark Laviano] as the General Manager; managing the facilities as in previous years…" Furthermore, both QRCC and QR Properties operated under the trade name Quail Ridge Country Club. Finally, QR Properties assumed a number of QRCC's mortgage obligations in order to prevent interruption of normal business operations. This evidence satisfies both the first and fourth *Duro* factors because it establishes that the general business operations of the country club remained unaffected and uninterrupted by the transfer.

---

[9] "Successor liability depends on state law, and the doctrines vary from state to state, but generally successor liability will not attach unless particular requirements imposed by that state have been satisfied." *In re Gen. Motors Corp.*, 407 B.R. at 500. Claimants argue that the court should utilize the factors outlined by *United States v. Davis* and *Ed Peters Jewelry Co. v. C & J Jewelry Co.*, but application of Massachusetts law demands use of the test articulated by the Massachusetts Supreme Judicial Court in *Milliken & Co. v. Duro Textiles, LLC.* Even if federal common law were to apply, however, the analysis of the facts would still support a conclusion of successor liability.

11

The second *Duro* factor requires a continuity of shareholders. While the identity of the equity owners of QRCC is not clear from the record, the evidence is replete as to the identities of the various "investors" in QRCC. Here there is continuity of investors. The Palmer Family Trust, Peabody Family Investments LLC, William B. McPherson, III, Phillip Miller, Jr. and Mike Rolla were all investors in QRCC. They were also equity owners of QR Properties. This evidence satisfies the second *Duro* factor.

The testimony of both Ronald Peabody and Mr. Rolla at the May 2, 2012 hearing that after the sale QRCC was left with no significant assets supports a finding that QRCC ceased operating as of that time. This satisfies the third *Duro* factor that the seller corporation ceased operations in close proximity to the transfer.

All the evidence presented leads me to conclude that QR Properties, the debtor in this case, was a mere continuation of its seller, QRCC, and thus QR Properties has succeeded to the liabilities of QRCC including its obligations to claimants.

But having won the battle, claimants have necessarily lost the war. Claimants argue that the sale from QRCC to QR Properties triggered the refund provision of the bylaws. Establishing that QR Properties is a mere continuation of QRCC means that QR Properties has succeeded to QRCC's obligations to the claimants under the membership subscription agreements, however, so the refund provision of the bylaws could not have been triggered by the transfer from QRCC to QR Properties. Under each subscription agreement, a member's right to a refund of his deposit is governed by the bylaws which

provide for a refund only if QRCC, now QR Properties, permanently discontinues operation of the country club and its facilities.[10]

According to the disclosure statement in support of QR Properties' plan of reorganization filed in this case on March 3, 2011,[11] QR Properties operated the country club, including the 18-hole golf course, through a lessee known as QR Members, LLC, during the 2009 and 2010 golf seasons.[12] The disclosure statement also indicates that the debtor would "open and operate the golf course in 2011." Thus as of the chapter 11 petition date and well beyond, the golf course and country club remained in operation. Claimants have not alleged nevermind offered evidence that the country club and its facilities had ceased operations on the bankruptcy petition date or thereafter. So long as Quail Ridge Country Club operates, claimants have no claims against QR Properties for a refund of their membership deposits.[13]

---

[10] The bylaws' refund provision is far from clear as to whether a sale of the property to a third party would trigger a member's right to a refund if the third party were to continue to operate the golf course and related facilities. Claimants have not raised the issue of whether the post-petition sale of the property to Pulte Homes triggered the refund provision of the bylaws and since the issue is not before me, I need not resolve it.

[11] "[A]lthough the Court must accept all well-pleaded facts as true, the Court is also permitted to take judicial notice of its own docket. *See LeBlanc v. Salem* (*In re Mailman Steam Carpet Cleaning Corp.*), 196 F.3d 1, 8 (1st Cir. 1999) ('[t]he bankruptcy court appropriately took judicial notice of its own docket'); *In re Marrama*, 345 B.R. 458, 463 n. 9 (Bankr. D. Mass. 2006) ('I may take judicial notice of the dockets and documents in the Debtor's two pending cases.')" *In re Giza,* 428 B.R. 266, 269 n. 6 (Bankr. D. Mass. 2010).

[12] Both the disclosure statement and Mr. Rolla's testimony indicate that the lessee is an entity comprised of members of the country club.

[13] While it is not dispositive to the decision here, I note that at a hearing held on December 20, 2012, in a related adversary proceeding, *QR Properties, LLC v. Pulte Homes of New England, LLC*, counsel for the debtor indicated that an 18-hole golf course still operated on the property.

13

For the foregoing reasons the objections of the debtor to claims 2, 3, 4, 5, 6, 7, 8, 10, 11, 12, 15, 16, 17, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, and 37 are SUSTAINED and all such claims are DISALLOWED.

*/s/ Melvin S. Hoffman*

_____
Melvin S. Hoffman
U.S. Bankruptcy Judge

Dated: January 7, 2013

Counsel Appearing:

Joseph G. Butler, Law Office of Joseph G. Butler, Westwood, MA,
    for the debtor

Ronald Dunbar, Jr., Dunbar Law, PC, Boston, MA,
    for the claimants